Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim (*Pro Hac Vice*)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NOE BAROCIO, SALVADOR BAROCIO, AND CINDY CONYBEAR, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>YINGLI GREEN ENERGY HOLDING COMPANY LIMITED, LIANSHENG MIAO, YIYU WANG, AND ZONGWEI "BRYAN" LI,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:15-cv-04003-ODW(MRWx)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

LIST OF DEFINED TERMS AND SPEAKERS

| **Earnings Calls** | **Date** | **Company Participants** |
|---|---|---|
| 2011 Q1 Earnings Call | 2011-05-20 | Liansheng Miao, Zong-Wei Bryan Li, Yiyu Wang, |
| 2011 Q2 Earnings Call | 2012-02-29 | Miao Lian Sheng, Zong-Wei Bryan Li, Yiyu Wang |
| 2012 Q1 Earnings Call | 2012-05-30 | Lian Sheng Miao, Zong Wei Li, Yi Yu Wang |
| 2012 Q2 Earnings Call | 2012-08-29 | Liansheng Miao, Zongwei (Bryan) Li, Yiyu Wang |
| 2012 Q3 Earnings Call | 2012-11-28 | ALian Sheng Miao, Zongwei (Bryan), Yiyu Wang |
| 2012 Q4 Earnings Call | 2013-03-04 | Liansheng Miao, Zong Wei Li, Yiyu Wang |
| 2013 Q1 Earnings Call | 2013-05-30 | Yiyu Wang |
| 2013 Q2 Earnings Call | 2013-08-30 | Liansheng Miao, Yiyu Wang, Zongwei Li |
| 2013 Q3 Earnings Call | 2013-11-12 | Liansheng Miao, Yiyu Wang |
| 2013 Q4 Earnings Call | 2014-03-18 | Liansheng Miao, , Yiyu Wang, |
| 2014 Q1 Earnings Call | 2014-06-17 | Liansheng Miao, Yiyu Wang |
| 2014 Q2 Earnings Call | 2014-08-27 | Liansheng Miao, Yiyu Wang |
| 2014 Q3 Earnings Call | 2014-11-25 | Liansheng Miao, Yiyu Wang |
| 2014 Q4 Earnings Call | 2015-03-25 | Liansheng Miao, Yiyu Wang |

LIST OF DEFINED TERMS AND SPEAKERS

| SEC Filing | Date Filed | Signed By | Certified by |
|---|---|---|---|
| 20-F for the year ended December 31, 2010 ("2010 20-F") | 2011-05-11 | Liansheng Miao | Liiangsheng Miao, Zongwei Li[1] |
| 20-F for the year ended December 31, 2011 ("2011 20-F") | 2012-04-26 | Liansheng Miao | Liiangsheng Miao, Zongwei Li |
| 20-F for the year ended December 31, 2012 ("2012 20-F") | 2013-04-23 | Liansheng Miao | Liiangsheng Miao, Zongwei Li |
| 20-F for the year ended December 31, 2013 ("2013 20-F") | 2014-04-11 | Liansheng Miao | Liiangsheng Miao, Yiyu Wang |
| 20-F for the year ended December 31, 2014 ("2014 20-F") | 2015-05-15 | Liansheng Miao | Liiangsheng Miao, Yiyu Wang |
| Registration Statement on Form F-3 | 2014-04-11 | Liansheng Miao, Yiyu Wang, Zongwei Li | N/A |
| Q2 2012 Earnings Release | 2012-08-29 | N/A | N/A |
| Q1 2014 Earnings Release | 2014-06-17 | N/A | N/A |

[1] Pursuant to the Sarbanes-Oxley Act of 2012, each of Yingli's annual reports on Form 20-F was required to be certified, and was certified, by Yingli's then-Principal Executive Officer and Principal Financial Officer, who each stated that " Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications all accompanied the financial report they certified.

# CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Court-appointed Lead Plaintiffs Noe and Salvador Barocio and Plaintiff Cindy Conybear ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Defendants Yingli Green Energy Holding Co. Ltd., Liansheng Miao, Yiyu Wang, and Zongwei "Bryan" Li ("Defendants") allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Yingli Green Energy Holding Co., Ltd, ("Yingli" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, interviews of former Yingli employees, and interviews of Yingli's customers. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action brought on behalf of purchasers of Yingli's American Depository Shares ("ADSs") between December 2, 2010, and May 15, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Yingli, together with its subsidiaries, designs, develops, manufacture, markets, sells, and installs solar energy products in the People's Republic of China ("China") and throughout the world.

3. In the first decade of the Twenty-First Century, European governments took extraordinary steps to encourage domestic production of solar power.

4. The beneficiaries of European pro-solar policy included China-based solar manufacturers like Yingli. Yingli earned more than 80% of its revenues in Europe each year between 2004 and 2010.

5. Beginning in 2011, the European market suffered traumas that dramatically curtailed Chinese solar manufacturers' sales there. First, due to the European debt crisis, European demand for solar panels fell substantially. Second, because prior solar subsidies had led to what the governments offering the subsidies viewed as overproduction, European governments sharply reduced the subsidies. And third, the European Union instituted anti-dumping proceedings against Chinese solar manufacturers, eventually reaching a negotiated settlement that called for Chinese manufacturers to sell their solar panels for a much higher minimum price, negating most or all of their price advantages.

6. Between 2010 and 2014, Yingli's sales in Europe fell by three quarters.

7. Yet at the same time as Europe was cutting off its market to Chinese manufacturers, the Chinese government announced that it would prioritize development of domestic solar power.

8. The net result was that Yingli's primary customer base shifted from Europe to China.

9. Unbeknownst to Yingli's investors, when Yingli shifted its center of gravity from Europe to China, it took on additional risk. Yingli's European customers paid their bills on time and in full. Yingli's Chinese customers did not.

10. Yingli had two types of Chinese customers: (a) large State Owned Enterprises ("SOEs"), and (b) smaller private companies.

11. Many of Yingli's private company customers were undercapitalized. To assist private companies to develop solar power, the Chinese government instituted a

program it called Golden Sun. Golden Sun provided solar power developers subsidies of 50% of anticipated project costs before the developers even began construction. The subsidies provided to developers the funds they needed to pay part of what they owed Yingli for solar panels in advance of construction.

12. The Golden Sun program was intended to jumpstart the Chinese solar industry. Accordingly, the Chinese government made it an explicit condition that projects that received grants in 2009 and 2010 must be completed by February 14, 2012. The government said that if a project was not completed by February 2012, the government would claw back the subsidy. The Chinese government awarded about RMB 34 billion[2] in total pursuant to Golden Sun. Yingli supplied about 25% of the solar panels used in Golden Sun.

13. The Golden Sun program proved to be an expensive boondoggle. A Chinese government audit later found that 29% of Golden Sun subsidies were procured through outright fraud, including wholly fictional projects supported by forged paperwork. Worse, 80% of 2009 and 2010 projects were not completed by February 2012 – including 51 of the 55 projects in which Yingli supplied solar panels. Since Yingli’s Chinese customers had not yet paid Yingli the amounts it was owed, the clawback endangered its accounts receivable.

14. The Chinese government later closed the Golden Sun program and demanded that the companies that had received subsidies repay it. A Yingli sales head was quoted as saying that the government’s action imperiled hundreds of millions of RMB of Yingli’s accounts receivable.

15. Before the Golden Sun program was shuttered, Yingli regularly told investors that the program supported its sales, that subsidies would only increase, that the Golden Sun project would not be cut, and that Golden Sun offered better payment

[2] As of December 31, 2012, the exchange rate between US dollars and Chinese Renminbi was about 6.07:1. Between 2008 and 2015, the exchange rate did not exceed 6.90 RMB: U.S. dollar, nor dip below 6.00 RMB: U.S. dollar.

terms. Yingli continued to tout the benefits of Golden Sun projects even after February 2012, when Yingli's projects officially violated the grant conditions, and pursuant to the grants' conditions, the subsidies would be clawed back. Yingli did not even disclose the Golden Sun fallout *after the government began to claw back Yingli's customers' subsidies.*

16. Nor were SOEs adequate customers. SOEs routinely violated the terms of their agreements with Yingli. Because SOEs controlled most of the large, lucrative solar projects in China, Yingli could not take any action – like suing the SOEs – that could antagonize the SOEs. Yingli thus had to accept whatever payment the SOEs deigned to provide.

17. Yingli's contracts with the SOEs provided that 30% was due as an advance payment, 30% due before construction began, 30% when the project was complete, and 10% was withheld as a quality guarantee. Plaintiffs' investigator spoke with an employee of China Datang Corporation, who personally worked on projects with Yingli in 2013 and 2014. The employee stated that while Datang's practice was to violate its contracts by paying Yingli, at most, 5-10% before the project was complete. When the project was complete, Datang would seek financing secured by the project. Only when Datang secured financing would it make substantial payments to Yingli. The employee cited as an example a RMB 300 million project that Yingli completed in December 2013 but on which Datang had not even paid 50% by mid-2014, in violation of its contractual obligations to pay.

18. But rather than disclosing that Yingli's SOE customers routinely violated their contractual obligations, Defendants reassured investors by claiming that its payment terms with customers in China were good and continually improving.

