**O**

# United States District Court
# Central District of California

KEVIN T. KNOX; NOE BAROCIO; SALVADOR BAROCIO; CINDY CONYBEAR, each individually and on behalf of all others similarly situated,

Plaintiff,

v.

YINGLI GREEN ENERGY HOLDING COMPANY LIMITED; LIANSHENG MIAO; YIYU WANG; and ZONGWEI "BRIAN" LI,

Defendants.

Case № 2:15-cv-04003-ODW(MRWx)
[c/w: 2:15-cv-04600-ODW (MRWx)]

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [65]**

## I. INTRODUCTION

This is a putative class action for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiffs Noe Barocio, Salvador Barocio, and Cindy Conybear allege that Defendant Yingli Green Energy Holding Company Limited ("Yingli"), a company that sells solar energy products, made false or misleading public statements regarding (1) a Chinese government subsidy program that funded the business ventures of Yingli's customers, and (2) Yingli's ability to collect on its accounts receivable. Yingli now moves to dismiss Plaintiffs' section 10(b) claim, arguing that Plaintiffs have not adequately pleaded either a

material misrepresentation or scienter, and that the allegations relating to the government subsidy program are barred by the two-year statute of limitations. For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion. (ECF No. 65.)

Golden Sun Program—Fraud and Abuse. Many of Yingli's customers received subsidies from the Golden Sun Program for solar power projects that they were developing. This benefitted Yingli's business significantly, because the subsidies gave Yingli's customers the capital needed to buy from Yingli various components for those projects. However, it was ultimately revealed that there was widespread fraud and abuse within the program, which ultimately caused the Chinese government to discontinue it. Plaintiffs allege that Yingli knew of the fraud and abuse in the program all along, knew or should have known that it would cause the government to discontinue the program, knew that such discontinuation would negatively impact its future business, and yet failed to disclose any of this to its investors. The Court holds that the material allegations regarding Yingli's misrepresentations and intent to defraud were reasonably discoverable before May 28, 2013, and are thus barred by the statute of limitations as currently pleaded.

Golden Sun Program—Clawbacks. All recipients of Golden Sun subsidies were required to meet certain project completion deadlines as a condition of receiving the subsidy, and the failure to meet those deadlines required them to repay the subsidy in full. Many project developers ultimately missed those deadlines—including at least fifty-one that had purchased products from Yingli—which caused the government to issue clawback notices to those developers. This, in turn, created a significant problem for Yingli. Yingli's customers were not required to pay Yingli in full for their purchases until their projects were completed, and thus the clawbacks endangered Yingli's outstanding accounts with these customers. Plaintiffs allege that Yingli always knew of the government's legal right to clawback the subsidies and of the detrimental effect such clawbacks would have on its accounts, yet failed to

disclose this to its investors. The Court holds that Plaintiffs do not adequately plead a material misrepresentation because there are insufficient allegations regarding the specific accounts at risk. Plaintiffs also do not adequately plead scienter because the allegations do not create a "strong inference" that Yingli knew of specific accounts that would be rendered uncollectible if clawbacks occurred. 15 U.S.C. § 78u-4(b)(2)(A). However, the Court declines to reach the statute of limitations issued until Plaintiffs properly plead a securities fraud claim.

Accounts Receivable—Revenue Recognition. Plaintiffs allege that Yingli improperly recognized as revenue the outstanding accounts of customers that had a history of not paying their debts on time or in full. Yingli ultimately wrote-off many of these accounts, which endangered Yingli's ability to maintain its operations. The Court holds that Plaintiffs have not adequately pleaded a material misrepresentation because they have neither identified the specific customers or accounts at issue, nor quantified the ultimate impact these improperly recognized accounts had on Yingli's overall revenue. And because Plaintiffs do not adequately plead a material misrepresentation, they also cannot rely on the alleged prominence of the misrepresentations to establish scienter.

Accounts Receivable—Public Statements. Finally, Plaintiffs allege that Yingli made misleading public statements concerning its revenue recognition policy, its ability to collect on its outstanding accounts, and its customers' payment terms. The Court holds that Plaintiffs have not adequately pleaded either a material misrepresentation or scienter with regard to any of the alleged statements.

## II. FACTUAL BACKGROUND

Defendant Yingli Green Energy Holding Company Limited is a publicly-traded company that manufactures and sells solar energy products. (Consolidated Compl. ("CC") ¶¶ 2, 26.) Prior to 2010, Yingli sold its products mainly to European companies. (*Id.* ¶¶ 4, 50.) By 2010, however, European demand for solar products had fallen drastically. (*Id.* ¶¶ 53–57.) Around the same time, the People's Republic

of China began encouraging and subsidizing domestic solar power development, causing Yingli's customer base to shift to China. (*Id.* ¶¶ 7, 8–9, 57–60.)

### A. The Golden Sun Program

One such subsidy program was called Golden Sun. (*Id.* ¶ 64.) Under this program, the Chinese government subsidized up to 70% of the cost of approved solar project developments in China. (*Id.* ¶ 66.) As the single largest supplier of photovoltaic panels used in Golden Sun projects, Yingli stood to benefit substantially from the program. (*Id.* ¶ 68.) In addition, Yingli developed its own solar power projects for which it also received subsidies under this program. (*Id.* ¶ 69.)

Between December 2010 and March 2013, Yingli touted its involvement in—and attributed its growth in the Chinese market to—the Gold Sun Program. (*Id.* ¶¶ 71–81.) According to Plaintiffs, however, Yingli's involvement in the program carried two significant risks that Yingli failed to disclose to its investors. First, there was a particular risk that Yingli's Golden Sun customers would default on their payments to Yingli. All Golden Sun subsidies came with tight project completion deadlines, and the failure to meet those deadlines required the award recipient to repay the subsidy in full. (*Id.* ¶¶ 72–73, 86.) Because Yingli's contracts with Golden Sun recipients required full payment only upon project completion, such clawbacks would jeopardize their ability to complete their payments to Yingli. (*Id.* ¶ 82.) Second, there was rampant fraud within the Golden Sun Program, such as the deliberate inflation of project cost estimates in subsidy applications and the use of a single project's infrastructure to apply for multiple subsidies. (*Id.* ¶¶ 87–88.) According to Plaintiffs, such massive fraud was bound to not only catch the government's attention, but to cause the government to terminate the Program entirely. And given Yingli's reliance on the Program for revenue, termination of the program would greatly endanger Yingli's business model. (*See id.* ¶ 86.)

