1  Laurence M. Rosen, Esq. (SBN 219683)
2  Phillip Kim (*Pro Hac Vice*)
   THE ROSEN LAW FIRM, P.A.
3  355 South Grand Avenue, Suite 2450
4  Los Angeles, CA 90071
   Telephone: (213) 785-2610
5  Facsimile: (213) 226-4684
6  Email: lrosen@rosenlegal.com

7  *Lead Counsel for Lead Plaintiffs*
8
9              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| NOE BAROCIO, SALVADOR BAROCIO, AND CINDY CONYBEAR, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> vs. <br><br> YINGLI GREEN ENERGY HOLDING COMPANY LIMITED, LIANSHENG MIAO, YIYU WANG, AND ZONGWEI "BRYAN" LI, <br><br> Defendants. | 2:15-cv-04003-ODW(MRWx) <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

- 1 -

## LIST OF DEFINED TERMS AND SPEAKERS

| Earnings Calls | Date | Company Participants |
|---|---|---|
| 2011 Q1 Earnings Call | 2011-05-20 | Liansheng Miao, Zong-Wei Bryan Li, Yiyu Wang, |
| 2011 Q2 Earnings Call | 2012-02-29 | Miao Lian Sheng, Zong-Wei Bryan Li, Yiyu Wang |
| 2012 Q1 Earnings Call | 2012-05-30 | Liansheng Miao, Zong Wei Li, Yi Yu Wang |
| 2012 Q2 Earnings Call | 2012-08-29 | Liansheng Miao, Zongwei (Bryan) Li, Yiyu Wang |
| 2012 Q3 Earnings Call | 2012-11-28 | Liansheng Miao, Zongwei (Bryan), Yiyu Wang |
| 2012 Q4 Earnings Call | 2013-03-04 | Liansheng Miao, Zong Wei Li, Yiyu Wang |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS – 2:15-CXV-04003-ODW (MRWx)

## LIST OF DEFINED TERMS AND SPEAKERS

| SEC Filing | Date Filed | Signed By | Certified by |
|---|---|---|---|
| 20-F for the year ended December 31, 2010 ("2010 20-F") | 2011-05-11 | Liansheng Miao | Liangsheng Miao, Zongwei Li[1] |
| 20-F for the year ended December 31, 2011 ("2011 20-F") | 2012-04-26 | Liansheng Miao | Liangsheng Miao, Zongwei Li |
| 20-F for the year ended December 31, 2012 ("2012 20-F") | 2013-04-23 | Liansheng Miao | Liangsheng Miao, Zongwei Li |
| 20-F for the year ended December 31, 2013 ("2013 20-F") | 2014-04-11 | Liansheng Miao | Liangsheng Miao, Yiyu Wang |
| 20-F for the year ended December 31, 2014 ("2014 20-F") | 2015-05-15 | Liansheng Miao | Liangsheng Miao, Yiyu Wang |
| Registration Statement on Form F-3 | 2014-04-11 | Liansheng Miao, Yiyu Wang, Zongwei Li | N/A |
| Q2 2012 Earnings Release | 2012-08-29 | N/A | N/A |
| Q1 2014 Earnings Release | 2014-06-17 | N/A | N/A |

[1] Pursuant to the Sarbanes-Oxley Act of 2012, each of Yingli's annual reports on Form 20-F was required to be certified, and was certified, by Yingli's then-Principal Executive Officer and Principal Financial Officer, who each stated that " Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications all accompanied the financial report they certified.

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Court-appointed Lead Plaintiffs Noe and Salvador Barocio and Named Plaintiff Cindy Conybear ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Defendants Yingli Green Energy Holding Co. Ltd., Liansheng Miao, Yiyu Wang, and Zongwei "Bryan" Li ("Defendants") allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Yingli Green Energy Holding Co., Ltd, ("Yingli" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, interviews of former Yingli employees, and interviews of employees of Yingli's customer. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.      This is a class action brought on behalf of purchasers of Yingli's American Depository Shares ("ADSs") between December 2, 2010, and May 15, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Yingli, together with its subsidiaries, designs, develops, manufactures, markets, sells, and installs solar energy products in the People's Republic of China ("China") and throughout the world.

3.      In the first decade of the Twenty-First Century, European governments took extraordinary steps to encourage domestic production of solar power.

4.      The beneficiaries of European pro-solar policy included China-based solar manufacturers like Yingli. Yingli earned more than 80% of its revenues in Europe each year between 2004 and 2010.

5.      Beginning in 2011, the European market suffered traumas that dramatically curtailed Chinese solar manufacturers' sales there. First, due to the European debt crisis, European demand for solar panels fell substantially. Second, because prior solar subsidies had led to what the governments offering the subsidies viewed as overproduction, European governments sharply reduced the subsidies. And third, the European Union instituted anti-dumping proceedings against Chinese solar manufacturers, eventually reaching a negotiated settlement that called for Chinese manufacturers to sell their solar panels for a much higher minimum price, negating most or all of their price advantages.

6.      Between 2010 and 2014, Yingli's sales in Europe fell by three quarters.

7.      At the same time as Europe was cutting off its market to Chinese manufacturers, the Chinese government announced that it would prioritize development of domestic solar power.

8.      In 2009 the Chinese government initiated its Golden Sun program, which provided approved solar-power projects up-front subsidies of 50% of anticipated project costs before the developers even began construction. To ensure that the Chinese government only reimbursed actual costs, Golden Sun applicants

- 5 -

were required to attach contracts to their applications setting out the prices they were paying for photovoltaic ("PV") parts from their suppliers (like Yingli).

9.     The Golden Sun program was intended to jumpstart the Chinese solar industry. Accordingly, the Chinese government made it an explicit condition that projects that received grants in 2009 and 2010 must be completed by February 14, 2012. The government notice announcing Golden Sun applications stated that if a project was not completed by February 2012, the government would claw back the subsidy. The Chinese government awarded about RMB 34 billion[2] in total pursuant to Golden Sun. Yingli supplied about 25% of the solar panels used in Golden Sun.

10.     Before the Golden Sun program was shuttered, Yingli regularly told investors that the program supported its sales, that subsidies would only increase, that the Golden Sun project would not be cut, and that Golden Sun offered better payment terms.

11.     The Golden Sun program proved to be an expensive boondoggle. A Chinese government audit later found that 29% of Golden Sun subsidies were procured through outright fraud. The Golden Sun applicants' fraud included, among other things, falsely overstating project costs (including by submitting fraudulent contracts in Golden Sun applications) and substituting cheaper, lower quality supplies after receiving Golden Sun subsidies. Moreover, 80% of 2009 and 2010 projects were not completed by February 2012. In 2013, the Chinese government closed the Golden Sun program and demanded that the companies that had received subsidies repay it.

12.     In fact, unbeknownst to investors, Yingli was complicit in all three frauds. First, Yingli would typically overstate its costs in Golden Sun applications.