19. Investors were damaged by a series of corrective disclosures which caused Yingli's stock price to fall. In March 2013, a series of articles published rumors that the Golden Sun program would be terminated due to massive fraud and

abuse. On March 18, 2013, Yingli's stock price fell from $2.47/ADS to $2/30/ADS, and from March 20-March 25, it fell from $2.52/ADS to $1.96/ADS, damaging investors.

20. Because of the fallout from the Golden Sun program, Yingli was forced to increase its allowance for doubtful account – a reserve against accounts receivable for bad loans. This meant that Yingli was finally recognizing that it would not collect amounts due from customers related to the Golden Sun program. The disclosure, on March 25, 2015, caused Yingli's stock price to fall from $2.34/ADS to $1.99/ADS, damaging investors.

21. Then, on May 18, 2015, Yingli wrote off about $33.2 million of its accounts receivable. In the next two trading days, Yingli's stock price fell from $1.70/ADS to $0.94/ADS, damaging investors.

## II. JURISDICTION AND VENUE.

22. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

25. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate

commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

26. Founded in 1998, Yingli Green Energy, Holdings Co. Ltd. is a major Chinese vertically integrated solar company. It chiefly earns its revenues from supplying solar panels and/or acting as a contractor for major solar panel projects, especially at the utility scale. Yingli's ADSs were actively traded on the New York Stock Exchange (the "NYSE") for the entire Class Period. Yingli is a Cayman Islands corporation with its principal executive offices located at No. 3399 Chaoyang North Street, Baoding 071051, People's Republic of China.

27. Defendant Liansheng Miao founded Yingli's precursor in 1998, and since then has served as its Chairman and CEO. As of December 31, 2014, Chairman Miao owned 28.75% of Yingli's stock. Miao received his bachelor's degree in business management from Beijing Economics Institute and his master's degree in business administration from Peking University in China.

28. Defendant Yiyu Wang joined Yingli in 2006, and served as its Chief Strategy Officer until 2013. Beginning May 2013, Wang served as Yingli's CFO and one of its directors. Wang has ten years' experience working as an auditor at Pricewaterhouse Coopers, and holds a bachelor's degree in international finance from Shanghai University.

29. Defendant Zongwei "Bryan" Li joined Yingli as its CFO and one of its directors in 2006, and served in these positions until May 2013, when he became Yingli's Chief Strategy Officer, a position he held until December 2014.

30. Court-appointed Lead Plaintiffs Noe and Salvador Barocio purchased Yingli ADSs at artificially inflated prices and were damaged thereby. Lead Plaintiffs' PSLRA certifications were previously filed with the Court and are incorporated by reference.

31. Plaintiff Cindy Conybear acquired Yingli securities and was damaged thereby. Ms. Conybear's PSLRA certification is attached as an exhibit to this Complaint and is incorporated by reference.

## IV. WITNESSES

32. Plaintiffs' investigator spoke with former Yingli employees ("FE") who have personal knowledge of the facts alleged in this Complaint:

| Source | Company | Position | Tenure |
|---|---|---|---|
| FE 1 | Yingli | Project manager, sales rep | 2010.12-2015.05 |
| FE 2 | Yingli | Manufacturing manager, sales rep, project manager | 2010.12-2015.04 |
| FE 3 | Yingli | Project manager | 2005.09-2015.04 |
| FE 4 | Yingli | Project manager, engineer | 2008.09-2015.03 |
| FE 5 | Yingli | Project manager | 2013.10-2015.05 |
| FE 6 | Yingli | Senior sales manager | 2009.04-2015.06 |
| FE 7 | Yingli | Project manager | 2012.09-2015.03 |
| FE 8 | Yingli | Internal auditor | 2011.07-2015.04 |
| FE 9 | Yingli | Project manager | 2013.06-2015.06 |
| FE 10 | Yingli | Project director | 2011.05-2013.03 |
| FE 11 | Yingli | Financial manager | 2007.07-2015.04 |
| FE 12 | Yingli | International sales | 2011.11-2014.01 |
| FE 13 | Yingli | SAP financial | 2013.07-2014.08 |
| FE 14 | Yingli | Big client manager | 2009.03-2014.10 |

33. Former Employee 1 ("FE1") began his career at Yingli as a key client sales representative in December 2010. In August 2012, he became a Project Manager and remained one until he left the Company in May 2015. While working at

Yingli, FE1's responsibilities included commercial negotiation with key clients, contract execution, payment collection, project proposal drafting, PV power station development, project investigation, investment analysis, government approval, government record filing, project construction follow-up, grid connection, and project acceptance tracking.

34. Former Employee 2 ("FE2") began his career at Yingli as a Project Manager in December 2010. In January 2012, he moved to Yingli's headquarters to take an executive position in its Sales Office, remaining there until July 2012. Between July 2012 and July 2013, FE2 served as a Sales Engineer in Yingli's Shenzhen office, where he was responsible for business development, project bidding, vendor development and management, and project application/filings. From July 2013 to his resignation from Yingli in April 2015, FE2 worked as a Development Executive of PV Distributed Generation at Guangdong Yingli PV Electricity Development Co, Ltd. a Yingli subsidiary. FE2's responsibilities while at Guangdong Yingli included PV project development which entailed conducting pre-construction research, coordinating with the government, drafting contracts, selling PV modules, and training distributors.

35. Former Employee 3 ("FE3") worked in Yingli's PV Electrical Investment Group from September 2005 to April 2015. During his time at Yingli, FE3 was a Project Manager of Yingli PV. FE3's project responsibilities included a joint project between Yingli and Datang, the Xinjiang Bohu 20 MW PV Power Plant, in 2012, as well as a joint project between Yingli and Datong Coal Mine Group, Youyu 50 MW PV Power Plant.

36. Former Employee 4 ("FE4") was an electrician for Yingli Solar from September 2008 to November 2012. FE4 became a Project Manager and electrical engineer at Yingli PV in December 2012, and remained in this position until March 2015. FE4's responsibilities as a Project Manager included constructing large PV

power plants and constructing a PV distribution system, and included a Golden Sun project – Great Wall Rooftop, a 50 MW PV project.

37. Former Employee 5 ("FE5") was a Project Manager at Tianjin Yingli PV Power Plant Technology Development Co. Ltd., a Yingli subsidiary, from October 2013 to May 2015. FE5's responsibilities at Tianjin Yingli PV Plant included two PV plant projects. One of the plants was a Golden Sun project, Tianjin Haval Branch Office 20 MW PV Plant. FE 5 also worked on the Tianjin Ninghe Pan Town Phase I Fishery, and a PV Complementary Project.

38. Former Employee 6 ("FE6") was a Senior Sales Manager at Yingli between April 2009 and June 2015. While at Yingli, FE6 was responsible for overseas sales to European countries, including Germany, Italy, France, the Netherlands, and Belgium. Other responsibilities of FE6 included training new staff.

39. Former Employee 7 ("FE7") worked as a Project Manager for Yingli between September 2012 and March 2015. FE7's responsibilities at Yingli included managing overseas market expansion in Germany as well as Latin America. FE7 was also responsible for selling PV modules, developing Yingli's PV plant and EPC business, department training, and managing Yingli's overseas branch offices.

40. Former Employee 8 ("FE8") started his career at Yingli as its Vendors Manager July 2011, and remained in this position until June 2012. FE8's responsibilities included gathering information and inspecting vendors. From July 2012 to April 2015, FE8 served as an Internal Auditor at Yingli.

41. Former Employee 9 ("FE9") was a Project Manager at Yingli from June 2013 to June 2015. FE9's responsibilities at Yingli included pre and post-construction management of PV power plants, sales of PV products, operational management of PV plants, and district business goal customization and assessments. While working at Yingli, FE9 was responsible for two PV power generation projects including the

Xinjang Yingli Kuerle 30 MW PV power generation as well as the operational management project of the Guangxi Long'an 60 MW PV greenhouse.

42. Former Employee 10 ("FE10") was a Project Director at Yingli from May 2011 to March 2013. FE10 was responsible for developing power plant projects. These responsibilities included construction quality inspection, project security management, pre- and post-construction quality control, operational security post-construction, as well as coordinating material and equipment inspection and testing. In June 2012, FE10 was a Project Manager for the Bazhou 20 MW power plant project, a project between Yingli and Datang.

43. Former Employee 11 ("FE11") was a Financial Manager at Yingli from July 2007 until April 2015. FE11's responsibilities at Yingli included constructing Yingli's financial system, accounting practice, and corporate finance management, as well as implementing ERP and maintaining Yingli's tax relationship.

44. Former Employee 12 ("FE12") was an International Salesperson and Accounts Manager at Yingli from November 2011 to January 2014. FE12 worked in Yingli's Export Unit and was responsible for managing Yingli's Spanish clients. FE12 also had additional miscellaneous management duties.

45. Former Employee 13 ("FE13") was an SAP Financial Consultant at Yingli from July 2013 to August 2014. FE13's responsibilities at Yingli included analyzing market demand, evaluation, workflow design, information system allocation and the SAP promotion program.

46. Former Employee 14 ("FE14") was a Large Client Manager at Yingli from March 2009 to October 2014. During his time at Yingli, FE14 was responsible for developing European markets, specifically Germany, Great Britain, Luxemburg, Belgium, and the Netherlands. During 2013 he was responsible for market development in emerging markets in Africa. FE14 also was responsible for training new staff and conducting performance assessments.