Sure enough, between March 15, 2013, and March 20, 2013, several reporters and financial analysts predicted that fraud and abuse within the Golden Sun Program

would lead to its termination. (*Id.* ¶¶ 146–50.) This caused Yingli's stock price to drop 22% by March 22, 2013. (*Id.* ¶¶ 148, 151.) In December 2013, the Chinese government discontinued the Golden Sun Program, allegedly in response to this fraud and abuse. (*Id.* ¶ 93.) Moreover, in April 2013, the Chinese Ministry of Finance began to issue clawback notices to developers whose projects were not completed on time. (*Id.* ¶ 89.) According to a Yingli "sales head," this affected fifty-one of the fifty-five Yingli customers involved in the Golden Sun Program, and thus put "hundreds of millions of RMB" in accounts receivable at risk. (*Id.* ¶ 82, 90.)

Plaintiffs allege that Yingli knew or should have known that the Chinese government would eventually discover the egregious fraud and abuse within the Program and would cancel it. (*Id.* ¶ 86.) Plaintiffs also allege that Yingli was always aware of the potential for clawbacks and the impact such clawbacks would have on its accounts receivable. (*Id.* ¶¶ 158–63.) Plaintiffs allege that the failure to disclose these risks made Yingli's cheery statements about the Golden Sun Program misleading.

**B. Yingli's Accounts Receivable**

Yingli's move to the Chinese market was further complicated by the fact that Chinese companies tended not to pay their bills either in full or on time. (*Id.* ¶ 94.) Yingli has two types of customers in China: Chinese state-owned enterprises ("SOEs") and private companies. (*Id.* ¶ 10.) Yingli's contracts with SOEs generally required them to pay 30% in advance, 30% before beginning construction, and 30% within a month of the end of construction. (*Id.* ¶ 98.) Plaintiffs do not say when the SOEs were contractually obligated to pay the remaining 10%, but regardless, the SOEs would "typically withhold[] the 10% . . . as a future quality guarantee." (*Id.*) And because SOEs harshly criticized the quality of Yingli's products, Yingli often had difficulty recovering the final 10%. (*Id.*) In addition, SOEs would "frequently" violate the terms of their contracts with Yingli, and would "routinely" delay other payments to Yingli—sometimes for up to five years. (*Id.* ¶ 99.) Because the larger SOEs had the power to award high-value projects, Yingli could not afford to

antagonize them by using harsh collection methods. (*Id.*) Private customers were apparently "even worse," and the majority of Yingli's doubtful and written-off accounts came from domestic private companies—many of which were bankrupt. (*Id.* ¶ 100.) The mounting accounts receivable are now "endangering" Yingli's ability to pay its obligations as they come due. (*Id.* ¶ 101.)

Plaintiffs allege that Yingli made false and misleading statements regarding its outstanding accounts in two ways. First, Plaintiffs allege that Yingli improperly recognized as revenue the unpaid accounts of SOEs and private companies. (*Id.* ¶ 110.) Under Generally Accepted Accounting Principles ("GAAP"), companies should not recognize outstanding accounts as revenue unless "collectability is reasonably assured." (*Id.* ¶ 108.) Based on the history of late payments and non-payments among domestic companies, Plaintiffs allege that the collectability of these outstanding accounts was not reasonably assured and should not have been recognized as revenue until Yingli had the money in-hand. (*Id.* ¶¶ 110–13.)

Second, Plaintiffs allege that Yingli made the following false and misleading public statements regarding its customers' payment terms, its accounts receivable, and the likelihood of collecting on those accounts:

- Between 2011 and 2014, Yingli stated in its yearly 20-F report that when selling products to domestic companies, "the risks and rewards of ownership [are] transferred" when "the product is received by the customer." (*Id.* ¶ 109.) Yingli also stated that installing a full solar power system for its clients "requires advance payments from the customer," and that the risks and rewards of ownership are transferred "when installation of all components is complete and customer acceptance is received." (*Id.*)
- In Yingli's Q1 2011 Earnings Call, Yingli stated that it did not intend to help finance its customers' purchases. (*Id.* ¶ 114.)
- In Yingli's Q2 2012 Earnings Call, Yingli stated that it had "implemented a more stringent management mechanism to minimize accounts receivable risk."

(*Id.* ¶ 116.)

- In Yingli's Q4 2012 Earnings Call, Yingli stated that it would "continue to optimize [its] customer portfolio and improve the profitability level of . . . sales[] in China." (*Id.* ¶ 118.)
- In Yingli's Q1 2013 Earnings Call, Yingli stated that it was "working on . . . the on-time collection of [its accounts receivable] balance," that its "cost receivable . . . has been deemed as a very low risk receivable," and that Yingli's payment terms with its customers "compared to the market scale and the potential of the market is reasonable." (*Id.* ¶ 119.)
- In slides accompanying Yingli's Q2 2013 Earnings Call, Yingli stated that the number of days its accounts remained outstanding was reduced by 40%. (*Id.* ¶ 121.)
- In Yingli's Q2 2013 Earnings Call, Yingli stated that it would recognize revenue "after we fully meet the contract terms, which means is [sic] deliver [sic] the whole project to the customer with risk and reward and title transferred." (*Id.* ¶ 123.)
- In Yingli's Q2 2013 Earnings Call, Yingli stated that it was able to gather between 10% and 30% prepayments for its products before it shipped. (*Id.* ¶ 125.)
- Yingli made a presentation at its 2013 Annual Global Investor Day in which it touted its "[r]obust cooperation with 5 largest power conglomerates and 4 utility companies." (*Id.* ¶ 128.)
- In slides accompanying Yingli's Q3 2013 Earnings Call, Yingli stated that "[p]ayment and pricing terms in China have improved continuously," and that "[p]ayment conditions for accounts receivable improved." (*Id.* ¶¶ 130, 134.)
- In Yingli's Q3 2013 Earnings Call, Yingli stated that "[p]ayment and the pricing terms in China have improved continuously." (*Id.* ¶ 132.)
- In Yingli's Q4 2013 Earnings Call, Yingli stated that it "managed [to]

improve[] receivables collection and significantly reduced the base outstanding in China." (*Id.* ¶ 136.)