---

[2] As of December 31, 2012, the exchange rate between US dollars and Chinese Renminbi was about 6.07:1. Between 2008 and 2015, the exchange rate did not exceed 6.90 RMB:1 U.S. dollar, nor dip below 6.00 RMB:1 U.S. dollar.

Because Golden Sun applications required contracts, this necessarily involved submitting forged contracts to government authorities. Second, Yingli would deliberately delay construction of solar projects to benefit from rapidly decreasing costs. And third, Yingli would substitute cheaper components than what was included in Golden Sun applications. Yingli would pass government inspections by first ensuring that certain specific physical project locations complied with subsidy requests, and then leaning on government inspection teams to inspect only the compliant locations.

13.     In March 2013, a series of articles published rumors that the Golden Sun program would be terminated. Yingli's investors were alarmed because so much of its success depended on Golden Sun. On March 18, 2013, Yingli's stock price fell from $2.47/ADS to $2/30/ADS, and from March 20-March 25, it fell from $2.52/ADS to $1.96/ADS, damaging investors.

14.     Because of the fallout from the Golden Sun program, Yingli was forced to increase its allowance for doubtful accounts – a reserve against accounts receivable for customers who could not pay Yingli what they owed. This meant that Yingli was finally recognizing that it would not collect amounts due from customers related to the Golden Sun program. The disclosure, on March 25, 2015, caused Yingli's stock price to fall from $2.34/ADS to $1.99/ADS, damaging investors.

15.     Then, on May 18, 2015, Yingli wrote off about $33.2 million of its accounts receivable. In the next two trading days, Yingli's stock price fell from $1.70/ADS to $0.94/ADS, damaging investors.

## II.  JURISDICTION AND VENUE.

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III. PARTIES

20.     Founded in 1998, Yingli Green Energy, Holdings Co. Ltd. is a major Chinese vertically integrated solar company. It chiefly earns its revenues from supplying solar panels and/or acting as a contractor for major solar panel projects, especially at the utility scale. Yingli's ADSs were actively traded on the New York Stock Exchange (the "NYSE") for the entire Class Period. Yingli is a Cayman Islands corporation with its principal executive offices located at No. 3399 Chaoyang North Street, Baoding 071051, People's Republic of China.

21.     Defendant Liansheng Miao founded Yingli's precursor in 1998, and since then has served as its Chairman and CEO. As of December 31, 2014,

Chairman Miao owned 28.75% of Yingli's stock. Miao received his bachelor's degree in business management from Beijing Economics Institute and his master's degree in business administration from Peking University in China.

22.     Defendant Yiyu Wang joined Yingli in 2006, and served as its Chief Strategy Officer until 2013. Beginning May 2013, Wang served as Yingli's CFO and one of its directors. Wang has ten years' experience working as an auditor at Pricewaterhouse Coopers, and holds a bachelor's degree in international finance from Shanghai University.

23.     Defendant Zongwei "Bryan" Li joined Yingli as its CFO and one of its directors in 2006, and served in these positions until May 2013, when he became Yingli's Chief Strategy Officer, a position he held until December 2014.

24.     Court-appointed Lead Plaintiffs Noe and Salvador Barocio purchased Yingli ADS at artificially inflated prices and were damaged thereby. Lead Plaintiffs' PSLRA certifications were previously filed with the Court and are incorporated by reference.

25.     Plaintiff Cindy Conybear acquired Yingli securities and was damaged thereby. Ms. Conybear's PSLRA certification is attached as an exhibit to this Complaint and is incorporated by reference.

## IV. WITNESSES

26.     Plaintiffs' investigator spoke with former Yingli employees who have personal knowledge of the facts alleged in this Complaint.

27.     Former Employee 1 ("FE 1") was a general ledger accountant with a Yingli subsidiary, Tianjin Yingli New Energy Co. Ltd. ("Tianjin Yingli"), from August 2013 to December 2015. FE 1's principal responsibilities included maintaining Tianjin Yingli's general accounts, and drafting monthly and year-end financial reports. FE 1 reported to Tianjin Yingli's head of finance.

28.     Former Employee 2 ("FE 2") was a head of project development at Yingli from December 2010 to May 2013. FE 2's principal responsibilities included Golden Sun project management, where he was mainly in charge of the project application process, including all interactions with government. FE 2's Golden Sun experience included Yingli Hunan Yueyang, a 20 MW project which received Golden Sun subsidies. FE 2 reported to Yingli's senior managers.

29.     Plaintiffs also spoke with a Chaori Employee 1, who was an administrative director at Shanghai Chaori Solar Energy Science & Technology Co. Ltd. ("Chaori"), from August 2007 to March 2016.

## V.  BACKGROUND

A. Yingli loses its European market.

30.     Since as early as 2004, Yingli's focus was on European markets. Yingli drew more than 80% of its revenues from sales in Europe in every year between 2004 and 2010. Yingli made most of its European sales in Germany. Yingli's sales to Germany made up between 40% and 66% of its total worldwide sales for every year between 2004 and 2010 except 2007.

31.     European markets were extraordinarily favorable to solar developers, as they were characterized by high prices and favorable payment terms. Further, as more fully set out below, European customers almost always timely paid Yingli the amounts the customers owed pursuant to the contracts the customers signed with Yingli. Yingli thus profited immensely from the European market.

32.     To subsidize its production expansions, Yingli took out massive loans, becoming very leveraged.

*Yingli bank debt, as of December 31 (in thousand U.S. dollars)*

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|------|------|------|------|------|------|------|
|      |      |      |      |      |      |      |

| Total short-term borrowings and current portion of long-term debt | 299,626 | 512,903 | 887,557 | 1,306,833 | 1,208,009 | 1,109,384 | 1,629,767 |
| Total long-term borrowings | 97,172 | 110,287 | 378,255 | 548,451 | 654,316 | 678,640 | 460,651 |
| Total bank debt | 396,789 | 623,190 | 1,265,812 | 1,855,284 | 1,862,235 | 1,788,024 | 2,090,418 |

33.    But between 2011 and 2013, a series of events slashed Yingli's sales to Europe.

34.    First, in 2011, European demand fell dramatically as a result of the European debt crisis. As Yingli stated on its Q1 2011 earnings conference call, Yingli experienced a sudden demand slowdown in Europe. Demand was also unexpectedly low in Q3 2011. Yingli's shipments to Europe fell.

35.    Second, Yingli's European customers had relied on very high European feed-in tariffs, especially in Germany.[3] These tariffs had supported high demand for Yingli's solar panels in Europe, since developers were eager to develop costly solar programs because the developers anticipated that they would be able to sell the electricity generated by their developments into the electric system at high guaranteed rates for decades. Germany's feed-in tariffs were designed to fall greatly between 2010 and 2014. For example, Germany's feed-in tariff for rooftop-mounted projects up to 10 MW fell from €28.43/kWh[4] in January 2010 to €22.07/kWh in January 2011 to €13.50/kWh in April 2012. Tariff reduction came to a head when in Q2 2012, Germany dramatically cut its feed-in-tariff, causing Yingli's sales there to fall by 17% in Q3 2012.