47. Plaintiffs' investigator also spoke with employees of Yingli's customers.

48. Customer Employee 1 was a Project Manager at China Datang Corporation from January 2013 to December 2014. One project in particular that he worked on with Yingli was the Datang Corporation Bazhou Bohu 20 MW Solar Farm project.

49. Customer Employee 2 is a Supplier Quality Manager at China Power Investment Corporation ("CPIC") and has been since July 2012. In his capacity at CPIC, Customer Employee 2 has been working with Yingli since 2013.

## V. BACKGROUND

50. Since as early as 2004, Yingli's focus was on European markets. Yingli drew more than 80% of its revenues from sales in Europe in every year between 2004 and 2010. Yingli made most of its European sales in Germany. Yingli's sales to Germany made up between 40% and 66% of its total worldwide sales for every year between 2004 and 2010 except 2007.

51. European markets were extraordinarily favorable to solar developers, as they were characterized by high prices and favorable payment terms. Further, as more fully set out below, European customers almost always timely paid Yingli the amounts the customers owed pursuant to the contracts the customers signed with Yingli. Yingli thus profited immensely from the European market.

52. To subsidize its production expansions, Yingli took out massive loans, becoming very leveraged.

*Yingli bank debt, as of December 31 (in thousand U.S. dollars)*

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Total short-term borrowings and current portion of long-term debt | 299,626 | 512,903 | 887,557 | 1,306,833 | 1,208,009 | 1,109,384 | 1,629,767 |
| Total long-term | 97,172 | 110,287 | 378,255 | 548,451 | 654,316 | 678,640 | 460,651 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| borrowings | | | | | | | |
| Total bank debt | 396,789 | 623,190 | 1,265,812 | 1,855,284 | 1,862,235 | 1,788,024 | 2,090,418 |

53. But between 2011 and 2013, a series of events slashed Yingli's sales to Europe.

54. First, in 2011, European demand fell dramatically as a result of the European debt crisis. As Yingli stated on its Q1 2011 earnings conference call, Yingli experienced a sudden demand slowdown in Europe. Demand was also unexpectedly low in Q3 2011. Yingli's shipments to Europe fell.

55. Second, Yingli's European customers had relied on very high European feed-in tariffs, especially in Germany.[3] These tariffs had supported high demand for Yingli's solar panels in Europe, since developers were eager to develop costly solar programs because the developers anticipated that they would be able to sell the electricity generated by their developments into the electric system at high guaranteed rates for decades. Germany's feed-in tariffs were designed to fall greatly between 2010 and 2014. For example, Germany's feed-in tariff for rooftop-mounted projects up to 10 MW fell from €28.43/kWh4 in January 2010 to €22.07/kWh in January 2011 to €13.50/kWh in April 2012. Tariff reduction came to a head when in Q2 2012, Germany dramatically cut its feed-in-tariff, causing Yingli's sales there to fall by 17% in Q3 2012.

56. And third, the European Union hit Yingli and other Chinese solar manufacturers with anti-dumping and anti-subsidy duties. In response to an industry complaint filed July 2012, in September and November 2012, the European Commission initiated anti-dumping and anti-subsidy investigations into supply of

---

[3] Feed-in tariffs are guaranteed rates paid to companies that supply electrical power to the grid from renewable sources. The tariffs are designed to accelerate development of renewable energy. They typically have three features: (1) guaranteed grid access; (2) long-term contracts; and (3) cost-based purchase prices. Although tariffs paid for new projects decline, older projects continue to be paid the same tariff.

[4] Kilowatt hour.

certain photovoltaic products supplied by PRC manufacturers to European markets. According to a comment made by Yingli European head Darren Thompson on August 29, 2012, "[i]t goes without saying that the anti-dumping complaint filed at the EU Commission late in July cast a shadow over Europe's solar industry along the whole value chain." In June 2013, the European Union made a provisional finding providing for the imposition of anti-dumping duties. Then, in August 2013, the European Union accepted an undertaking from a group of Chinese PV manufacturers, including Yingli, voluntarily limit their exports of solar panels and to set prices above a minimum price, in exchange for the EU agreeing to forgo imposing anti-dumping duties.

57. The result of these three developments was to sharply curtail Yingli's sales to Europe between 2010 and 2013.

58. At the same time, for a variety of reasons, Yingli's sales to China dramatically increased. Beginning in 2011, the Chinese government undertook to subsidize domestic production of solar power. In 2011, China's National Energy Administration released a draft of its Twelfth Five-Year Plan for the Development of Renewable Energy, calling for the installation of 10 GW by 2015 (China later raised the 2015 goal to 21 GW in 2012 and 35 GW in 2013) and 50 GW by 2020. In August 2011, China's National Development and Reform Commission issued its Notice on Perfecting Feed-in Tariff Policy of Solar PV Power Generation, setting an initial rate of $0.15 per kilowatt-hour – enough to allow solar electricity providers to break even in 7 years of an estimated 25+ year project lifespan.[5] At the same time, China greatly

[5] Coco Liu, China Uses Feed-In Tariff to Build Domestic Solar Market, N.Y. Times Sept. 14, 2011, available at < http://www.nytimes.com/cwire/2011/09/14/14climatewire-china-uses-feed-in-tariff-to-build-domestic-25559.html>. All articles cited in this Complaint are incorporated by reference.

enhanced the scope of the Golden Sun project, which provided large subsidies to solar power manufacturer.

59. As a result, in 2011, China's solar production increased by more than 500% Production doubled again in 2012.

60. As a result, Yingli's center of gravity shifted from Europe to China:

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Sales to Europe (thousand $) | 951,178 | 1,561,585 | 1,440,964 | 1,102,042 | 666,880 | 395,830 |
| Sales to Europe (% of total) | 89.5% | 82.5% | 61.8% | 60.3% | 30.1% | 19% |
| Sales to China ($) | 48,126, | 113,018 | 518,263 | 425,891 | 751,025 | 733,474 |
| Sales to China (% of total) | 4.5% | 6.0% | 22.2% | 23.3% | 33.9% | 35.2% |

61. As more fully set out below, the shift from Europe to China was traumatic for Yingli.

## VI. DEFENDANTS' FALSE STATEMENTS

### A. *Golden Sun false statements*

1. Yingli exploits an expensive Chinese government boondoggle meant to jump-start China's solar industry.

62. Though Chinese solar companies were heavily involved in international solar projects, China's own solar power development was minimal. By December 31, 2010, China had developed less than 1 GW of solar power, against 2010 exports by Chinese companies of 10 GW of solar panels.[6]

63. In 2011, China installed about 2.5 GW of solar power domestically. In 2012, it installed about 5.0 GW domestically.

64. A large part of the expansion of China's solar panel output was driven by a program named Golden Sun, an ambitious Chinese subsidy program designed to jump-start China's domestic production of solar power. In truth, Golden Sun was a massive boondoggle.

[6] *Id.*

65. Originally intended to apply only to demonstration projects, when China ramped up production in 2011, Golden Sun was expanded to include most of China's solar production.

66. Domestic Chinese solar project developers received sizeable subsidies for projects approved under Golden Sun. The subsidies were meant to defray 50% of a project's costs, or 70% for rural projects. Moreover, the subsidies were paid before construction even began.

67. The Golden Sun program provided massive subsidies. For projects announced between 2009 and 2011, the Golden Sun program provided subsidies of more than RMB 10 billion.[7] For projects announced in 2012, the Golden Sun program provided subsidies of about RMB 24 billion.[8] Pursuant to Golden Sun, the Chinese Government made awards to projects totaling 6.147 GW in solar production.

68. Yingli was the largest single beneficiary of the Golden Sun program. According to a press release issued by Yingli on December 11, 2012, Yingli supplied one quarter of the photovoltaic panels used in all the Golden Sun projects, including 70% of a batch of Golden Sun projects announced in December 2010.[9]

69. Yingli benefited from the Golden Sun program in two ways. First, Yingli developed its own projects, for which it directly received Golden Sun subsidies. Second, with Golden Sun subsidies, many more projects were viable, and Yingli's customers turned to Yingli to supply solar panels.

70. Yingli led investors to believe that the Golden Sun subsidies ensured prompt payments to Golden Sun subsidies ensured prompt payments to Yingli. For

---

[7] Jiali Wang *et al*, The Ministry of Finance to Liquidate PV Industry's Golden Sun Program. Where Did The Billons of RMB in Subsidies Go, May 20, 2013.

[8] You Wang, China Subsidized Golden Sun Program with Tens of Billions of RMB in 3 years. PV Enterprises Conned Subsidies in a Rampant Way. The Program May Come to an End, China Business News Daily, March 15, 2013 (reporting comments from Wentao Hou, PV Industry Analyst from Guotai Junan Securities).

[9] Source: 2010 20-F, at 73.

example, on December 10, 2010, the Chinese government announced Golden Sun awards to projects amounting to 272 MW; Yingli was contracted to supply solar panels to projects amounting to 190 MW of the total awards. That very December, Yingli was paid $113.5 million from the subsidies, amounting to 35% of the total purchase price for Yingli's solar panels. 2010 20-F, at 73. For these reasons, Yingli assisted its customers to apply for Golden Sun subsidies.