- In Yingli's Q2 2014 Earnings Call, Yingli stated that it was "working with . . . strong partners in China which [sic] they will be helping us to enhance the project finance for those projects we developed together." (*Id.* ¶ 141.)
- In slides accompanying Yingli's Q3 2014 Earnings Call, Yingli stated that "[s]ome customers even increased the advance payment or made full payment for the purpose of speeding up the delivery." (*Id.* ¶ 144.)

Plaintiffs allege that these statements gave the impression that Yingli was successful in collecting on its accounts receivable and enforcing its payment terms, but in reality neither was true. (*Id.* ¶¶ 110, 115, 120, 124, 128, 131, 133, 135, 137, 142, 145.) As an example, Plaintiffs point to the Bazhou Bohu project between Yingli and the China Datang Corporation. As an SOE, Datang's contract with Yingli used the 30/30/30/10 payment structure discussed above. (*See id.* ¶ 102.) Yingli completed the project for Datang by December 2013, yet by mid-2014, Datang had paid less than 50% of the project price to Yingli. (*Id.*) Notably, the price for the Bazhou Bohu project was RMB 300 million (approximately USD$46 million). (*Id.*) Moreover, this was apparently not an isolated incident—Datang would "often" delay payments on "small" bills by up to two years, and "large" bills would take "much longer." (*Id.* ¶ 104.) Likewise, the China Power Investment Corporation would also often "delay payment" to Yingli. (*Id.* ¶ 106.)

**C. Procedural History**

On May 28, 2015, Kevin Knox filed this action. (ECF No. 1.) Three weeks later, Bhimsain Mangla filed a near-identical action. (Complaint, *Mangla v. Yingli Green Energy Holding Co. Ltd., et al.*, No. 2:15-cv-04600-ODW (MRWx) (C.D. Cal. June 17, 2015).) On October 6, 2015, this Court consolidated the two actions, appointed Noe Barocio and Salvador Barocio as lead plaintiffs, and The Rosen Law Firm as lead counsel. (ECF No. 55.) On November 20, 2015, Plaintiffs filed a

Consolidated Complaint. (ECF Nos. 63, 74.) On December 18, 2015, Yingli moved to dismiss the Complaint. (ECF No. 65.) Plaintiffs timely opposed, and Yingli timely replied. (ECF Nos. 77, 80.) That Motion is now before the Court for consideration.

## III. LEGAL STANDARD

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In a private securities fraud case, the plaintiff must comply with the stringent pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012), although the Rule 9(b) analysis is "effectively subsumed" under the stricter PSLRA analysis, *Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008).

"In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008); *see also* 17 C.F.R. § 240.10b-5. Only the first two elements are at issue in this Motion.

### A. Material Misrepresentation

To establish the first element, "a plaintiff must show that the defendant made a statement that was *misleading* as to a *material* fact. . . . [T]his materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (footnote and some internal quotation marks omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omissions are actionable only where they

"affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) ("Often, a statement will not mislead even if it is incomplete or does not include all relevant facts.").

"Pursuant to the PSLRA, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (quoting 15 U.S.C. § 78u-4(b)(1)); *Cutera Sec. Litig.*, 610 F.3d at 1109.

**B. Scienter**

"The complaint must also 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'—that is, that he acted with intentionality or deliberate recklessness or, where the challenged act is a forward looking statement, with 'actual knowledge . . . that the statement was false or misleading.'" *Ronconi*, 253 F.3d at 429 (quoting 15 U.S.C. §§ 78u-4(b)(2)(A), 78u-5(c)(1)(B)(i)) (footnotes and some citations omitted).

To determine whether the plaintiff has met the "strong inference" standard, the court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). This analysis requires the courts to "assess all the allegations holistically" rather than "scrutiniz[ing] each allegation in isolation." *Id.* at 326.

/ / /

**C. Purpose**

The PSLRA's strict pleading requirements were "[d]esigned to curb perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Id.* at 320 (citation omitted). "Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed." *Medhekar v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 99 F.3d 325, 328 (9th Cir. 1996). Thus, "[w]here pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." 15 U.S.C. § 78u-4(b)(3)(A).

**D. Leave to Amend**

As a general rule, a court should freely give leave to amend a complaint that has been dismissed, even if not requested by the plaintiff. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). However, a court may deny leave to amend when it "determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV. DISCUSSION

Yingli challenges only Plaintiffs' section 10(b) claim. Yingli argues that Plaintiffs have not adequately pleaded either a material misrepresentation or scienter with respect to both the Golden Sun Program and the collectability of accounts receivable. In addition, Yingli argues that the alleged misrepresentations relating to the Golden Sun Program are barred by the two-year statute of limitations. The Court addresses each issue in turn.

/ / /

## A. Golden Sun Program

### 1. Fraud Within the Golden Sun Program

#### i. Statute of Limitations

Yingli argues that a reasonable person would have discovered the alleged fraud within the Golden Sun Program no later than May 27, 2013, and thus Plaintiffs' claims are barred by the two-year statute of limitations. (Mot. 24–25.) Plaintiffs counter that they could not have reasonably discovered facts constituting scienter before that date. (Opp'n 24–25.) The Court agrees with Yingli and concludes that this theory is barred.

A section 10(b) claim must be brought either within two years after "the discovery of the facts constituting the violation," or within five years after the violation, whichever is earlier. 28 U.S.C. § 1658(b); *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1205 (9th Cir. 2012). "'[D]iscovery' as used in this statute encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010). This includes both facts constituting the misrepresentation and facts showing that the defendant acted with scienter. *Id.*

Misrepresentations. Here, all facts constituting the misrepresentations were reasonably discoverable prior to May 28, 2013. All of Yingli's allegedly false and misleading statements were made before March 4, 2013. (*Id.* ¶¶ 71–81.) On March 25, 2013, only days after several reporters and financial analysts publicly opined that fraud within the Golden Sun Program could lead to its termination, Yingli's stock price fell by 22%. (*Id.* ¶¶ 146–51.) If the market learned of the fraud in the Golden Sun Program by this date, so too would a reasonably diligent investor.