---

[3] Feed-in tariffs are guaranteed rates paid to companies that supply electrical power to the grid from renewable sources. The tariffs are designed to accelerate development of renewable energy. They typically have three features: (1) guaranteed grid access; (2) long-term contracts; and (3) cost-based purchase prices. Although tariffs paid for new projects decline, older projects continue to be paid the same tariff.

[4] Kilowatt hour.

36.     And third, the European Union hit Yingli and other Chinese solar manufacturers with anti-dumping and anti-subsidy duties. In response to an industry complaint filed July 2012, in September and November 2012, the European Commission initiated anti-dumping and anti-subsidy investigations into supply of certain photovoltaic products supplied by PRC manufacturers to European markets. According to a comment made by Yingli European head Darren Thompson on August 29, 2012, "[i]t goes without saying that the anti-dumping complaint filed at the EU Commission late in July cast a shadow over Europe's solar industry along the whole value chain." In June 2013, the European Union made a provisional finding providing for the imposition of anti-dumping duties. Then, in August 2013, the European Union accepted an undertaking from a group of Chinese PV manufacturers, including Yingli, voluntarily limit their exports of solar panels and to set prices above a minimum price, in exchange for the EU agreeing to forgo imposing anti-dumping duties.

37.     The result of these three developments was to sharply curtail Yingli's sales to Europe between 2010 and 2013.

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Sales to Europe (thousand $) | 951,178 | 1,561,585 | 1,440,964 | 1,102,042 | 666,880 | 395,830 |
| Sales to Europe (% of total) | 89.5% | 82.5% | 61.8% | 60.3% | 30.1% | 19% |
| Sales to China (thousand $) | 48,126 | 113,018 | 518,263 | 425,891 | 751,025 | 733,474 |
| Sales to China (% of total) | 4.5% | 6.0% | 22.2% | 23.3% | 33.9% | 35.2% |

B. The Chinese government creates the Golden Sun program to jump-start the domestic Chinese solar power industry.

38.     Though Chinese solar companies were heavily involved in international solar projects, China's own solar power development was minimal. By December 31, 2010, China had developed less than 1 GW of solar power, against 2010 exports by Chinese companies of 10 GW of solar panels.[5]

39.     Beginning in 2011, the Chinese government undertook to massively increase subsidies for domestic production of solar power. In 2011, China's National Energy Administration released a draft of its Twelfth Five-Year Plan for the Development of Renewable Energy, calling for the installation of 10 GW by 2015 (China later raised the 2015 goal to 21 GW in 2012 and 35 GW in 2013) and 50 GW by 2020. In August 2011, China's National Development and Reform Commission issued its Notice on Perfecting Feed-in Tariff Policy of Solar PV Power Generation, setting an initial rate of $0.15 per kilowatt-hour – enough to allow solar electricity providers to break even in 7 years of an estimated 25+ year project lifespan.[6]

40.     In 2011, China installed about 2.5 GW of solar power domestically. In 2012, it installed about 5.0 GW domestically.

41.     A large part of the expansion of China's solar panel output was driven by a program named Golden Sun, an ambitious Chinese subsidy program designed to jump-start China's domestic production of solar power.

---

[5] *Id.*

[6] Coco Liu, China Uses Feed-In Tariff to Build Domestic Solar Market, N.Y. Times Sept. 14, 2011, available at < http://www.nytimes.com/cwire/2011/09/14/14climatewire-china-uses-feed-in-tariff-to-build-domestic-25559.html>.  All articles cited in this Complaint are incorporated by reference.

42.     Domestic Chinese solar project developers received sizeable subsidies for projects approved under Golden Sun. The subsidies were meant to defray 50% of a project's actual costs, or 70% for rural projects. Moreover, the subsidies were paid before construction even began.

43.     Golden Sun was established in 2009, and initially only applied to demonstration projects. Only 304 MW of projects were approved in 2009, and only 272 MW in 2010.

44.     But when China jump-started production in 2011, Golden Sun was expanded to include most of China's solar production.

45.     The Golden Sun program provided massive subsidies. For projects announced between 2009 and 2011, the Golden Sun program provided subsidies of more than RMB 10 billion.[7] For projects announced in 2012, the Golden Sun program provided subsidies of about RMB 24 billion.[8] Golden Sun awards were made to projects totaling 6.147 GW in solar production.

46.     Golden Sun subsidies included an explicit condition that projects had to be completed quickly. The Golden Sun awards specifically provided that projects receiving subsidies announced in 2009-2011 had to be completed before February 15, 2012. Should Golden Sun recipients fail to timely complete the projects, the awards were subject to a clawback.

47.     Golden Sun applications were complicated and detailed. Applicants were required to state the total cost of the PV project. Per the Implementation of

---

[7] Jiali Wang *et al*, The Ministry of Finance to Liquidate PV Industry's Golden Sun Program. Where Did The Billons of RMB in Subsidies Go, May 20, 2013.
[8] You Wang, China Subsidized Golden Sun Program with Tens of Billions of RMB in 3 years. PV Enterprises Conned Subsidies in a Rampant Way. The Program May Come to an End, China Business News Daily, March 15, 2013 (reporting comments from Wentao Hou, PV Industry Analyst from Guotai Junan Securities).

Golden Sun Program dated July 16, 2009, applicants were also required to follow a bid process to obtain PV parts from suppliers like Yingli. And the applications were required to include contracts with the PV parts suppliers, purchase agreements, and project pricing documents to prove the total claimed cost of the PV project.

48.     Yingli was the largest single beneficiary of the Golden Sun program. According to a press release issued by Yingli on December 11, 2012, Yingli supplied one quarter of the photovoltaic panels used in all the Golden Sun projects, including 70% of a batch of Golden Sun projects announced in December 2010.[9]

49.     Yingli benefited from the Golden Sun program in two ways. First, Yingli developed its own projects, for which it directly received Golden Sun subsidies. Second, with Golden Sun subsidies, many more projects were viable, and Yingli's customers turned to Yingli to supply solar panels.

50.     Yet even when projects were developed by Yingli's customers, rather than Yingli itself, the subsidies frequently were paid directly to Yingli. For example, on December 10, 2010, the Chinese government announced Golden Sun awards to projects amounting to 272 MW; Yingli was contracted to supply solar panels to projects amounting to 190 MW of the total awards. In fact, that very December, Yingli was paid $113.5 million from the subsidies, amounting to 35% of the total purchase price for Yingli's solar panels. 2010 20-F, at 73.

## VI. DEFENDANTS' FALSE STATEMENTS

A. Yingli misleadingly omitted to disclose that it and other Golden Sun participants were systematically defrauding Golden Sun.