2. Yingli made misleading statements about Golden Sun.

71. In a press release issued December 2, 2010, Yingli stated:

> "We are honored to become a major PV module supplier for the Golden Sun Program, which is a significant business milestone for our expansion in the Chinese solar market," Mr. Liansheng Miao, Chairman and Chief Executive Officer of Yingli Green Energy commented. "I am happy to witness that the Chinese government has demonstrated its strong commitment to boost renewable energy utilization in its recently announced Five-Year Plan. Meanwhile, the renewable energy industry, including solar energy, has been identified as one of China's strategic emerging industries by the central government of China. Earlier today, the Ministry of Finance, the Ministry of Science and Technology, the Ministry of Housing and Urban-Rural Development, and the National Energy Administration jointly hosted a meeting to further boost the utilization of renewable energy in China. In the meeting, the Chinese government declared its expectations to further expand its PV project portfolio in the next two years to reach a scale of at least 1,000 MW per year after 2012."
>
> "***As a solar pioneer based in China, Yingli Green Energy has demonstrated a firm commitment to the Golden Sun Program.***[10] The Company is responding to its mission and responsibility to meet the demand for affordable renewable energy in China by supplying high quality PV products from cutting-edge technologies. In addition, we expect this strategic move in emerging markets will further reduce the

[10] Unless otherwise noted, all emphases are added.

> dependence on the German market, thus strengthening our long-term development dynamics," Mr. Miao concluded.

72. Golden Sun projects were intended to be completed quickly. Failure to complete the projects within a year was a violation of the grant's terms and subjected award recipients to clawback of the entire subsidy amount.

73. In fact, on June 26, 2011, the Chinese government published a notice providing that if a project was not connected to the grid by the due date, the Chinese government "shall" recover the subsidy from the developer. The contract awards announced in Yingli's December 2, 2010 press release were required to be completed by February 15, 2012.

74. On the Q1 2011[11] Earnings Call, Defendant Miao stated:

> ***In China, we have established a solid market position through continuous involvement in a series of solar initiatives, such as the Golden Sun Program***. We are growing more confident in the Chinese government signaling that it is considering raising cumulative PV installation targets to 10 gigawatts by 2015 and 50 gigawatts by 2020. We strongly believe that China will quickly evolve into one of the largest and most important solar markets in the world.

75. On the Q4 2011 Earnings Call, Defendant Miao stated:

> China market achieved significant growth in 2011 and has become one of the most promising emerging markets. ***The strong performance is attributable to the boom in the utilities segment driven by the feed-in tariffs and the steady growth in the rooftop segment under the Golden Sun Program***. Based on our commitment – committed strategic layout in broad sales networks, our sales to China increased to 22% of total revenues in 2011, compared to only 6% a year ago. We have reallocated our domestic sales force and implemented different strategic strategies to better address demands on the utility segment in Western China, and

[11] All capitalized terms are defined in the accompanying List of Defined Terms and Speakers, which is incorporated by reference into this Complaint.

> rooftop segment in Eastern China. We will continue to provide our customers with full service that covers project planning, technical support and talent training to improve our brand loyalty in establishing Yingli Solar as the brand of choice. Through enhanced cooperation with our customers, we are on track to further improve our leading position in China.

76. Notably, the Q4 2011 Earnings Call took place on February 29, 2012 - after the construction deadline imposed by the Chinese government to avoid a clawback.

77. On the Q1 2012 Earnings Call, Defendant Miao attributed part of Yingli's success to the Golden Sun Program:

> In recent two months, we have actively involved in the bidding for many ground mounted projects. We expect that China – we expect the demand in China market to surge in second and third quarter, as the constructions of utility scale will be gradually begin in Western China.
>
> ***Earlier this month, the China government announced a total of 1,709 megawatts Golden Sun program for 2012, while the number was only 689 megawatts in 2011.*** In addition, we expect promising demand from the public and family-use sector, especially independent off-grid systems in remote area may be also encouraged by the Chinese government. ***We will fully utilize our domestic sales and service networks to bid for the projects and target to provide more customers with Yingli modules. We expect approximately 30% of our revenue to come from Chinese customers this year by leveraging our solid customer relations and pioneer position in China.***

78. In the Q2 2012 Earnings Release, Defendant Miao was quoted as saying:

> ***In China, demand started to pick up as the installation of utility scale projects in northwestern China and the Golden Sun Program gradually accelerated***. We expect to see a significant increase of demand in China in the second half of this year, especially from September to November.

79. On the Q3 2012 Earnings Call, Defendant Li stated:

> ***And under the current situation based on our understanding, we expect the China government will be announced more and more incentive program. The Golden Sun volume for next year will be much larger than this year*** and the ground project of RMB1 feed-in tariff for this year will be – remain the same for next year. ***There will be no any cut.***

80. On the Q3 2012 Earnings Call, Defendant Miao also stated:

> In addition to our own application for the Golden Sun Program, we have actively helped our customers with the application procedures. We believe this practice will reinforce our customer relations and help expand our market shares in China.

81. On the Q3 2012 Earning Call, Defendant Miao stated:

> <Q - >Just a quick one on the receivables. What were the payment terms like in China right now? And also, given that the shipments to China will still continue accounting for significant portion, what would be Yingli's strategy to contain the receivables at comfortable levels? Thank you.
>
> **<Defendant Miao>** [Foreign Language]
>
> **<A – Arthur Chen**>: We are now taking this very seriously. He [Miao] thinks this is a very important question to be addressed but however observing from the trend that we control and the situation has been improving from Q3 to present. And going forward and he thinks that there are many ways that it could further improve and one way is to like (inaudible) which could potentially be changed in the future and certainly we are going to tap into the downstream market and which make it more leverage and thirdly the Chinese government will implement stringent regulations in which will also benefit from this. ***And also the Golden Sun project in which we are offer a better, much better payment terms that will also benefit us from those payment terms and also for some of the receivables will rely further upon insurance to make sure that those receivables will be covered.***

82. Until 2014, Yingli's contracts provided that it would only be paid in full when the projects were complete. In fact, as set out below, as of the Q3 2012 Earnings Call, Yingli had been paid in full on at most 4 of the 55 Golden Sun projects that had been announced in 2009-2011 to which Yingli was supplying solar panels, because at most 4 projects had been completed by Q3 2012. Yingli thus knew that 51 of 55 Golden Sun project to which it was supplying solar panels were in explicit violation of the award's terms. The awards given to the developers on the 51 of 55 projects were thus subject to rescission, and without the awards, the developers did not have enough cash to pay their obligations to Yingli – casting doubt on whether Yingli would be paid. Thus, the emphasized statement was misleading because it omitted to disclose that Yingli's customers were violating the terms of the Golden Sun project, putting them at risk that the Chinese government would claw back the subsidies, such that Yingli would not be able to benefit from the better payment terms.

83. In a press release issued December 11, 2012, to announce Yingli's second phase 2011 programs, Defendant Miao was quoted as saying:

> The acceleration of the Golden Sun Program and the announcements of other incentive policies have clearly demonstrated China's strong determination of promoting solar applications. With these policies in place, we believe that the China PV market will achieve a faster and healthier growth. We'll continue to enhance our business activities in China and power more families and businesses with our high quality products."

84. Yingli accompanied its Q4 2012 earnings call with a series of powerpoint slides. The slides provided that: "We secured 288 MW of modules under the Golden Sun Program to delivery in 2013."

85. Then, on the Q4 2012 Earnings Call, Defendant Miao stated that China would meet its quota of roughly 30 GW production by 2015 through Golden Sun

projects.[12] And Defendant Miao added that "in the future, our profitability points are really coming from Golden Sun Program and the distributed generation program will leverage our brand name and network."

86. These statements were false and misleading because as further set out below, they omitted to disclose that (a) a large proportion of Golden Sun contracts were procured through outright fraud; (b) the majority of Golden Sun projects violated the terms of the awards; and therefore (c) the Golden Sun program was in danger of being cancelled; and (d) award recipients would soon have their subsidies clawed back and be unable to pay Yingli for the solar panels, causing Yingli to write off substantial amounts of accounts receivable.

87. Golden Sun developers employed numerous kinds of fraud to obtain subsidies. Because Golden Sun awards were made before construction and based on estimates, many developers inflated estimated project costs.[13] In many cases, developers' plans called for high-quality materials, but after receiving Golden Sun subsidies, the developers substituted low quality equivalents. Developers sometimes even used discarded returns from abroad. Developers also overstated the production capacity of their projects, and obtained subsidies for fraudulent non-existent projects by supplying forged contracts to the Chinese governments.[14] FE 9 also states that PV producers abused the Golden Sun project. According to FE 9, PV companies first built projects and received a Golden Sun subsidy. Then, after state officials inspected

---

[12] "As you may all heard, so for year 2015 and the installation from now through 2014, the total installation would be up roughly 30 gigawatts Chinese market. So this year we are estimating we will be 10 gigawatts minimum length and there are three types of segments that will be highlighted probably during the next three or four years. [...] The second one is announce the Golden Sun Program."

[13] *See generally* Phillip Andrews-Speed, Renewable Energy Finance in China, in Charles W. Donovan, Renewable Energy Finance: Powering the Future, Imperial College Press, at 184 (2015); Ray Yu, Vast Subsidy Fraud Revealed in Chinese PV Industry, Solar PV Investor, June 25, 2013, available at <http://tinyurl.com/qzkgsjq>.