Plaintiffs argued at the hearing on the Motion that (1) the key reports were written in Chinese and thus not reasonably discoverable before May 28, 2013, and (2) because the English-language reports did not specifically mention "fraud" in the Golden Sun Program, it is not clear that the stock drop was in fact a reaction to the

market learning of the fraud. The Court is not persuaded by either argument. First, the fact that the articles were published in Chinese does not justify any significant delay in discovery. In this day in age, reasonably sophisticated analysts and investors following a China-based company should have the means with which to locate and analyze Chinese-language news articles just as quickly as it could with English-language news articles. Second, it is simply not possible to square Plaintiffs' new-found arguments with their allegations. It is beyond cavil that Plaintiffs cited these news reports and their immediate effect on Yingli's stock price in an attempt to establish loss causation for its fraud theory. (CC ¶¶ 19, 146–51.) As a result, Plaintiffs cannot now argue (or plead in a subsequent iteration of the complaint) that these allegations actually establish the market's reaction to something *other* than the alleged fraud in the Golden Sun Program.

Scienter. Plaintiffs' allegations with respect to scienter are limited to extremely broad and vague statements made by Yingli between November 2012 and November 2013 concerning its purportedly "deep knowledge" of the solar energy market. (CC ¶¶ 158–63.) Contrary to Plaintiffs' arguments, their allegations do not show in the first instance that Yingli acted with the requisite knowledge and intent, let alone that those allegations were discoverable only after May 28, 2013. (CC ¶¶ 158–63; *see infra* Section IV.B.2.ii.)

However, the Court will grant Plaintiffs leave to amend to show both that Yingli acted with scienter and that the facts constituting scienter were discoverable only after May 28, 2013. Although Yingli protests that Plaintiffs cannot cure the deficiency in a manner that is consistent with the allegations in the Complaint, the Court concludes that they could plausibly do so. As the Court noted, none of the allegations give rise to a "strong inference" of scienter. Thus, if, for example, Plaintiffs unearth new facts that properly establish scienter, and Plaintiffs show that those new facts were reasonably discoverable only after May 28, 2013, Plaintiffs could insert those allegations in an amended complaint without contradicting any

allegations that it made in the operative complaint. *See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run."); *Pension Trust Fund for Operating Eng'rs v. Mort. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 275 (3d Cir. 2013) (following *MBIA*).

**2. Clawbacks**

**i. Material Misrepresentations**

Yingli gives two reasons why Plaintiffs have not pleaded an actionable misrepresentation. First, Yingli argues that the failure to predict the clawbacks constitutes inactionable fraud-by-hindsight, and that at any rate, cautionary statements issued by Yingli conclusively demonstrates that it did not mislead its investors. (Mot. 6–7.) Second, Yingli argues that Plaintiffs fail to allege with sufficient particularity how the potential for clawbacks would impact specific accounts. (Mot. 7–9.) The Court disagrees with the former, but agrees with the latter.

<u>Fraud-by-Hindsight</u>. "A plaintiff may not plead 'fraud by hindsight'; i.e., a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) (citation omitted). As the Ninth Circuit has explained, "[s]ecurities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute on other grounds as recognized in*

*Johnson v. Wal-Mart Stores, Inc.*, 544 F. App'x 696, 698 (9th Cir. 2013). Rather, "a plaintiff must set forth . . . an explanation as to why the disputed statement was untrue or misleading *when made*. This can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants [at the time]." *Id.* at 1549 (original emphasis).

Here, Plaintiffs' theory is based not on a failure to predict the future issuance of clawback notices, but on a failure to disclose the government's then-existing legal right to clawback subsidies if certain conditions were not met. That right was spelled out in the government contracts that Yingli allegedly helped procure for its clients, not to mention in its *own* contracts for its own solar projects. (*See* CC ¶¶ 69, 80.) Moreover, the Chinese government reiterated in 2011 that it would clawback the subsidies if the projects did not meet their deadlines. (*Id.* ¶ 73.) Yingli therefore knew at the time it made the cheery statements regarding the Golden Sun Program that there was actually risk to its involvement in the program. And if Plaintiffs can adequately allege that the risk was material, then the failure to disclose it made the cheery statements misleading.

Yingli also notes that its yearly 20-F reports disclosed that its "business depends substantially on government incentives given to its customers," and that "[a] significant reduction in or discontinuation of government subsidies and economic incentives may have a material adverse effect on our results of operations." (Yingli's Req. for Judicial Notice, Ex. A–D.) Yingli argues that these disclosure show as a matter of law that Yingli did not mislead its investors. The Court disagrees. "Inclusion of *some* cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading. A motion to dismiss for failure to state a claim will succeed only when the documents containing defendants' challenged statements include '*enough* cautionary language or risk disclosure' that 'reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995)

(citations omitted). Here, the warning that Yingli references is most naturally read to refer to the potential discontinuation of *future* subsidies under the Golden Sun Program, not the recovery of *past* subsidies already paid out.[1] Indeed, it is Yingli that emphasizes the substantial difference between the two theories. (Reply 2.) As a result, the disclosures contain insufficient cautionary language to dismiss the clawbacks theory outright.

Materiality. Yingli next argues that Plaintiffs do not plead with sufficient particularity the extent to which Yingli's accounts receivable would be "imperiled" by the potential clawbacks. Plaintiffs respond by pointing to a Chinese-language news article that appeared on Sina.com after the clawback notices were issued. There, it was reported that the clawbacks endangered fifty-one of Yingli's fifty-five accounts relating to Golden Sun, and that the amount at risk added up to "hundreds of millions of RMB." The article cited a Yingli "sales head" as the source of this information. Plaintiffs argue that these facts are sufficiently specific to satisfy the PSLRA's pleading requirements. Plaintiffs are wrong.

First, Plaintiffs cannot rely on the Sina.com article's *post hoc* analysis to establish materiality. "The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false. . . . In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood." *GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1549. Here, while the Sina.com article shows that the clawbacks ultimately ended up jeopardizing Yingli's outstanding accounts, it does *not* show that a reasonable person would have predicted that outcome all along—i.e., when the allegedly misleading statements were

---

[1] However, to the extent Plaintiffs do not correct the statute of limitation problem with its fraud and abuse theory in the next iteration of their complaint, Yingli may reassert this argument in a subsequent motion to dismiss as to *that* theory.

made. The PSLRA specifically prohibits this type of Monday-morning-quarterback analysis.