---

[9] Source: 2010 20-F, at 73.

51.     According to Defendants, Golden Sun was a centerpiece of Yingli's strategy in China.

52.     In a press release issued December 2, 2010, Yingli stated:

> "We are honored to become a major PV module supplier for the Golden Sun Program, which is a significant business milestone for our expansion in the Chinese solar market," Mr. Liansheng Miao, Chairman and Chief Executive Officer of Yingli Green Energy commented. "I am happy to witness that the Chinese government has demonstrated its strong commitment to boost renewable energy utilization in its recently announced Five-Year Plan. Meanwhile, the renewable energy industry, including solar energy, has been identified as one of China's strategic emerging industries by the central government of China. Earlier today, the Ministry of Finance, the Ministry of Science and Technology, the Ministry of Housing and Urban-Rural Development, and the National Energy Administration jointly hosted a meeting to further boost the utilization of renewable energy in China. In the meeting, the Chinese government declared its expectations to further expand its PV project portfolio in the next two years to reach a scale of at least 1,000 MW per year after 2012."

> "***As a solar pioneer based in China, Yingli Green Energy has demonstrated a firm commitment to the Golden Sun Program.***[10] The Company is responding to its mission and responsibility to meet the demand for affordable renewable energy in China by supplying high quality PV products from cutting-edge technologies. In addition, we expect this strategic move in emerging markets will further reduce the dependence on the German market, thus strengthening our long-term development dynamics," Mr. Miao concluded.

53.     Golden Sun projects were intended to be completed quickly. Failure to complete the projects within a year was a violation of the grant's terms and subjected award recipients to clawback of the entire subsidy amount.

---

[10] Unless otherwise noted, all emphases are added.

54.     In fact, on June 26, 2011, the Chinese government published a notice providing that if a project was not connected to the grid by the due date, the Chinese government "shall" recover the subsidy from the developer. The contract awards announced in Yingli's December 2, 2010 press release were required to be completed by February 15, 2012.

55.     On the Q1 2011[11] Earnings Call, Defendant Miao stated:

*In China, we have established a solid market position through continuous involvement in a series of solar initiatives, such as the Golden Sun Program*. We are growing more confident in the Chinese government signaling that it is considering raising cumulative PV installation targets to 10 gigawatts by 2015 and 50 gigawatts by 2020. We strongly believe that China will quickly evolve into one of the largest and most important solar markets in the world.

56.     On the Q4 2011 Earnings Call, Defendant Miao stated:

China market achieved significant growth in 2011 and has become one of the most promising emerging markets. *The strong performance is attributable to the boom in the utilities segment driven by the feed-in tariffs and the steady growth in the rooftop segment under the Golden Sun Program*. Based on our commitment – committed strategic layout in broad sales networks, our sales to China increased to 22% of total revenues in 2011, compared to only 6% a year ago. We have reallocated our domestic sales force and implemented different strategic strategies to better address demands on the utility segment in Western China, and rooftop segment in Eastern China. We will continue to provide our customers with full service that covers project planning, technical support and talent training to improve our brand loyalty in establishing Yingli Solar as the brand of choice. Through enhanced cooperation with our

---

[11] All capitalized terms not defined herein are defined in the accompanying List of Defined Terms and Speakers, which is incorporated by reference into this Complaint.

customers, we are on track to further improve our leading position in China.

57.      The Q4 2011 Earnings Call took place on February 29, 2012 - after the construction deadline imposed by the Chinese government to avoid a clawback.

58.      Thus, Defendants made clear that Yingli's financial performance depended on Golden Sun.

59.      Yet despite its critical importance to Yingli's financial performance, Defendants made misleading statements about Golden Sun.

60.      On the Q1 2012 Earnings Call, Defendant Miao attributed part of Yingli's success to the Golden Sun Program:

> In recent two months, we have actively involved in the bidding for many ground mounted projects. We expect that China – we expect the demand in China market to surge in second and third quarter, as the constructions of utility scale will be gradually begin in Western China.
>
> ***Earlier this month, the China government announced a total of 1,709 megawatts Golden Sun program for 2012, while the number was only 689 megawatts in 2011.*** In addition, we expect promising demand from the public and family-use sector, especially independent off-grid systems in remote area may be also encouraged by the Chinese government. ***We will fully utilize our domestic sales and service networks to bid for the projects and target to provide more customers with Yingli modules. We expect approximately 30% of our revenue to come from Chinese customers this year by leveraging our solid customer relations and pioneer position in China.***

61.      In the Q2 2012 Earnings Release, Defendant Miao was quoted as saying:

> ***In China, demand started to pick up as the installation of utility scale projects in northwestern China and the Golden Sun Program gradually accelerated***. We expect to see a significant increase of

demand in China in the second half of this year, especially from September to November.

62.      On the Q3 2012 Earnings Call, Defendant Li stated:

*And under the current situation based on our understanding, we expect the China government will be announced more and more incentive program. The Golden Sun volume for next year will be much larger than this year* and the ground project of RMB1 feed-in tariff for this year will be – remain the same for next year. *There will be no any cut.*

63.      On the Q3 2012 Earnings Call, Defendant Miao also stated:

In addition to our own application for the Golden Sun Program, we have actively helped our customers with the application procedures. We believe this practice will reinforce our customer relations and help expand our market shares in China.

64.      On the Q3 2012 Earning Call, Defendant Miao stated:

<Q - >Just a quick one on the receivables. What were the payment terms like in China right now? And also, given that the shipments to China will still continue accounting for significant portion, what would be Yingli's strategy to contain the receivables at comfortable levels? Thank you.

**<Defendant Miao>** [Foreign Language]

**<A – Arthur Chen>**:[12] We are now taking this very seriously. He [Miao] thinks this is a very important question to be addressed but however observing from the trend that we control and the situation has been improving from Q3 to present. And going forward and he thinks that there are many ways that it could further improve and one way is to like (inaudible) which could potentially be changed in the

---

[12] Arthur Chen was translating Defendant Miao's answer, which was provided in a foreign language.

future and certainly we are going to tap into the downstream market and which make it more leverage and thirdly the Chinese government will implement stringent regulations in which will also benefit from this. ***And also the Golden Sun project in which we are offer a better, much better payment terms that will also benefit us from those payment terms and also for some of the receivables will rely further upon insurance to make sure that those receivables will be covered.***

65.     In a press release issued December 11, 2012, to announce Yingli's second phase 2011 programs, Defendant Miao was quoted as saying:

> ***The acceleration of the Golden Sun Program and the announcements of other incentive policies have clearly demonstrated*** China's ***strong determination of promoting solar applications.*** With these policies in place, we believe that the China PV market will achieve a faster and healthier growth. We'll continue to enhance our business activities in China and power more families and businesses with our high quality products.