[14] *See generally id.*

the project and awarded the subsidy, PV companies disassembled the project, and moved it to another location, receiving another subsidy. An audit report issued by the Chinese National Audit Office on June 20, 2013, estimated that by wattage, 29% of the projects awarded in 2009-2011 committed one of the examples of intentional fraud set out in this Paragraph. The National Audit Office reached its conclusion by auditing a sample of projects amounting to only 239.37 MW;[15] in that sample alone, the National Audit Office determined that subsidies of RMB 207 million had been awarded based on intentional fraud.

88. The National Audit Office's June 20 report identified projects that were procured through intentional fraud:

[15] Fengtao Li, The Golden Sun Project: Fraud with Zero Risk. So Why Not Con? China Economic Weekly, July 1, 2013. The July 1, 2013 China Economic Weekly article was not reported in the English-language press.

| Project | Violation | Status of recovery effort |
|---|---|---|
| Hunan Junhong Real Estate Co Ltd PV Power Model Project | Misappropriated RMB 3 million to pay unrelated transfer fee, land use rights, and taxes | Subsidy returned |
| Guangdong Hanergy Co Ltd 10MW PV Power Project | Substantially overstated project size to obtain RMB 26.4 million, violating rules | Subsidy returned |
| Sha'anxi Yulin Yushen Energy Development and Construction Co Ltd - Yushen Industrial Zone Coal Museum PV Power Model Project | Fabricated documents and fraudulent obtained RMB 21.87 million in subsidies | Redressing the violation |
| Sha'anxi Yanan Shenzhen Light Industry Zone Co Ltd - Yanan Economy and Technology Development Zone Plants' Rooftops PV Power Consolidated Module Model Project | Applied on behalf of an unqualified project and obtained RMB 38.51 million | Redressing the violation |
| Shandong Dongying PV Solar Power Co Ltd - Donging PV On Grid Power Plant Construction Project | Supplied untruthful leasing agreement to obtain RMB 33.6 million in violation of rules | Redressing the violation |
| Anhui Bengbu Glass Industry Design Institute - Ningguo Port Ecosystem Industry Zone PV Power Model Project | Submitted untruthful rooftop leasing agreement, and obtained 33.5989 million RMB subsidies in violation of rules | Redressing the violation |
| Anhui Maanshan South Transitional Industrial Transfer New Zone Economic and Technological Development Co Ltd - Transitional Industrial Transfer Model Park PV Power Model Project (Phase I) | Obtained 3.5 million RMB subsidies in violation of rules by submitting duplicate applications | Redressing the violation |
| Anhui Central Energy Investment and Management Co Ltd - Longzihu Industrial Park User Supplemental Grid Non-Silicone PV Power Project | Submitted fraudulent application and obtained 59.26 million RMB subsidies in violation of rules | Redressing the violation |

89. And beyond this intentional fraud, the vast majority of Golden Sun projects broke the conditions of the award. The Golden Sun awards specifically provided that projects awarded in 2009-2011 had to be completed before February 15, 2012. In April 2013, the Chinese Ministry of Finance began to issue notices to developers that had been granted awards in 2009-2011: (a) finding that the developers had breached the terms of their awards by failing to develop solar power within one

year as provided in the grant; and (b) demanding that the developers repay part or all of the subsidy. A May 20, 2013 published by Sina.com, a Chinese-language publication, reported that the Ministry of Finance had issued notices to 109 projects, accounting for 998 WM of the 1,295 MW for which subsidies had been issued, and demanded repayment of nearly RMB 10 billion.[16] For example, the Chinese government demanded return of hundreds of millions of RMB from Datang Power Generation Co. Ltd., and approximately RMB 240 million from Guangxi Yuchai New Energy Co Ltd. project.[17]

90. The May 20, 2013 Sina.com article quoted a Yingli sales head as saying that Yingli supplied solar panels to 55 Golden Sun projects awarded in 2010 and 2011, and that 51 of the projects had received notices demanding repayment for failure to meet conditions of the awards.[18] The sales head added that hundreds of millions of RMB of Yingli's accounts receivable were gravely imperiled.[19]

91. Then, a June 8, 2013 China Economic Weekly article reported that the Ministry of Finance had issued demands for repayment of subsidies for 80% of the subsidies that had been awarded in 2009-2011.[20]

92. In December 2013, in response to systematic fraud and abuse, the Chinese government liquidated the Golden Sun program.

---

[16] Jiali Wang et al, The Ministry of Finance to Liquidate PV Industry's Golden Sun Program. Where Did The Billons of RMB in Subsidies Go, May 20, 2013. The May 20, 2013 Sina.com article was not reported on in the English-language press.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Fengtao Li, "Liquidation" is not "Cancellation." PV Golden Sun will not sink, China Economic Weekly, June 8, 2013. The June 8, 2013 China Economic Weekly article was not reported in the English-language press.

93. Thus, Yingli's statements concerning Golden Sun were misleading because they did not disclose the known risk that the program would be discontinued, and funds clawed back, because of fraud, imperiling Yingli's accounts receivable.

B. Defendants make false statements about Yingli's revenues and accounts receivable.

1. The true state of Yingli's accounts receivable and revenue.

94. European Average Selling Prices were higher than domestic Chinese prices. But non-Chinese customers, particularly European customers, were better customers than Chinese for another reason: they paid their bills in full and on time, while Chinese customers typically did not. When Yingli's center of gravity shifted from Europe to China, it took on additional risks that accounts receivable would not be paid timely or in full.

95. FE 1, 2, 5, 6, 7 and 14 confirm that Yingli's operations have struggled from the collapse of its European sales since 2011.

96. FE 2 confirms that since at least 2013, the Chinese market has been Yingli's focus, while according to FE 14, the European and U.S. tariffs have dramatically reduced Chinese companies' competitive position, such that Chinese companies no longer have a price advantage in Europe and the U.S.[21]

97. According to FE 1, 2, 6, 12, and 14, Yingli rarely recognizes any increase to its allowance for doubtful accounts from sales in any foreign (i.e., non-Chinese) market. Substantially all of Yingli's allowance for doubtful accounts arises from uncollectable accounts receivable owed by domestic Chinese customers. And according to FE 1, Yingli has had great difficulty collecting its accounts receivable from domestic (i.e., Chinese) customers. Sometimes, according to FE 1, Yingli

[21] On the Q1 2013 Earnings Call, Defendant Wang stated that "[w]e actually view our largest target markets in 2013 for Yingli will be China, U.S."

ordered sales representative to stop trying to sell product and to collect accounts receivable instead. According to FE 2 and 3, an outright majority of Yingli's past due accounts receivable derives from domestic clients.[22]

98. Many of Yingli's clients are Chinese State-Owned Enterprises ("SOEs"). According to both FE 3 and 7, Yingli's contracts with SOEs call for Yingli's customers to pay 30% as an advance payment, 30% before beginning construction, and 30% within one month of the end of construction. The SOE then typically withholds the 10% of the funds as a future quality guarantee. Yingli recognizes the last 10% as revenue once construction finishes. FE 7 reports that SOEs are typically "harsh" in evaluating project quality. FE 9 and 10 specifically note that SOEs typically intentionally delay payment of the final 10%, at a minimum. Both FE 1 and 3 report that when building domestic solar farms, domestic clients typically require that Yingli begin construction before paying, forcing Yingli to expend its capital for its clients' sake in violation of their contractual obligations.

99. And SOEs frequently violated their contracts with Yingli. According to FE 2, both private (i.e., not state-owned) domestic Chinese customers and SOE customers routinely push off accounts receivable, sometimes for up to 5 years. Citing himself as an example, FE 2 reports that at times sales representatives retire before they can collect outstanding receivables. According to FE 3, SOEs often require Yingli to sign a contract before securing funding for the project. The SOEs then refuse to pay pursuant to the contract's terms and further delay payments to Yingli. FE 3 continues that SOEs prioritize and pay amounts due on their bank loans before making payments to Yingli and their other suppliers. FE 7 adds that Yingli has few options against the large SOEs, since they hold and have the discretion to award the

[22] Yingli's 2013 20-F provides that "[a]s of December 31, 2012 and 2013, 31% and 30%, respectively, of accounts receivable were denominated in currencies other than the RMB", suggesting that at those times, 69% and 70% of Yingli's accounts receivable were due from sales in China.

vast majority of high value Chinese projects. Accordingly, Yingli cannot take action that would antagonize the SOEs to collect Yingli's accounts receivable – such as suing the SOEs or cutting them off.

100. Problems for Yingli caused by *private* domestic customers extend beyond late payments or partial non-payments. According to FE 13, bankrupt domestic private customers are responsible for more than half of Yingli's doubtful accounts as well as written-off accounts receivable. According to FE 6 and 14, foreign customers and SOE have much better payment reliability than domestic private producers, and as a result, most of Yingli's doubtful accounts and written-off accounts receivable arise from domestic private customers. FE 9, for his part, specifically stated that the majority of doubtful accounts that appear in Yingli's filings are from domestic private companies.

101. According to FE 2, Yingli's mounting accounts receivable are endangering its ability to pay its obligations as they come due. And according to FE 2, to address the cash flow harm caused by its customers' routine violation of their contract terms, in 2014, Yingli adopted a "payment on receipt" policy requiring customers to pay immediately on delivery.