Second, even if reliance on the Sina.com article would not constitute fraud by hindsight, the article is too conclusory to satisfy the PSLRA's requirements. "[N]ewspaper articles satisfy the heightened PSLRA pleading requirements if (1) they are based on an independent investigative effort, (2) they are sufficiently particular and detailed to indicate their reliability, and (3) Plaintiffs' counsel conducted its own independent investigation which corroborates the information in the article." *In re JPMorgan Chase & Co. Sec. Litig.*, No. 06C4675, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007). Here, the article contains insufficient detail regarding Yingli's accounts receivable or the financial condition of Yingli's customers. *Id.* ("'[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.'" (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1271 (N.D. Cal. 2000))). Moreover, there is no "independent investigation" of counsel to corroborate the information in the article.

Finally, as Yingli points out, clawbacks alone would not *ipso facto* render Yingli's customers incapable of paying their debts. Rather, its customers' ability to satisfy their account with Yingli in the event of clawbacks depends on, among other things, the customer's financial health at that time and the safeguards Yingli may have put in place to secure the debt. It is possible, for example, that the customers had sufficient reserves at that time to settle their accounts with Yingli in the event of clawbacks, or that Yingli had the right to liquidate project infrastructure to satisfy the debt. In those cases, a reasonable person would not predict that the clawbacks would affect Yingli's bottom line, and thus the possibility of clawbacks would not have "significantly altered the 'total mix' of information made available" to investors at the

time of the alleged misstatements. *Matrixx Initiatives, Inc.*, 563 U.S. at 38.

**ii. Scienter**

Yingli argues that Plaintiffs have not adequately pleaded scienter for two reasons. First, Yingli argues that Plaintiffs have not shown that Yingli knew that its customers could not repay the loans in the event of clawbacks. (Mot. 18–20.) Second, Yingli submits evidence showing that the Chinese government provided several exceptions and extensions to project deadlines, and points to statements in the Sina.com article showing that the government's decision to actually issue clawback notices "sent shockwaves through the Chinese photovoltaic industry." (*Id.*; Yingli RJN at Ex. E.) Thus, Yingli argues, the more compelling inference is that Yingli was just as surprised as everyone else when the government began to clawback the subsidies, and therefore did *not* intend to mislead its investors by failing to disclose the possibility of clawbacks. The Court agrees with Yingli's first argument, but disagrees with the second.

The Court agrees that Plaintiffs have not pleaded a "strong inference" of scienter. As previously noted, Plaintiffs did not plead facts in sufficient detail to show that Yingli's customers were incapable of paying their accounts with Yingli following the government clawbacks. Similarly, Plaintiffs have not pleaded any facts regarding Yingli's knowledge of the financial state of their customers, and thus have not established a compelling inference that they knew that its customers could not settle their accounts with Yingli.[2]

However, the other evidence Yingli points to does not conclusively establish lack of scienter. While the deadline extensions and other delays in issuing clawback

[2] This is not to say that Yingli's lack of knowledge or investigation regarding their customers' financial health could *never* provide a basis for scienter. A willful failure to investigate their customers' finances in the face of impending clawbacks could constitute deliberate recklessness. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness"). But the Consolidated Complaint says nothing about Yingli's knowledge of or efforts to investigate their customers' finances.

notices suggest that the government was not rigorously enforcing hard deadlines, there is no evidence (yet) that the government rescinded the clawback provisions in the project contracts. As such, Yingli knew that once all of the extensions expired, the Chinese government had the legal right to clawback the subsidies for each and every non-compliant project. In the face of this, the extensions and delays do not show that the most compelling inference is that Yingli made an innocent error in judgment in not disclosing the potential for clawbacks. Finally, the Court gives little weight to the statement of a non-Yingli employee about how the clawbacks "sent shockwaves" through the Chinese solar power industry. This broad statement about the industry in general is insufficient to raise any substantial inference regarding Yingli's state of mind. *JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *5.

**iii. Statute of Limitations**

Next, Yingli argues that because the Sina.com article was published on May 20, 2013, Plaintiffs' claims are barred by the statute of limitations. However, the Court declines to address the statute of limitations issue at this time. The Court agrees with the Second Circuit and the Third Circuit that it should generally defer ruling on the statute of limitations issue until the plaintiffs plead a viable claim. "Since the purpose is to prevent stale claims, it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim: A claim that has not yet accrued could never be considered stale. Thus, in the limitations context, it makes sense to link the standard for 'discovering' the facts of a violation to the plaintiff's ability to make out or plead that violation. Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run." *MBIA, Inc.*, 637 F.3d at 175; *see also Pension Trust Fund for Operating Eng'rs*, 730 F.3d at 275. Here, Plaintiffs have substantially failed to plead either a material misrepresentation or scienter, and thus evaluating whether the statute of limitations has run on those claims would be premature. Yingli may reassert this argument in any future motion to dismiss.

**B. Accounts Receivable**

Plaintiffs plead two theories of liability with respect to Yingli's accounts receivable. First, Plaintiffs allege that Yingli improperly recognized as revenue its outstanding domestic accounts receivable because collectability on those accounts was not reasonably assured. (CC ¶ 110.) Second, Plaintiffs allege that Yingli's executives made multiple false and misleading public statements regarding its accounts receivable, its ability to collect on those accounts, and on its customers' payment terms. (*Id* ¶¶ 109–45.) The Court concludes that neither theory adequately states a securities fraud claim.