66.     Yingli accompanied its Q4 2012 earnings call with a series of powerpoint slides. The slides provided that: "We secured 288 MW of modules under the Golden Sun Program to delivery in 2013."

67.     Then, on the Q4 2012 Earnings Call, Defendant Miao stated that China would meet its quota of roughly 30 GW production by 2015 through Golden Sun projects.[13] And Defendant Miao added that "***in the future, our profitability points are really coming from Golden Sun Program and the distributed generation program will leverage our brand name and network.***"

---

[13] Specifically, Defendant Miao stated: "As you may all heard, so for year 2015 and the installation from now through 2014, the total installation would be up roughly 30 gigawatts Chinese market. So this year we are estimating we will be 10 gigawatts minimum length and there are three types of segments that will be highlighted probably during the next three or four years. [...] The second one is announce the Golden Sun Program."

68.     The emphasized statements in ¶¶60-67 above were false and misleading because, for the reasons set out in ¶¶69-81 and 101-114, below: (a) they omitted to disclose that a large proportion of Golden Sun contracts were procured through outright fraud; (b) they omitted to disclose that in its own Golden Sun projects, Yingli committed fraud by overstating its actual costs, purposefully delaying construction to benefit from rapidly decreasing costs, and substituting lower quality materials after an application is approved; (c) for these reasons,  the Golden Sun program was in danger of being cancelled; and (d) award recipients would soon have their subsidies clawed back and be unable to pay Yingli for the solar panels, causing Yingli to write off substantial amounts of accounts receivable.

B. The Chinese government cancels Golden Sun because of fraud and abuse.

69.     On March 18, 2013, Bloomberg published an article calling attention to a new Chinese government policy enacted on March 14, 2013.[14] The Bloomberg article cited Xiangan Meng, Vice Chairman of the China Renewable Energy Society in Beijing, as saying that the March 14 policy may abolish Golden Sun subsidies. Mr. Wang was quoted as saying that Golden Sun "have been increasingly accused of using public resources *inefficiently* by providing developers with an *overgenerous* capital expenditure-based subsidy before installation" (emphasis added). The March 18 Bloomberg article, however, did not mention any fraud or abuse in the Golden Sun program.  Nor did it mention Yingli.

70.     As a result of this adverse news, on March 18, 2013, Yingli's stock price fell from $2.47/ADS to $2.30/ADS, or 6.9%, damaging investors.

---

[14] China Seen Cutting Subsidy for Largest Solar Projects: Energy, Bloomberg News, March 18, 2013.

71.     On March 18, 2013, 80 solar industry professionals gathered at the PV Project Implementation Conference – China to discuss the future of the Chinese PV market. On March 20, 2013, PV Magazine, an industry journal, published an article citing rumors that Golden Sun would be scrapped, and quoted Minsheng Securities analyst Hai Sheng Wang as saying that "it is very likely that Golden Sun will be cancelled soon."[15] The March 20, 2013 PV Magazine article did not mention any fraud or abuse in the Golden Sun Program. Nor did it mention Yingli.

72.     Also on March 20, 2013, Sicheng Wang of the Energy Research Institute, part of China's top economic planning authority, the National Development and Reform Commission, spoke about a shift from Golden Sun, which offers subsidies for capacity construction, to a program that subsidized performance. And on March 21, NPD Solarbuzz analyst Han Qiming stated at a separate conference organized by econet china that Golden Sun would be scrapped in 2013. Wang and Qiming's comments were reported in a March 22, 2013 article in PV Magazine.[16]   The March 22, 2013 PV Magazine article did not mention any fraud or abuse in the Golden Sun program.  Nor did it mention Yingli.

73.     These disclosures trickling in between March 20 and March 22, 2013, caused Yingli's stock price to fall from $2.52/DS on March 20 to $2.32/ADS on March 21, a fall of 7.9%, then to $2.17/ADS on March 22, a fall of 6.5%, and finally to $1.96/ADS on March 25 (the next trading day after March 22), a fall of 9.7%. The total price collapse was 22.2%.

74.     In April 2013, the Chinese Ministry of Finance issued its Notice on the Settlement of the Financial Subsidy Funds for the Golden Sun Demonstration

---

[15] Eckhart Gouras, China: Scaling back ambitions and overhauling PV subsidies, PV Magazine, March 20, 2013.

[16] Eckhart Gouras, Solarcon 2013: Restructuring in China, PV Magazine, March 22, 2013.

Projects (No. 117) ("Notice 117"), ordering inter alia that projects which had received subsidies in 2009-2011 but had not been completed on schedule were cancelled and the subsidies would be recovered. Pursuant to Notice 117, sub-national Departments of Finance began to issue notices to developers that had been granted awards in 2009-2011: (a) finding that the developers had breached the terms of their awards by failing to develop solar power within one year as provided in the grant; and (b) demanding that the developers repay all or part of the subsidy.

75. On May 20, 2013, a Chinese-language article was published on Sina.com by a reporter from Caijing Magazine, a respected Chinese-language business daily.[17] The May 20, 2013 Caijing article reported that the Ministry of Finance had issued notices to 109 projects, accounting for 998 WM of the 1,295 MW for which subsidies had been issued, and demanded repayment of nearly RMB 10 billion. For example, the Chinese government demanded return of hundreds of millions of RMB from Datang Power Generation Co. Ltd., and approximately RMB 240 million from Guangxi Yuchai New Energy Co Ltd. project.[18]

76. It was only later that it became clear that the Golden Sun program was being cancelled because of fraud and abuse. First, a June 8, 2013 China Economic Weekly article reported that the Ministry of Finance had issued demands for repayment of subsidies for an astounding 80% of the subsidies that had been awarded in 2009-2011.[19]

---

[17] Jiali Wang et al, The Ministry of Finance to Liquidate PV Industry's Golden Sun Program. Where Did The Billons of RMB in Subsidies Go, May 20, 2013.
[18] Id.
[19] Fengtao Li, "Liquidation" is not "Cancellation." PV Golden Sun will not sink, China Economic Weekly, June 8, 2013. The June 8, 2013 China Economic Weekly article was not reported in the English-language press.

77.     Then, on June 20, 2013, the Chinese National Audit Office issued a report on its audit of the Golden Sun Program. The National Audit Office Report estimated that by wattage, 29% of the projects awarded in 2009-2011 were procured through intentional fraud. The National Audit Office Report reached its conclusion by auditing a sample of projects amounting to only 239.37 MW;[20] in that sample alone, the National Audit Office determined that subsidies of RMB 207 million had been awarded based on intentional fraud. The National Audit Office Report identified three types of fraud. First, subsidy recipients overstated the costs of materials and therefore of whole projects to obtain higher subsidies. Second, subsidy recipients agreed to build projects using high quality materials, but then used cheaper poor quality materials instead. Third, contractors submitted false applications using fraudulent paperwork, or misappropriated subsidies for other purposes.