102. Yingli's customers' employees statements to plaintiffs' investigator support the claims of former Yingli employees that there were endemic problems with Yingli's accounts receivable in China. Customer Employee 1 was a Project Manager at the China Datang Corporation, an SOE, from January 2013 to December 2014. Customer Employee 1 personally worked on projects with Yingli. Customer Employee 1 mentions a 20 MW project completed by Yingli for Datang by December 2013 - Bazhou Bohu. By the middle of 2014, Datang had not even paid 50% of Bazhou Bohu's purchase price, even though 60% was due before Yingli even broke ground. Notably, the Bazhou Bohu project cost about RMB 300 million. Customer Employee 1 adds that because of Yingli's bad experiences with payments from SOEs

(such as late payments, underpayments, and no payments), it no longer actively seeks to work for SOEs like Datang.

103. Customer Employee 1 also describes Datang's approach when it worked with Yingli. Datang would make no pre-payment, or at most a prepayment of 5% or 10%. Then, when the project was complete, Datang would use the project as collateral to obtain a loan. Yingli would only be paid once Datang secured a loan based on the finished project. Even then, though, Datang's payments would only satisfy part of its obligation to Yingli; Datang would keep some of the funds it owed Yingli for future investments and not pay the full contract amount. This payment scheme blatantly violated Yingli's contracts, which provided for 30% payment in advance, 30% payment before construction begins, 30% within one month of completion, and only 10% withheld as quality guarantee.

104. Customer Employee 1 noted that a ***small*** bill "***normally***" would be paid off ***within 2 years of the required due date***. Large bills take much longer.

105. Notably, Datang and Yingli partnered on many projects. For example, for one province (Xinjiang Province) and in just two years (2013 and 2014), Customer Employee 1 remembered that Yingli and Datang partnered in projects to produce 60 MW.

106. Similarly, Customer Employee 2 has been a Supplier Quality Manager of China Power Investment Corporation ("CPIC"), from July 2012 to the present, and worked on projects with Yingli. Customer Employee 2 stated that "objective" factors frequently caused CPIC to delay payment to Yingli. Customer Employee 2 specifically cited CPIC's delays in getting loans or funding. According to Customer Employee 2, CPIC would then force Yingli to adjust the payment schedule.

2. Defendants' false statements concerning accounts receivable

107. Throughout the Class Period, Defendants regularly called attention to Yingli's excellent relationship with its customers, to its stringent accounts receivable collection process, and to its expertise in dealing with the Chinese market. But Defendants never disclosed to investors that Yingli's customers broke their contracts with it as a matter of course.

108. Yingli stated that its financial statements were prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"). Under GAAP, revenues can only be recognized when (a) persuasive evidence of an arrangement exists, (b) the company has delivered the product, (c) the price the seller must pay is fixed or determinable, and (d) collectability is reasonably assured. In other words, "[d]on't count your money before it's yours." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 654 (E.D. Va. 2000).

109. Each of Yingli's 2011 20-F, 2012 20-F, 2013 20-F, and 2014 20-F stated that Yingli's revenue recognition policy was:

> ***Revenue is recognized when persuasive evidence of an arrangement exists, delivery of the product has occurred, the fee is fixed or determinable and collectibility is reasonably assured. These criteria as they relate to the sale of the Company's products or services are as follows:***
>
> For all sales, the Company requires a contract or purchase order which ***quantifies pricing***, quantity and product specifications.
>
> For sales of PV modules from PRC to foreign customers, delivery of the products occurs at the point in time the product is delivered to the named port of shipment, which is when the risks and rewards of ownership are transferred to the customer. ***For sales of PV modules to domestic customers in PRC or by foreign subsidiaries, delivery of the product occurs at the point in time the product is received by the customer, which is when the risks and rewards of ownership have been transferred.***

> Sales of PV systems consist of the delivery, assembly and installation of PV modules, related power electronics and other components. ***The Company considers the PV system to be delivered, and the risks and rewards of ownership transferred, when installation of all components is complete and customer acceptance is received. Customer acceptance is evidenced by a signed project acceptance document.*** The assembly and installation of PV systems is short, generally lasting between 1 to 3 months, ***and requires advance payments from the customer.***

110. The emphasized statements were false and misleading because (a) Yingli did not always require advance payments from customers, (b) Yingli recognized revenues from sales to SOE even when the SOE still retained 10% of the project costs as a quality guarantee, meaning that revenue was not fixed or determinable, and (c) Yingli recognized revenues even when collectability was not reasonably assured, including the hundreds of millions of RMB in accounts receivable from Yingli's Golden Sun projects.

111. When revenue is properly recognized but not yet paid, the funds the customers owe are recognized as accounts receivable. Accounts receivable can only be recognized from revenue that was properly recorded. If the company cannot record sales as revenue, then the company cannot recognize the proceeds of these sales as accounts receivable.

112. Improperly recognizing accounts receivable can play havoc with a company's financial position. Operating businesses like Yingli rely on money coming in to pay their bills as they come due. If a business mischaracterizes its accounts receivable, investors will overestimate the business's ability to pay its bills, and underestimate the likelihood that the business will succeed. Moreover, accounts receivable are an asset, in that they are money that is due to the business. If the business includes as accounts receivable funds that its customers do not owe it, then investors will overestimate the business's value.

113. Accounts receivable are the lifeblood of a business. Companies use money from sales to pay their obligations as they come due. If the payments are delayed, then companies will have difficulty paying their obligations as they come due. Accordingly, whether accounts receivable are being paid timely is a material fact. Yingli was required to disclose the material fact that its accounts receivable arising from Chinese customers were categorically not being paid on time, if at all. Yingli's statements were even more misleading because during the Class Period, Yingli earned more and more of its revenues from Chinese customers.

114. In the Q1 2011 Earnings Call, an analyst specifically asked Yingli whether it would use its balance sheet to support its clients.

> **<Q - >**: And if I could fit one more in, Bryan, you've taken your cash position up to RMB 1 billion by tapping the local market there with the bonds. What is your intention with this cash? Is it to appear more bankable, or might this be used to help finance your customers' purchases? And on a sidebar, is it true that the Chinese Government will give you money to finance your customers and give them longer days to pay?
>
> **<A - Zhongwei Bryan Li>**: Thirdly, back to your last question, we sought and we were also asked by our customer for the project finance opportunities to support the downstream projects. And I think – I don't think – and we will use our own cash to support such kind of idea and a boat with a rudder to help our customers to bridge through the domestic banks in China, who have the strongest relationship with Yingli to help the customers getting and obtaining the project finance from a Chinese bank with the lower interest rate and longer tenure.
>
> **<Q >**: Has that started yet? Has that started? We heard of one of your competitors giving a project a very long term.
>
> <A - Zhongwei Bryan Li>: I'm not sure which customer – which competitor you're referring to and whether they are using their own balance sheet to finance the project, but that's not our intention. We will

> use our own balance sheet, but we are helping our customers to negotiate with the domestic banks for the project finance idea.

115. A balance sheet reflects a company's assets and liabilities. For Yingli to use its balance sheet to support its clients means that Yingli is financing its customers' purchases by either supplying solar panels for a project with little or no money down so that the customer can wait until the project is complete to pay Yingli, or for it to guarantee the customer's loans so that the customer can borrow enough cash to complete the customer's project. Yingli's statement that it was not using its balance sheet to support its customers' purchases from it was false because, in fact, Yingli's strategy and practice in China was to use its own balance sheet to support its clients. Yingli funded the initial stages of projects, and was only repaid after completion, when the customer was able to use the project as collateral to secure a loan – thus "using [its] own balance sheet to finance the project." Furthermore, the SEOs often did not pay Yingli for months or years after completion.

116. On the Q2 2012 Earnings Call, Defendant Li stated:

> ***We have also implemented a more stringent management mechanism to minimize accounts receivable risk.*** At the end of second quarter, our accounts receivables decreased slightly from US$531.7 million to US$505.7 million. We managed to moderately improve the days sales outstanding from 96 days in the first quarter to 93 days in the second quarter.

117. The statement was false and misleading because, as further set out above, Yingli had not implemented a stringent management mechanism to minimize accounts receivable risk.

118. On the Q4 2012 Earnings Call, Defendant Miao stated:

> The steady development of utility market and quickly growing distributed generation segments will likely catapult China to be the largest solar market in the world of 2013. Our track record of success in China and increasingly broad sales and the service networks will further

> solidify our market position. During 2013, we expect to increase our module shipments to China by more than 40% compared to 2012. ***Furthermore, we will continue to optimize our customer portfolio and improve the profitability level of our sales, in China.***

119. On the Q1 2013 Earnings Call, Defendant Wang stated:

> **<Q >**: Right. And just a quick follow-up because I think your visibility in China is pretty high because you mentioned 70% of target shipment has been secure. And as far as I understand, mostly to Chinese utilities and their payment terms are not very favorable to suppliers. I wondered can you make some comment on that? Will that be a strain on your working capital, especially in second half?
>
> **<A - Yiyu Wang>**: I think, while we felt in China, the China utility payments terms are slightly longer than other market, but we can – first is during the bidding process, you can quote your proposal payment term. The second is that we are working on – with those biggest among the big utility companies to ensure the collection – the on-time collection of the AR balances. Besides that, we are also working with the banks to see any flexible refinancing structures of our cost receivable given this receivable has been deemed as a very low risk receivable and that should be able to refinance. That's why all in all, I think, the AR payment terms in China compared to the market scale and the potential of the market is reasonable.