**1. Revenue Recognition**

**i. Material Misrepresentation**

Plaintiffs appear to lump together two distinct revenue recognition theories. First, Plaintiffs allege that Yingli should not have recognized the 10% "quality guarantee" offered to Chinese SOEs because Yingli "typically" would not recover that money. (CC ¶ 110.) Second, Plaintiffs allege that Yingli should not have recognized as revenue *any* outstanding accounts receivable of China-based companies based on their general history of not paying their debts. (*Id.*)

"To properly state a claim for accounting fraud, plaintiffs must plead facts sufficient to support a conclusion that defendant prepared the fraudulent financial statements and that the alleged financial fraud was material." *Daou Sys.*, 411 F.3d at 1016 (citations, brackets, and internal quotation marks omitted). Plaintiffs should generally include "(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or company employees involved in the transactions." *Id.* (brackets and internal quotation marks omitted). While the amount of detail required will vary from case to case, the bottom line is that plaintiffs "must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in

nature, or whether they constituted widespread and significant inflation of revenue." *Id.* at 1017 (internal quotation marks omitted); *see also id.* at 1018 ("[T]he plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position."); *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1213 (S.D. Cal. 2005) (allegations insufficient where plaintiffs did not explain "why the allegedly uncollectible receivables were outside of the range provided for by the Company's allowance for doubtful accounts, and by how much"); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 928 (N.D. Cal. 2015) (plaintiffs must allege "specific accounts that were in jeopardy when the alleged misrepresentations were made, specific accounts in existence at the time the alleged misrepresentations were made that were ultimately rendered uncollectible, and when and to what extent [the company's] reserves should have been changed"); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009); *In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *36 (N.D. Cal. Oct. 1, 2015); *Siegel v. Lyons*, No. C-95-3588 DLJ, 1996 WL 438793, at *5 (N.D. Cal. Apr. 26, 1996).

In addition, where, like here, the plaintiff relies on information provided by confidential witnesses, those witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou Sys., Inc.*, 411 F.3d at 1015. But even where this threshold requirement is satisfied, the Court is not required to take every statement of that witness at face value—the court should still evaluate "'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Id.* (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002)).

<u>10% Quality Guarantees</u>. There are several problems with Plaintiffs' theory

that Yingli improperly recognized the quality guarantees. First, Plaintiffs do not plead sufficient facts showing that Yingli did in fact recognize all quality guarantees as revenue, and if so, when.[3] While Plaintiffs rely on two confidential witnesses (FE3 and FE7) for the proposition that "Yingli recognizes the last 10% as revenue once construction finishes" (CC ¶ 98), it does not appear that either witness is in a position to know such facts. FE3 was a project manager in Yingli's Electrical Investment Group, and FE7 was a project manager that was responsible for overseeing market expansion in Germany and Latin America. (*Id.* ¶¶ 35, 39.) Notably absent are any allegations that they worked in the accounting department at Yingli, or that they otherwise had anything to do with deciding either when revenue was recognized for accounting purposes, or at what point Yingli would make bad-debt allowances. Thus, Plaintiffs have not shown a sufficient probability that these two sources knew the information attributed to them.

Second, the allegations concerning how often SOEs actually pay the quality guarantee are insufficiently specific. Plaintiffs allege only that Yingli's SOE customers in general are "typically harsh" in evaluating project quality, and that an unstated number of SOEs "typically" delay payment of the final 10%. (*Id.* ¶ 98.) Plaintiffs say nothing about what percentage of Yingli's business is comprised of sales to Chinese SOEs under this 30/30/30/10 deal structure, how long the delays in collection were, which specific customers do not make timely payments, how often Yingli failed to collect the quality guarantee, the total amount that was ultimately written off, and what fraction of total company revenue was comprised of those written off quality guarantees. If, as Plaintiffs contend, Yingli's recognition of such revenue constituted a misrepresentation because past customer conduct indicated little-to-no likelihood of actual collection, the Court requires much more than majestic generalities of what "typically" happened among such a large subset of customers.

---

[3] In fact, Plaintiffs do not even say when Yingli's customers were contractually obligated to pay the 10% quality guarantee; all they allege is that the customers "typically withheld" that payment.

Likewise, to determine whether the misrepresentation was material requires the Court to evaluate the extent to which the improperly recognized revenue affected Yingli's bottom line. *See Daou Sys.*, 411 F.3d at 1019; *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1160 (D. Ariz. 2005). If such revenue represented, say, 0.001% of Yingli's overall revenue, Plaintiffs would be hard-pressed to argue that delays in payment "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc.*, 563 U.S. at 38.[4] Because Plaintiffs failed to provide this information, they have not shown that the allegedly improper recognition was material.

Outstanding Accounts of Domestic Companies. Plaintiffs' theory that Yingli should not have recognized any outstanding accounts of China-based companies is even more tenuous. Again, Plaintiffs do not state how much total revenue was improperly recognized, do not identify any accounts with the requisite specificity, and do not describe in sufficient detail the payment history of particular customers whose outstanding accounts should not have been recognized.[5] Indeed, Plaintiffs actually undermine their argument when they repeatedly point out Yingli's large allowance for the doubtful accounts of multiple private Chinese companies. (CC ¶¶ 97, 100.) Plaintiffs have essentially alleged the equivalent of saying, "I'm sure there's something there." This is not sufficient under the PSLRA.

---

[4] Plaintiffs' allegation that Yingli's overdue accounts "are endangering its ability to pay its obligations as they come due" is also insufficiently specific. (CC ¶ 101.) This is simply a conclusion, and the Court needs supporting facts to evaluate the reasonableness of that conclusion—e.g., some estimate of the total amount in uncollectible accounts, and the percentage of overall revenue that it constitutes. Moreover, the Court rejects Plaintiffs' comparison between Yingli's low operating margins and the quality guarantees. (Opp'n 17 & n.13.) Without knowing what percentage of overall revenue is made up of quality guarantees, there is still no way to know whether the uncollected quality guarantees materially affected Yingli's operating margin.

[5] Plaintiffs' allegations relating to the Bazhou Bohu project do not satisfy the PSLRA. (CC ¶¶ 102–05.) Plaintiffs do not say when, or even if, the unpaid amounts owed from that particular project were recognized as revenue, and whether (or when) allowances were made for late collection of those payments. Plaintiffs' allegations regarding when Datang would "normally" pay "small" and "large" bills owed to Yingli are similarly too general.

**ii. Scienter**

Further, Plaintiffs allege no direct facts showing that Yingli knew that it was improperly recognizing revenue. Instead, they argue that the improper recognition of revenue—and quality guarantees in particular—was so "pervasive" and had such significant effect on its bottom line that it would be "absurd to suggest" that such recognition was an innocent error in judgment. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008). However, Plaintiffs have not pleaded sufficient facts to rely on the "absurd to suggest" doctrine.