78.     The National Audit Office's June 20 report identified projects that were procured through intentional fraud:

| Project | Violation | Status of recovery effort |
| --- | --- | --- |
| Hunan Junhong Real Estate Co Ltd PV Power Model Project | Misappropriated RMB 3 million to pay unrelated transfer fee, land use rights, and taxes | Subsidy returned |
| Guangdong Hanergy Co Ltd 10MW PV Power Project | Substantially overstated project size to obtain RMB 26.4 million, violating rules | Subsidy returned |
| Sha'anxi Yulin Yushen Energy Development and Construction Co Ltd - Yushen Industrial Zone Coal Museum PV Power Model Project | Fabricated documents and fraudulent obtained RMB 21.87 million in subsidies | Redressing the violation |
| Sha'anxi Yanan Shenzhen Light Industry Zone Co Ltd - Yanan Economy and Technology Development Zone Plants' Rooftops | Applied on behalf of an unqualified project and obtained RMB 38.51 million | Redressing the violation |

[20] Fengtao Li, The Golden Sun Project: Fraud with Zero Risk. So Why Not Con? China Economic Weekly, July 1, 2013. The July 1, 2013 China Economic Weekly article was not reported in the English-language press.

| | | |
|---|---|---|
| PV Power Consolidated Module Model Project | | |
| Shandong Dongying PV Solar Power Co Ltd - Donging PV On Grid Power Plant Construction Project | Supplied untruthful leasing agreement to obtain RMB 33.6 million in violation of rules | Redressing the violation |
| Anhui Bengbu Glass Industry Design Institute - Ningguo Port Ecosystem Industry Zone PV Power Model Project | Submitted untruthful rooftop leasing agreement, and obtained 33.5989 million RMB subsidies in violation of rules | Redressing the violation |
| Anhui Maanshan South Transitional Industrial Transfer New Zone Economic and Technological Development Co Ltd - Transitional Industrial Transfer Model Park PV Power Model Project (Phase I) | Obtained 3.5 million RMB subsidies in violation of rules by submitting duplicate applications | Redressing the violation |
| Anhui Central Energy Investment and Management Co Ltd - Longzihu Industrial Park User Supplemental Grid Non-Silicone PV Power Project | Submitted fraudulent application and obtained 59.26 million RMB subsidies in violation of rules | Redressing the violation |

79.     On June 25, 2013, Solar PV Investor reported that "[t]he report is another signal that the Golden Sun subsidy program is nearing its end."[21]

80.     As set out in ¶¶109-114 below, Yingli itself committed fraud in Golden Sun applications.

81.     Golden Sun was finally cancelled in December 2013.

82.     One substantial factor in the Chinese government's decision to halt and ultimately terminate Golden Sun was its discovery that Golden Sun applicants were systematically committing fraud in obtaining subsidies. The fraud and abuse thus made it substantially more likely that the Chinese government would cancel the Golden Sun project, and seek clawbacks. Golden Sun's cancellation, therefore, was a materialization of the risk of fraud and abuse in the Golden Sun program.

---

[21] Ray Yu, Vast Subsidy Fraud Revealed in Chinese PV Industry, Solar PV Investor, June 25, 2013, available at <http://tinyurl.com/qzkgsjq>.

C. Defendants misleadingly omit to take an allowance for doubtful accounts
   in the wake of the Golden Sun collapse.

83.     The 2013 20-F provided that:
*We establish an allowance for doubtful accounts for the estimated loss on receivables when collection may no longer be reasonably assured.* We assess collectability of receivables based on a number of factors, including the customer's financial condition and creditworthiness.
2013 20-F, at 72-73.

84.     The 2013 20-F provided that:
The Company maintains an allowance for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments. The allowance for doubtful accounts is based on a review of specifically identified accounts and aging data. Judgments are made with respect to the collectability of accounts receivable balances based on historical collection experience, customer specific facts and current economic conditions. Account balances *are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote*.
2013 20-F, at F-19.

85.     The 2013 20-F also provided that "[o]ur consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or U.S. GAAP." 2013 20-F, at 3.

86.     In fact, because of the Golden Sun clawbacks, collectability could no longer be reasonably assured for many of Yingli's accounts.

87.     As set out above, in April/May 2013, the Chinese government issued clawback notices to Golden Sun subsidy recipients who had not completed their project in compliance with project requirements. The May 20, 2013 Caijing article quoted a Yingli sales head as saying that Yingli supplied solar panels to 55 Golden Sun projects awarded in 2010 and 2011, and that 51 of the projects had received

notices demanding repayment for failure to meet conditions of the awards.[22] The sales head added that hundreds of millions of RMB of Yingli's accounts receivable were gravely imperiled.[23]

88.     According to FE 1, Yingli conducts formal reconciliations every month with its buyer's accounting department. Notwithstanding these reconciliations, Yingli will not book items as bad debt when it should because it adversely affects Yingli's financial performance. According to FE 1, the accounting department records a provision for doubtful accounts solely as a last resort, when Yingli has lost virtually all hope of collecting any bad debt. Yingli's processes require the accounting team to follow a complex auditing process with Yingli's tax team before recording any provision for doubtful accounts. Specifically, Yingli's accounting staff is only permitted to recognize bad debt if it simultaneously obtains permission from the tax office to write off income from the debts from Yingli's taxes and thereby obtain a tax refund. The process is cumbersome and has the effect of delaying the recognition of any bad debt. Moreover, it contradicts Yingli's statements that Yingli recognizes bad debt as soon as collection is no longer reasonably assured. FE 1 never recognized any bad debt for Yingli.

89.     According to FE 2, as he left Yingli in May 2013, Yingli was owed approximately RMB 100 million from Shanghai Chaori Solar Energy Science & Technology Co. Ltd. ("Chaori"). The amounts owed by Chaori were recognized as (current) accounts receivable on Yingli's books by December 2012 at the latest. Chaori was one of Yingli's largest debtors. According to FE 2, Chaori was heavily involved in Golden Sun. Chaori was one of the Yingli debtors whose existence was imperiled by the Golden Sun clawbacks.

[22] *Id.*
[23] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 2:15-CXV-04003-ODW (MRWx)

90.     Chaori was unable to pay its bills. According to FE 2, between late 2012 and the end of FE 2's tenure in May 2013, Yingli sent numerous letters demanding payments to Chaori. Numerous trade creditors sued Chaori; by July 2013, creditors had filed lawsuits seeking a total of RMB 1.906 billion.

91.     In April 2013, Yingli's subsidiary Hainan Yingli New Energy ("Hainan Yingli") sued Chaori for RMB 75.3 million relating to one particular dispute between Yingli and Chaori. On September 1, 2013, the court ruled in favor of Yingli, awarding it the full RMB 75.3 million plus interest and fees. The court's opinion summarizes the dispute. According to the court's opinion, Chaori's payment was due in May 2013, but on March 18, 2013, Chaori sent Yingli a letter stating it did not presently have enough cash to pay the amounts it owed and asked to extend payment on the RMB 75.3 million until the end of 2013.