120. Wang's answer was misleading because (1) whatever payment terms Yingli and the customers agreed to, the customers would break those terms; (2) Yingli had no recourse when its customers breached their contract obligations; and (3) even if Yingli quoted its payments terms to its customers, the customers did not accept Yingli's terms.

121. Slides accompanying Yingli's Q2 2013 Earnings Call provided:

> "Due to improved supply-demand balance, our accounts receivable days in China reduced by 40% in Q2 compared to Q1 as the industry fundamental improved significantly. ASP stabilized in Q2"

122. The slides were misleading because they omitted to disclose that Yingli's customers routinely violated the terms of the customers' contracts with Yingli.

123. On the Q2 2013 Earnings Call, Defendant Wang stated:

> **<Q >**: Thank you and then just a quick follow-up on your business in China, I guess you mentioned one-third of the megawatts in 2013 have already been completed. I guess one thing we've heard from quite a few companies is delays with projects. Is there any risk or when will you anticipate recognizing revenue from those projects and then just a quick question on when you expect revenue from distributed generation projects in China? Thank you.
>
> **<A - Yiyu Wang>**: The first is regarding to the revenue recognition policy in China, if we develop projects, we will already recognize revenue after we fully meet the contract terms, which means is deliver the whole project to the customer with risk and reward and title transferred.

124. Wang's statement was not true. When Yingli delivered its project to its customers, they refused to pay Yingli according to the contracts' terms. Thus, even after Yingli delivered the project, the risk, reward, and title to the project were not transferred from Yingli to the customer.

125. On the Q2 2013 Earnings Call, Defendant Li stated:

> Okay. Thanks Bryan. One last one, what kind of prepayments are you requiring from customers of different regions?
>
> <**A - Yiyu Wang**>: ***At this moment, with the improvement of the markets, we are able to gather some prepayments, especially in China markets.*** The prepayment percentage could be from 10% to 30% before we ship the goods, depends on the differences. For other markets, majority of the customer will still pay after we ship the goods.

126. Wang's statement was misleading because it omitted to disclose that even if contracts required prepayments, Yingli frequently could not enforce the contracts or collect prepayments.

127. On October 22, 2013, Yingli made a presentation in its Annual Global Investor Day.

128. The slides to Yingli's presentation, which were publicly filed on its websites, touts Yingli's "Robust cooperation with 5 largest power conglomerates and 4 utility companies." Yingli's statement was misleading because it omitted to disclose that these customers, the so-called five big and four small, frequently delayed payments to Yingli in violation of contractual agreements and/or forced Yingli to renegotiated contracts providing for later payments rather than being paid as called for by their contracts.

129. Yingli's presentation also included a flow chart showing its process to begin construction on its customers' projects. The flow chart misleadingly stated that Yingli would obtain equity fund certification and letter of bank intent to provide a loan before beginning construction. In fact, Yingli frequently began construction before its customers obtained financing or even developed a plan to obtain financing.

130. Slides accompanying Yingli's Q3 2013 Earnings Call provided:

> "Payment and pricing terms in China have improved continuously."

131. The slides were misleading because they omitted to disclose that (1) whatever payment terms Yingli and the customers agreed to, the customers would break those terms; (2) Yingli had no recourse when its customers breached their contract obligations; and (3) Yingli's customers continued to force lopsided payment terms on Yingli.

132. On the Q3 2013 Earnings Call, Defendant Miao stated:

> Starting from the end of September, our shipments scheduled for domestic orders have been fully booked through the end of December, 2013. ***In addition, China solar market is maturing as supply and demand is more balanced. Payment and the pricing terms in China have improved continuously.***

133. The slides were misleading because they omitted to disclose that (1) whatever payment terms Yingli and the customers agreed to, the customers would break those terms; (2) Yingli had no recourse when its customers breached their contract obligations; and (3) Yingli's customers continued to force lopsided payment terms on Yingli.

134. Slides accompanying Yingli's Q3 2013 Earnings Call provided:

> "***Payment conditions for accounts receivable improved*** while the days sales outstanding in domestic market decreased by 36% from last quarter"

135. In fact, payment conditions had not improved, and in 2014, Yingli was forced to adopt a policy requiring full payment of all amounts owed on delivery.

136. On the Q4 2013 Earnings Call, Defendant Miao stated:

> Furthermore we have also managed improved receivables collection and significantly reduced the base outstanding in China.

137. Defendant Miao's statement was misleading because it omitted to disclose that Yingli's customers would routinely break the terms of the customers' contracts with Yingli.

138. On April 11, 2014, Yingli filed its 2013 20-F. Yingli's 2013 20-F was misleading because the 2013 20-F did not recognize an allowance for doubtful accounts based on the uncollectable accounts receivable derived from Golden Sun projects.

139. On April 11, 2014, Yingli filed a Registration Statement on Form 3/A to sell up to $200 million of its ADSs. Yingli's April 11 Registration Statement was declared effective on April 15, 2014, and on April 30, Yingli sold $87.5 million of its shares for net proceeds of $84.0 million.

140. On June 17, 2014, Yingli filed its Q1 2014 Earnings Release and held its Q1 2014 Earnings Call.

141. On the Q2 2014 Earnings Call, Defendant Wang stated:

> **<Q>**: Hey. Thanks for taking my question, guys. I guess I'm just looking at your balance sheet, your cash balance, it looks pretty low here. The lowest it's been since the third quarter of – it looks like 2008. And I'm looking at your expectations for funding of the projects. Should we be at all concerned here given your debt balance at $2.4 billion and high level of interest expense? Should we be at all concerned if the Chinese market doesn't recover, that there could be – there could need to be a capital raise or potentially a credit event? And then I have a follow-up.
>
> **<A - Yiyu Wang>**: I think first thing is regarding to our own operating cash flow improvement, I think the Q2 operating cash flow was slightly decreased compared to Q1 given we shipped more module and that we produced some in Q2, and that will be collected back in Q3 and ongoing. ***So, we expect in Q3 our total operating cash flow will be increased again based on Q2 level.*** So relating to the downstream project, as I mentioned, our strategy is to limit our exposure in the equity portion investment of the project, and try to sell the project as much as we can.
>
> ***And on the other side, for those joint venture, we are working with those strong partners in China which they will be helping us to enhance the project finance for those projects we developed together.*** So at this moment, we don't expect that we will see big cash in the project development through the end of this year.
>
> At this moment, we don't see any near-term necessary to raise money or fund any extra financing in the market.
>
> However, we will be actually to looking for finance facilities and options to continuously enhance our total operational and financial facility.

142. Defendant Wang's statements were misleading because Yingli's partners did not assist it with project finance but instead violated contractual payment obligations owed to Yingli.

143. And on the Q2 2014 Earnings Call, Defendant Wang also stated:

> **<Q>**: Okay. Thanks. And then this is a follow-up, I mean, you've been pretty clear that the strategy with the projects you're developing in China is to sell them. I'm just curious what is the strategy behind that decision? Why not retain them as some of your peers have done either in China or other places around the world?
>
> **<A - Yiyu Wang>**: I think the first thing is at this moment our company strategy is to accelerate the cash flow and turnover for any kind of PV segments in order to continue to enhance our cash flow and enhance our financial facilities.
>
> Second thing is that China just started its policies in the first quarter of this year and end of last year. At this moment, to hold a big volume of projects on the balance sheet still subject to a continuous project finance for all the project developed, but also subject to a continuous refinancing program through the downstream business which currently in China, it still takes time to get a mature mechanism.

144. Slides accompanying Yingli's Q3 2014 Earnings Call provided:

> "• Some customers even increased the advance payment or made full payment for the purpose of speeding up the delivery."

145. In fact, the customers did not voluntarily make advance payments to speed up delivery. Rather, as further set out above, in 2014, Yingli made its entire payment due on delivery (when it could enforce the term) in an attempt to resolve its ongoing accounts receivable problem.

## VII. LOSS CAUSATION

146. On March 15, 2013, a Chinese-language article was published calling attention to the fact that fraud and abuse of the Golden Sun program could lead to its termination.[23]

147. On March 18, 2013, Bloomberg published an article calling attention to a new Chinese government policy enacted on March 14, 2013.[24] The Bloomberg article cited Xiangan Meng, Vice Chairman of the China Renewable Energy Society in Beijing, as saying that the March 14 policy may abolish Golden Sun subsidies.

148. The March 18 Bloomberg Article quoted Xiaoting Wang, a Bloomberg New Energy Finance Beijing analyst, as saying that Golden Sun "have been increasingly accused of using public resources inefficiently by providing developers with an overgenerous capital expenditure-based subsidy before installation". As a result of this adverse news, on March 18, 2013, Yingli's stock price fell from $2.47/ADS to $2.30/ADS, or 6.9%, damaging investors.

149. On March 18, 2013, 80 solar industry professionals gathered at the PV Project Implementation Conference – China to discuss the future of the Chinese PV market. On March 20, 2013, PV Magazine, an industry journal, published an article citing rumors that Golden Sun would be scrapped, and quoted Minsheng Securities analyst Hai Sheng Wang as saying that "it is very likely that Golden Sun will be cancelled soon."[25]

150. Also on March 20, 2013, Sicheng Wang of the Energy Research Institute, part of China's top economic planning authority, the National Development

---

[23] You Wang, China Subsidized Golden Sun Program with Tens of Billions of RMB in 3 years. PV Enterprises Conned Subsidies in a Rampant Way. The Program May Come to an End, China Business News Daily, March 15, 2013 (reporting comments from Wentao Hou, PV Industry Analyst from Guotai Junan Securities).