Generally, "'the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'" *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994); *see also Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994); *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001). One narrow exception to this rule is where "the nature of the relevant fact[s are] of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009); *Berson*, 527 F.3d at 989; *see also, e.g., In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1204–07 (D. Ariz. 2009).

The "absurd to suggest" doctrine does not help Plaintiffs here. A plaintiff must first adequately plead a material misrepresentation before they can rely on those same allegations to establish scienter. *Berson*, 527 F.3d at 989. Plaintiffs here have not adequately pleaded a material misrepresentation. That is, Plaintiffs have not shown that specific customers had such a poor history of paying their accounts or the quality guarantee that no reasonable accountant would recognize it as revenue until paid. Plaintiffs have also not shown when (or even if) such revenue was recognized, or if it

made up more than a negligible portion of Yingli's overall revenue. Thus, the allegations obviously cannot show that it was *so* apparent that customers never timely paid the quality guarantee, and that it had *such* a huge impact on Yingli's bottom line, that upper management could not possibly have been unaware that the revenue was being improperly recognized. Plaintiffs have therefore not established scienter.

**2. Public Statements**

**i. Material Misrepresentation**

Plaintiffs allege that Yingli made numerous statements regarding its payment terms and accounts receivable with domestic companies that gave the false or misleading impression that there was little to no risk that they would default on payment, when in fact they were persistently unable to collect on those accounts. Upon close inspection of each statement, however, it is clear that the statements are either not actionable or that Plaintiffs have not pleaded sufficient facts to show that they are false or misleading.

Non-Actionable Puffing. Plaintiffs point to numerous vague assessments and future predictions made by Yingli regarding its accounts receivable and payment terms. (CC ¶¶ 118, 128, 136, 141.) However, statements that constitute only "mildly optimistic, subjective assessment[s] hardly amount[] to a securities violation. Indeed, 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Cutera Sec. Litig.*, 610 F.3d at 1111 (citations omitted); *see also In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) (holding that the following phrases were non-actionable puffing: "'we're doing well and I think we have a great future,' 'business will be good this year . . . we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . . ,' 'everything is clicking [for the 1990s] . . . new products are coming in a wave, not in a trickle . . . old products are doing very well' and that 'I am optimistic about Syntex's performance during this decade'"), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *Mulligan v. Impax Labs., Inc.*, 36 F.

Supp. 3d 942, 966 (N.D. Cal. 2014) ("[P]uffing statements are generally not capable of objective verification, and lack a standard against which a reasonable investor could expect them to be pegged." (citations and internal quotation marks omitted)); *cf. Daou Sys.*, 411 F.3d at 1021 (holding that the following statements were not actionable: that the company's position was "extremely strong" and "remained healthy and would fuel future earnings growth," that "visibility of future earnings was outstanding," and that the company's "momentum was increasing").

The following statements constitute the same sort of nonactionable puffery: (1) that Yingli will "continue to optimize our customer portfolio and improve the profitability level of our sales in China" (CC ¶ 118); (2) that Yingli has "robust cooperation with [the] 5 largest power conglomerates and 4 utility companies" (*id.* ¶ 128); and (3) that Yingli was "working with . . . strong partners in China which [sic] they will be helping us to enhance the project finance for those projects we developed together" (*id.* ¶ 141). The Court dismisses Plaintiffs' section 10(b) claim without leave to amend to the extent it is based on these statements.

Transfer of Risk. In its yearly 20-F statements, Yingli stated that for certain solar power products sold to domestic companies, "delivery of the product occurs at the point in time the product is received by the customer, which is when the risks and rewards of ownership have been transferred." (*Id.* ¶¶ 109, 123.) Similarly, for certain solar power systems built for domestic companies, Yingli stated that "the risks and rewards of ownership [are] transferred[] when installation of all components is complete and customer acceptances is received." (*Id.*) Plaintiffs argue that these statements gave the impression that there was no financial danger to Yingli from the transaction after delivery, and that this impression was misleading because Yingli was in fact not paid in full at that time, and was unable or unwilling to enforce their right to payment on the outstanding accounts. Yingli argues that Plaintiffs simply misconstrue these statements. Yingli points out that under GAAP, delivery of the product is a prerequisite to recognizing revenue, and thus these statements amount to

nothing more than the uncontroversial proposition that a product is "delivered" for revenue recognition purposes when it is received by the customer.

While it is true that the portion of the statement that simply defines the point in time that "delivery" occurs is not a misrepresentation, Yingli's statement does not relate *only* to the delivery requirement under GAAP. Rather, the misrepresentation here exists in the next clause of the sentence, where Yingli stated that delivery of the product is *also* the point in time when "the risks and rewards of ownership have been transferred." This clause does not appear to have anything to do with the delivery requirement. It is unclear if that clause is otherwise used in a technical sense,[6] but either way it is misleading to tell investors that the "risks and rewards of ownership have transferred" upon delivery if Yingli was never actually paid for the product after delivery occurred, for then it would still have retained one of the major "risks" of product ownership (i.e., being financially responsible for it). That said, Plaintiffs have not pleaded sufficient facts to make out a claim on such grounds. For example, Plaintiffs say nothing about how long the delays in collection were, whether there were instances where Yingli did not ever collect the revenue, which specific customers did not make timely payments, the total amount that was ultimately written off, and what fraction of total company revenue was comprised of those written off amounts. Thus, there is no way to determine whether the substantial "risks and rewards of ownership" were or were not transferred upon product delivery.

Yingli's alleged inability to enforce payment on the outstanding accounts is also not pleaded with sufficient particularity. First, the confidential witness who attested to this fact (FE7) did not work either on collections or on Chinese accounts, and thus it is

---

[6] Under International Financial Reporting Standards, a seller can recognize revenue only when it has "transferred to the buyer the significant risks and rewards of ownership of the goods." Clyde P. Stickney et al., *Financial Accounting: An Introduction to Concepts, Methods, and Uses* 342 (13th ed. 2010). This requirement basically mirrors the GAAP requirement that revenue cannot be recognized until "collectability is reasonably assured." *Id.* However, it is unclear why Yingli would make such a reference given that it prepared its financial statements in accordance with GAAP and not IFRS.

unclear how he would know about Yingli's collection methods except through rumor and hearsay. (CC ¶¶ 39, 99.) Second, the details surrounding Yingli's collection methods are insufficiently pleaded. For example, FE7 appears to concede that Yingli still had *some* enforcement options available to it, yet he does not describe these options or how they were less effective than, say, suing the SOE. (*Id.* ¶ 99.)