92.     Further, the court's opinion lists Defendant Liansheng as Hainan Yingli's legal representative.

93.     Chaori defaulted on its PRC-issued notes in March 2014. Then, in July 2014, a Chaori supplier sought to place it in bankruptcy, and the Chinese court accepted the case. According to Chaori Employee 1, on or after July 2014, Chaori advised all of its creditors (including Yingli) to seek to pursue creditor's rights with the court hearing Chaori's bankruptcy.

94.     An allowance for doubtful accounts results in a charge against net income. Yingli's 2013 net loss was about RMB 2.1 billion. Yingli should have recorded an allowance for doubtful accounts for its Golden Sun clients in 2013, since collectability was no longer reasonably assured given that all of the subsidies they had received had been, or were in the process of being, clawed back. In particular, Chaori told Yingli it could not pay the amounts it owed Yingli, Yingli was forced to sue, and the amounts of lawsuits against Chaori exceeded its assets. Accordingly, Yingli should have recorded an allowance for doubtful account of

RMB 75.3 million for Chaori alone, in addition to allowances for doubtful accounts arising from its other Golden Sun doubtful accounts.

95.     Yet, in 2013, Yingli did not record any allowance for doubtful account related to Chaori. Indeed, Yingli did not record any substantial allowance for doubtful accounts for Golden Sun write-offs, as that year, Yingli recognized a total allowance for doubtful account of only RMB 20.0 million.

96.     Instead, Yingli waited until 2014 to record an allowance for doubtful accounts, recording an additional allowance for doubtful accounts of RMB 228.8 million that year.

97.     On March 25, 2015, Yingli announced its financial results for Q4 2014, disclosing that Yingli was recording a bad debt provision of RMB 90.5 million in Q4 2014, or about ($0.08) per share.

98.     The allegations in this complaint establish the bad debt provision arose from private domestic customers who had never made their final payment in projects subsidized by Golden Sun. First, Yingli admitted that Golden Sun imperiled hundreds of millions of RMB of its accounts receivable owed by domestic Chinese customers. And second, other than another allowance for doubtful accounts made in Q1 2014, Yingli did not add to its allowance for doubtful accounts to account for the hundreds of millions of RMBs in accounts receivable it lost through the Golden Sun clawbacks.

99.     On March 25, 2014, as of result Yingli's disclosure of the bad debt provision related to cancellation and clawbacks of Golden Sun subsidies, its stock price fell from its previous close of $2.34/ADS to $1.99/ADS, or 15.0%, damaging investors.

100.     On May 15, 2015, Yingli filed its 2014 20-F.

101.     The 2014 20-F disclosed that Yingli was writing off $33.2 million of overdue accounts receivable. For the same reasons that the March 25 allowance for

bad debt related to Yingli's Golden Sun projects for domestic Chinese customers, the 2014 20-F write-off related to private domestic customers who had never made their final payments in projects subsidized by Golden Sun.

102.     On May 18, 2015, the next trading day, Yingli's stock price fell from its previous close of $1.70/ADS to $1.49/ADS, or 12.4%, and it continued to fall to $0.94/ADS, or by 37.0%, the following day, damaging investors.

## VII. DEFENDANTS' STATEMENTS WERE MADE WITH SCIENTER, AND PLAINTIFFS COMPLIED WITH THE STATUTE OF LIMITATIONS

103.     This Action was filed on May 28, 2015, and Plaintiffs' claims are subject to a statute of limitations of 2 years.

104.     Plaintiffs are individual investors and do not read Chinese or speak Mandarin. Plaintiffs did not review, and could not have reviewed, the May 20, 2013 Caijing article, or a March 15, 2013 Chinese-language article published in the China Business News Daily, which in any case did not discuss Yingli. The Caijing article was not reported on Bloomberg or anywhere in the English language press. Even had Plaintiffs reviewed the Caijing article, they would not have been able to confirm the reporter's account in the eight days between May 20, 2013 and May 28, 2013 and file a securities fraud lawsuit. While the Caijing article listed the name of the reporter, it did not list any contact information for the reporter. Plaintiffs later sought to arrange an interview with the reporter through Caijing, leaving several messages over a period of days asking to be put in touch with the reporter. Caijing did not respond to Plaintiffs' messages. Lead Plaintiffs are based in Illinois, while Named Plaintiff is based in Colorado, and are in time zones respectively 11 and 10 hours apart from China. Further, because Plaintiffs do not speak Mandarin, they would have had to retain a Chinese-speaking interpreter to

assist them in speaking with the journalist, even if Caijing had provided the reporter's contact information, which it didn't.

105.     Nor is it unreasonable for Plaintiffs to invest in Yingli even though they do not speak Chinese. As an SEC-filing issuer, Yingli was required to provide annual financial statements and periodic updates in its SEC filings. All SEC filings must be in English.[24] Further, Yingli's conference calls were conducted in English, not Mandarin.

106.     Nor could Yingli have confirmed the reports of the sales head quoted in the May 20, 2013 Caijing article. As an issuer subject to the securities laws of the United States, Yingli is prohibited from selectively disclosing material non-public information. Regulation FD [17 C.F.R. § 243.100(a), (b)(iv)].

107.     Yingli is closely followed by stock analysts who issue periodic reports updating investors on developments. During the period from March 14, 2013 to May 28, 2013, analysts from Deutsche Bank, UBS, Credit Suisse, Oppenheimer & Co., Roth Capital partners, Maxim Group, Macquarie Capital, Morningstar Research, and Trefis each issued at least one report on Yingli. Not one analyst report mentioned that there were allegations of widespread fraud in Golden Sun. This demonstrates that not even reasonably sophisticated institutional investors had access to or could have reasonably discovered the information in the May 20, 2013 articles, nor established from other pre-May 28, 2013 articles that Golden Sun's cancellation was linked to widespread fraud and abuse.

108.     Further, the Caijing article did not provide definitive proof that Yingli knew or was reckless in not knowing that its own statements about Golden Sun were false. While the Caijing article showed that Yingli's projects were responsible for some of the fraud and abuse, it did not show that Yingli itself knew

---

[24] See SEC Release No. 33-8099 *et seq.*, Section II.C., available at <https://www.sec.gov/rules/final/33-8099.htm#treatment>.

that its projects were non-compliant or that Yingli engaged in any intentional fraud.

109.     In fact, Yingli plainly knew of the widespread Golden Sun fraud and abuse because it partook in the fraud and abuse: Yingli's Golden Sun projects were extremely profitable because it benefited from at least three different kinds of fraud and abuse.