[24] China Seen Cutting Subsidy for Largest Solar Projects: Energy, Bloomberg News, March 18, 2013.

[25] Eckert Gouras, China: Scaling back ambitions and overhauling PV subsidies, PV Magazine, March 20, 2013.

and Reform Commission, spoke about a shift from Golden Sun, which offers subsidies for capacity construction, to a program that subsidized performance. And on March 21, NPD Solarbuzz analyst Han Qiming stated at a separate conference organized by econet china that Golden Sun would be scrapped in 2013. Wang and Qiming's comments were reported in a March 22, 2013 article in PV Magazine.[26]

151. These disclosures trickling in between March 20 and March 22, 2013, caused Yingli's stock price to fall from $2.52/DS on March 20 to $2.32/ADS on March 21, a fall of 7.9%, then to $2.17/ADS on March 22, a fall of 6.5%, and finally to $1.96/ADS on March 25 (the next trading day after March 22), a fall of 9.7%. The total price collapse was 22.2%.

152. On March 25, 2015, Yingli announced its financial results for Q4 2014, disclosing that Yingli was recording a bad debt provision of $14.6 million in Q4 2014, or about ($0.08) per share.

153. The allegations in this complaint establish the bad debt provision arose from private domestic customers who had never made their final payment in projects subsidized by Golden Sun. First, Yingli's former employees establish that the majority of Yingli's bad debts arose from sales to private domestic customers. Second, Yingli admitted that Golden Sun imperiled hundreds of millions of RMB of its accounts receivable owed by domestic Chinese customers. And third, other than an other allowance for doubtful accounts made in Q1 2014, Yingli did not add to its allowance for doubtful accounts to account for the hundreds of millions of RMBs in accounts receivable it lost in the Golden Sun fiasco.

154. On March 25, 2014, Yingli's stock price fell from its previous close of $2.34/ADS to $1.99/ADS, or 15.0%, damaging investors.

155. On May 15, 2015, Yingli filed its 2014 20-F.

---

[26] Eckhard Gouras, Solarcon 2013: Restructuring in China, PV Magazine, March 22, 2013.

156. The 2014 20-F disclosed that Yingli was writing off $33.2 million of overdue accounts receivable. For the same reasons that the March 25 allowance for bad debt related to Yingli's Golden Sun projects for domestic Chinese customers, the 2014 20-F write-off related to private domestic customers who had never made their final payments in projects subsidized by Golden Sun.

157. On May 18, 2015, the next trading day, Yingli's stock price fell from its previous close of $1.70/ADS to $1.49/ADS, or 12.4%, and it continued to fall to $0.94/ADS, or by 37.0%, the following day, damaging investors.

## VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER.

### *A. Yingli claims to be exceptionally at home in the Chinese market.*

158. Yingli began serving the Chinese PV local market in 2002. Yingli has steadily told investors its competitive position was excellent because of its deep understanding of the Chinese market.

159. For example, on the Q3 2012 Earnings Call, Defendant Miao stated, through a translator:

> **<Q >**: Okay. And then, can you talk about how you think about potentially moving downstream into project development, we hear a lot of people talk about that because it – for now, at least, has higher margins, how should we think about projects perhaps contributing to revenue or as a percentage of megawatts, as we look forward into 2013?
>
> **<A - Lian Sheng Miao>** [Foreign Language]
>
> **<A - Arthur Chen>**: Well, going downstream will be a trend for the future development of the market. And we have been promoting a concept called 334 Strategy. And the 4, talking about the 40%, or 4 out of 10 share of our module shipment will eventually go into the downstream development in our projects.
>
> And particularly, in China markets, we have a very good foundation because we have been investing heavily and for very long time to build

> our distribution channels and nurturing our relationship with our business partners and local government. And so, we are well positioned in the Chinese market to implement our future strategies.

160. On Yingli's Global Investor Day presentation on October 22, 2013, Defendant Li announced that it was Yingli's goal to occupy the "leading position in downstream PV business of China", leaving other markets to its competitors.

161. On Yingli's Global Investor Day, October 22, 2014, Defendant Wang presented a slide stating that "Yingli is well positioned to benefit from the growth of China's favorable policies" because its "earlier entrance: Pioneer in China PV market with deep understanding of local market since 2002".

162. On the Q3 2013 Earnings Call, Defendant Miao stated:

> Yingli and other well-positioned companies in China experienced strong demand. They were known by their reputation for excellent quality and the superior service. Yingli's PV modules are natural choice for many of our customers.

163. Further, Yingli's management was very hands on. According to FE 1, Yingli's highest-level officers take personal responsibility and are personally involved in Yingli's key projects. According to FE 2, many of Yingli's Chinese offices, such as Sichuan and Tibet, operate as satellites of its Beijing office.

*B. Accounts receivable are critically important to Yingli*

164. During the Class Period, Yingli's financial condition became ever more precarious.

165. At the same time, during the Class Period, accounts receivable became Yingli's largest asset.

166. Yingli used accounts receivable to meet its immediate cash flow needs. For example, Yingli sold accounts receivable and used them as security for short-term loans.

167. Accordingly, any fact that cast doubt on Yingli's receivables' collectability would impair its ability to raise the funds it needed to pay its obligations as they came due.

| In thousands U.S. dollars | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Accounts receivable as of December 31: | 289,291 | 338,483 | 583,321 | 697,710 | 655,808 |
| Accounts receivable sold during the year ended December 31: | 255,297 | 54,635 | 35,838 | 111,964 | 30,319 |
| Accounts receivable used as security for loans as of December 31: | 0 | 2,062 | 0 | 53,290 | 72,009 |

*C. Other misconduct.*

168. According to FE 10, Yingli's problems were compounded by internal corruption and misappropriation of corporate funds, which are semi-open secrets within Yingli. In 2012, Yingli made a $8.0 loan to its own-subsidiary Hainan Yedao Harvest Real Estate Development Co., Ltd., to develop a real estate project. Yingli then made a $4.13 million and a $6.4 million loan in 2013 and 2014, respectively. The investments were puzzling, since Yingli is not otherwise involved in real estate. According to FE 1, the reason for the investment and the entire Hainan Yedao project was to spend Yingli's scarce cash to benefit Yingli's employees.

## IX. CLASS ACTION ALLEGATIONS

169. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Yingli's securities between December 2, 2010 and May 15, 2015, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

170. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Yingli's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Yingli shares were traded publicly during the Class Period on the New York Stock Exchange. At the end of the Class Period, Yingli had 181,763,770 Ordinary Shares outstanding, including 128,592,337 ordinary shares represented by ADSs. Record owners and other members of the Class may be identified from records maintained by Yingli's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

173. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Yingli;

(c) whether the Individual Defendants caused Yingli to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Yingli ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) to what extent the members of the Class have sustained damages and the proper measure of damages.

174. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

175. The market for Yingli's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Yingli's securities traded at artificially inflated prices during the Class Period. On February 18, 2011, the Company's ADSs closed at a Class Period high of $13.34 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Yingli's securities and market information relating to Yingli, and have been damaged thereby.

176. During the Class Period, the artificial inflation of Yingli's ADSs was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Yingli's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Yingli and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company ADSs. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

177. At all relevant times, the market for Yingli's securities was an efficient market for the following reasons, among others:

(a) Yingli's ADSs met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) as a regulated issuer, Yingli filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c) Yingli regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Yingli was followed by at least 8 securities analysts employed by brokerage firms who wrote reports about the Company during the Class Period, including Credit Suisse Securities (USA) LLC, Deutsche Bank AG, RBC Capital Markets, and Arete Research, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e) On average, 17% of Yingli's outstanding ADSs were traded weekly, permitting a very strong presumption of that its shares traded on an efficient market;

(f) More than 270 market makers made a market in Yingli's ADS; and/or

(g) New company-specific information was rapidly reflected in Yingli's stock price.

178. As a result of the foregoing, the market for Yingli's securities promptly digested current information regarding Yingli from all publicly available sources and reflected such information in Yingli's stock price. Under these circumstances, all purchasers of Yingli's securities during the Class Period suffered similar injury through their purchase of Yingli's securities at artificially inflated prices and a presumption of reliance applies.

179. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on

Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

180. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Yingli who knew that the statement was false when made.

## XII. FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

181. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

182. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Yingli's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

183. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Yingli's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

184. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Yingli's financial well-being and prospects, as specified herein.

185. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Yingli's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Yingli and its business operations and future prospects in light of the

circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

186. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

187. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Yingli's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period,

Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

188. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Yingli's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Yingli's securities during the Class Period at artificially high prices and were damaged thereby.

189. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Yingli was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Yingli securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

190. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with

their respective purchases and sales of the Company's securities during the Class Period.

## XIII. SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

192. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

193. The Individual Defendants acted as controlling persons of Yingli within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

194. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

195. As set forth above, Yingli and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this

Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 20, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By/s/ *Laurence M. Rosen*

Laurence M. Rosen (SBN 219683)
Phillip Kim (*Pro Hac Vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (310) 407-7502
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2015, I filed the foregoing CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS through the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2015 /s/ Laurence M. Rosen.