Improving Collections on Outstanding Accounts. Yingli made several statements to the effect that collections on outstanding accounts were improving, and Plaintiffs contend that this was misleading because Yingli's customers would generally not pay its accounts on time. (CC ¶¶ 116, 117, 119, 120, 136, 137, 140, 141.) Again, Plaintiffs' allegations are deficient. While qualitative assessments like "improved" (*id.* ¶¶ 119, 130, 132, 134), "stringent" (*id.* ¶ 116), "low risk," and "reasonable" (*id.* ¶ 119) are potentially actionable, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000), Plaintiffs have not alleged sufficient facts showing that these statements were in fact false or misleading. First, as previously stated *ad nauseam*, Plaintiffs do not allege sufficient facts regarding the particular customers at issue or the overall effect on Yingli's revenue. (*See supra* Section IV.B.1.i.) Second, and more importantly here, Plaintiffs do not allege *any* facts showing that accounts receivable collection had not in fact "improved" in the relevant time frame. Collections on accounts receivable can improve relative to some earlier point, yet still be poor overall. Thus, these statements are not actionable as pleaded.

Other. Plaintiffs reference three other statements by Yingli that they contend are false and misleading. The Court addresses each in turn.

- Paragraph 114. Yingli allegedly stated that it did not intend to "use [its] own balance sheet [to finance its customer's purchases]," and were instead "helping our customers to negotiate with the domestic banks for the project finance idea." (CC ¶ 114.) Plaintiffs allege that this statement was false or misleading because Yingli would only ever be paid long after project completion (if at all), and thus was effectively financing the projects. (*Id.*

¶ 115.) The Court agrees that this statement may be misleading; however, Plaintiffs do not plead sufficient facts to show that the projects that Yingli was allegedly financing constituted a material portion of Yingli's overall revenue. Thus, Plaintiff has not adequately established materiality.

- Paragraph 125. Yingli allegedly stated that it was able to "gather" between 10% and 30% prepayments for its products before it shipped, and Plaintiffs allege that this statement was false or misleading because Yingli failed to disclose that even if it required advanced payments, Yingli frequently could not collect the prepayments. (*Id.* ¶¶ 125, 126.) First, the word "gather" suggests that the prepayments were *already* received (and not just promised) before shipping, and thus it is unclear why collection would be an issue. Second, Plaintiffs' allegation that Yingli "frequently" could not enforce prepayments does not make Yingli's statement false or misleading. Yingli stated only that it was able to gather "some" prepayments, and thus the onus is on Plaintiffs to plead not just that Yingli "frequently" did not collect such payments, but that Yingli collected no prepayments *at all*. As a result, this statement is not an actionable misrepresentation.
- Paragraph 144. Yingli allegedly stated that "[s]ome customers even increased the advance payment or made full payment for the purpose of speeding up the delivery," and Plaintiffs allege that this was misleading because "customers did not voluntarily make advance payments to speed up delivery." (*Id.* ¶¶ 144, 145). Again, Yingli does not state that *all* customers increased advanced payments, and Plaintiffs do not plead any specific facts showing that *none* of Yingli's customers increased advanced payments or made full payments for this purpose. Thus, this statement is not an actionable misrepresentation.

**ii. Scienter**

Plaintiffs rely on the following facts to establish scienter: (1) the general

prominence of the accounts receivable problem itself; and (2) Yingli's "deep knowledge" of the Chinese solar energy market. These facts are not sufficient, either independently or in combination.

As previously noted, Plaintiffs cannot (yet) rely solely on the prominence of the accounts receivable problem to establish scienter. Plaintiffs have not shown that any of the alleged misrepresentations were even material, let alone *so* material as to dispel doubt that Yingli's upper management knew of it and thus knew that the statements they were issuing were misleading. *Berson*, 527 F.3d at 989.

In addition, the facts alleged regarding Yingli's knowledge of the solar market adds little, if anything, to the inference that it intended to defraud its investors. Plaintiffs point to statements issued by Yingli, including: (1) "in China markets, we have a very good foundation because we have been investing heavily and for very long time to build our distribution channels and nurturing our relationship with our business partners and local government" (CC ¶ 159); (2) that its goal was to be in a "leading position in downstream PV business of China" (*id.* ¶ 160); (3) that it had a "deep understanding of local market since 2002" (*id.* ¶ 161); and (4) that in China, Yingli had "reputation for excellent quality and the superior service" (*id.* ¶ 162). These statements constitute nothing more than vague puffery, none of which specifically relate to Yingli's accounts receivable. Thus, they add absolutely nothing to the inference that Yingli acted with reckless indifference or intent to defraud.

Finally, Yingli's alleged misappropriation of corporate funds is completely unrelated to the accounts receivable issue and thus also does not help to establish scienter. *See Zucco Partners*, 552 F.3d at 1008 (holding that "a large quantity of otherwise questionable allegations" does not create a strong inference of scienter); *Bricklayers of W. Penn. Pension Plan v. Hecla Min. Co.*, No. 2:12-CV-00042-BLW, 2013 WL 5423875, at *8 (D. Idaho Sept. 26, 2013) ("unrelated and irrelevant" allegations of misconduct do not help to establish scienter).

/ / /

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Yingli's Motion to Dismiss. (ECF No. 65.) To the extent that the Court grants Yingli's Motion, it is with leave to amend unless otherwise noted. Plaintiffs shall file a First Amended Consolidated Complaint within 45 days addressing the deficiencies noted in this Order. Yingli shall have 45 days to respond to the FACC. If Yingli's response is a pre-answer motion under Rule 12, Plaintiffs shall file their opposition within 45 days after the motion is filed, and Yingli may file a reply within 25 days thereafter. The motion should be noticed for hearing on October 31, 2016.

**IT IS SO ORDERED.**

May 10, 2016

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**