110.     First, according to FE 2, Yingli made false statements about its costs in Golden Sun applications. Yingli's Golden Sun contracts provided solar panels at a typical rate of RMB 6 per watt. Yet in Golden Sun applications, Yingli reported a typical rate of about RMB 10 per watt. Yingli thus overstated the costs of solar panels on its projects by about RMB 4 per watt, resulting in a fraudulent over-subsidy to Yingli and its customers of about RMB 2 per watt.

111.     Second, according to FE 2, Yingli deliberately delayed construction of Golden Sun projects. Because the subsidies were paid immediately, while costs were only paid when they were incurred during construction, Yingli and its customers thereby obtained interest free loans from the Golden Sun programs. But the benefits often were even more substantial because throughout 2009-2013, prices for solar panels and solar power accessories were falling steeply. Between Q4 2010 and Q4 2012, the cost of producing 1 watt of solar power prices fell by 54%.[25] FE 2 cites as an example a large relatively-expensive project for which Yingli received a subsidy in very early 2012. At that time, Yingli could only complete the project for RMB 13 per watt, the amount reported in the subsidy application. Yet by deliberately delaying construction, Yingli was able to complete the project at a time when its costs had fallen to RMB 7-8 per watt. Yingli thus earned a fraudulent profit of RMB 5-6 per watt from the project.

---

[25] See generally PV Technology and Cost Outlook, 2013-2017, Green Tech Media Research, available at <http://tinyurl.com/zxgeoed>.

112.     And third, according to FE 2, Yingli provided parts that fell below its representations in its subsidy applications. For example, when Yingli's contracts called for use of a 240 watt solar panel, Yingli would use a 235 watt solar panel instead. According to FE 2, such fraudulent substitutions were "widespread." Because Yingli substituted lower-quality, cheaper materials, but received subsidies on projects that assumed higher-quality, more expensive materials, Yingli and its customers earned fraudulent profits from Golden Sun subsidies.

113.     According to FE 2, in late 2009 and 2010, the government discovered several instances of fraud in Golden Sun projects. In response, subsidies awarded from September 2010 onwards provided that an inspection of the project should be conducted upon completion. Indeed, the September 21, Notice of Strengthening Golden Sun Program provides that an inspection should be conducted upon completion of a Golden Sun project.

114.      According to FE 2, because of the many fraudulent substitutions of lower-quality goods, Yingli and its customers' projects did not comply with their subsidized projects' specifications, thus rendering Golden Sun subsidies subject to clawbacks. Yet according to FE 2, Yingli passed the inspections because its "good connections" with the auditors provided it a "certain influence" on their judgment. Before a government audit, Yingli's staff would review a project and ensure that a few specific locations in the projects met the subsidy standards. When the government audit team arrived, Yingli staff would direct the audit team to these areas which Yingli had previously prepared for inspection. Because of Yingli's good connections, the audit teams accepted Yingli's directions. More generally, Yingli's good connections ensured that government scrutiny of Yingli's projects was limited.

## VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER.

### A. Accounts receivable are critically important to Yingli

115.    During the Class Period, Yingli's financial condition became ever more precarious.

116.    At the same time, during the Class Period, accounts receivable became Yingli's largest asset.

117.    Yingli used accounts receivable to meet its immediate cash flow needs. For example, Yingli sold accounts receivable and used them as security for short-term loans.

118.    Accordingly, any fact that cast doubt on Yingli's receivables' collectability would impair its ability to raise the funds it needed to pay its obligations as they came due.

| In thousands U.S. dollars | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Accounts receivable as of December 31: | 289,291 | 338,483 | 583,321 | 697,710 | 655,808 |
| Accounts receivable sold during the year ended December 31: | 255,297 | 54,635 | 35,838 | 111,964 | 30,319 |
| Accounts receivable used as security for loans as of December 31: | 0 | 2,062 | 0 | 53,290 | 72,009 |

## IX. CLASS ACTION ALLEGATIONS

119.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Yingli's securities between December 2, 2010 and May 15, 2015, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs,

- 34 -

successors or assigns and any entity in which Defendants have or had a controlling interest.

120.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Yingli's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Yingli shares were traded publicly during the Class Period on the New York Stock Exchange. At the end of the Class Period, Yingli had 181,763,770 Ordinary Shares outstanding, including 128,592,337 ordinary shares represented by ADSs. Record owners and other members of the Class may be identified from records maintained by Yingli's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

122.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

123.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Yingli;

(c) whether the Individual Defendants caused Yingli to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Yingli ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) to what extent the members of the Class have sustained damages and the proper measure of damages.

124.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

125.     The market for Yingli's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Yingli's securities traded at artificially inflated prices during the Class Period. On February 18, 2011, the Company's ADSs closed at a Class Period high of $13.34 per share. Plaintiffs and other

members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Yingli's securities and market information relating to Yingli, and have been damaged thereby.

126.     During the Class Period, the artificial inflation of Yingli's ADSs was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Yingli's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Yingli and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company ADSs. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

127.     At all relevant times, the market for Yingli's securities was an efficient market for the following reasons, among others:

(a) Yingli's ADSs met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) as a regulated issuer, Yingli filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c) Yingli regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and

through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Yingli was followed by at least 8 securities analysts employed by brokerage firms who wrote reports about the Company during the Class Period, including Credit Suisse Securities (USA) LLC, Deutsche Bank AG, RBC Capital Markets, and Arete Research, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e) On average, 17% of Yingli's outstanding ADSs were traded weekly, permitting a very strong presumption of that its shares traded on an efficient market;

(f) More than 270 market makers made a market in Yingli's ADS; and/or

(g) New company-specific information was rapidly reflected in Yingli's stock price.

128.     As a result of the foregoing, the market for Yingli's securities promptly digested current information regarding Yingli from all publicly available sources and reflected such information in Yingli's stock price. Under these circumstances, all purchasers of Yingli's securities during the Class Period suffered similar injury through their purchase of Yingli's securities at artificially inflated prices and a presumption of reliance applies.

129.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that

Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

130.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Yingli who knew that the statement was false when made.

## XII. FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

131.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132.      During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Yingli's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

133.      Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Yingli's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

134.      Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Yingli's financial well-being and prospects, as specified herein.

135.      These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Yingli's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue

statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Yingli and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

136.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

137.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Yingli's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

- 41 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

138.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Yingli's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Yingli's securities during the Class Period at artificially high prices and were damaged thereby.

139.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Yingli was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Yingli securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

140.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

141.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XIII. SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

142.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

143.     The Individual Defendants acted as controlling persons of Yingli within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

144.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

145.     As set forth above, Yingli and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 24, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By/s/ *Laurence M. Rosen*

Laurence M. Rosen (SBN 219683)
Phillip Kim (*Pro Hac Vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (310) 407-7502
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS – 2:15-CXV-04003-ODW (MRWx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# CERTIFICATE OF SERVICE

I certify that on November 20, 2015, I filed the foregoing CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS through the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 24, 2016                    /s/ Laurence M. Rosen.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 2:15-CXV-04003-ODW (MRWx)