Laurence M. Rosen, Esq. (SBN 219683)
Jonathan Horne (*pro hac vice*)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
Email: jhorne@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NOE BAROCIO, SALVADOR BAROCIO, AND CINDY CONYBEAR, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>vs.<br><br>YINGLI GREEN ENERGY HOLDING COMPANY LIMITED, LIANSHENG MIAO, YIYU WANG, AND ZONGWEI "BRYAN" LI,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 2:15-cv-04003-ODW(MRWx)<br><br>**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

LIST OF DEFINED TERMS AND SPEAKERS

| **Earnings Calls** | **Date** | **Company Participants** |
|---|---|---|
| Q1 2011 Earnings Call | 2011-05-20 | Liansheng Miao, Zongwei Li, Yiyu Wang, |
| Q4 2011 Earnings Call | 2012-02-29 | Liansheng Miao, Zongwei Li, Yiyu Wang |
| Q1 2012 Earnings Call | 2012-05-30 | Liansheng Miao, ZongWei Li, Yi Yu Wang |
| Q2 2012 Earnings Call | 2012-08-29 | Liansheng Miao, Zongwei Li, Yiyu Wang |
| Q3 2012 Earnings Call | 2012-11-28 | Liansheng Miao, Zongwei Li, Yiyu Wang |
| Q4 2012 Earnings Call | 2013-03-04 | Liansheng Miao, Zongwei Li, Yiyu Wang |

LIST OF DEFINED TERMS AND SPEAKERS

| SEC Filing | Date Filed | Signed By | Certified by |
|---|---|---|---|
| 20-F for the year ended December 31, 2010 ("2010 20-F") | 2011-05-11 | Liansheng Miao | Liansheng Miao, Zongwei Li[1] |
| 20-F for the year ended December 31, 2011 ("2011 20-F") | 2012-04-26 | Liansheng Miao | Liansheng Miao, Zongwei Li |
| 20-F for the year ended December 31, 2012 ("2012 20-F") | 2013-04-23 | Liansheng Miao | Liansheng Miao, Zongwei Li |
| 20-F for the year ended December 31, 2013 ("2013 20-F") | 2014-04-11 | Liansheng Miao | Liansheng Miao, Yiyu Wang |
| 20-F for the year ended December 31, 2014 ("2014 20-F") | 2015-05-15 | Liansheng Miao | Liiansheng Miao, Yiyu Wang |
| Registration Statement on Form F-3 | 2014-04-11 | Liansheng Miao, Yiyu Wang, Zongwei Li | N/A |
| Q2 2012 Earnings Release | 2012-08-29 | N/A | N/A |
| Q1 2014 Earnings Release | 2014-06-17 | N/A | N/A |

[1] Pursuant to the Sarbanes-Oxley Act of 2012 (the "SOX"), each of Yingli's annual reports on Form 20-F was required to be certified, and was certified, by Yingli's then-Principal Executive Officer and Principal Financial Officer, who each stated that " Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications all accompanied the financial report they certified.

**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiffs Noe and Salvador Barocio and Plaintiff Cindy Conybear ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Defendants Yingli Green Energy Holding Co. Ltd., Liansheng Miao, Yiyu Wang, and Zongwei "Bryan" Li ("Defendants") allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Yingli Green Energy Holding Co., Ltd, ("Yingli" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, Chinese regulatory filings and Chinese news media, interviews of former Yingli employees, and interviews of Yingli's customers. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action brought on behalf of purchasers of Yingli's American Depository Shares ("ADSs") between December 2, 2010, and May 15, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Yingli, together with its subsidiaries, designs, develops, manufactures, markets, sells, and installs solar energy products in the People's Republic of China ("China") and throughout the world.

3. In the first decade of the Twenty-First century, European governments took extraordinary steps to encourage domestic production of solar power.

4. The beneficiaries of European pro-solar policy included China-based solar manufacturers like Yingli. Yingli earned more than 80% of its revenues fron sales to Europe in each year between 2004 and 2010.

5. Beginning in 2011, the European market suffered traumas that dramatically curtailed Chinese solar manufacturers' sales there. First, due to the European debt crisis, European demand for solar panels fell substantially. Second, because prior solar subsidies had led to what the European governments offering the subsidies viewed as overproduction, the subsidies were sharply reduced. And third, the European Union instituted anti-dumping proceedings against Chinese solar manufacturers, eventually reaching a negotiated settlement that called for Chinese manufacturers to sell their solar panels for a much higher minimum price, negating all or most of their price advantages.

6. Between 2010 and 2014, Yingli's sales in Europe fell by three quarters.

7. At the same time as Europe was cutting off its market to Chinese manufacturers, the Chinese government announced that it would prioritize development of domestic solar power.

8. In 2009 the Chinese government initiated its Golden Sun program, which provided approved solar-power projects up-front subsidies of 50% of anticipated project costs before the developers even began construction. To ensure that the Chinese government only reimbursed actual costs, Golden Sun applicants were required to attach contracts to their applications setting out the prices they were paying for photovoltaic ("PV") parts from their suppliers (like Yingli).

9. The Golden Sun program was intended to jumpstart the Chinese solar industry. Accordingly, the Chinese government made it an explicit condition that projects that received grants in 2009 and 2010 must be completed by February 14, 2012. The government notice announcing Golden Sun applications stated that if a project was not completed by February 2012, the government would claw back the

subsidy. The Chinese government awarded about RMB 34 billion[2] in total pursuant to Golden Sun. Yingli supplied about 25% of the solar panels used in Golden Sun.

10. Before the Golden Sun program was shuttered, Yingli regularly told investors that the program supported its sales, that subsidies would only increase, that the Golden Sun project would not be cut, and that Golden Sun offered better payment terms.

11. The Golden Sun program proved to be an expensive boondoggle. A Chinese government audit later found that 29% of Golden Sun subsidies were procured through outright fraud. The Golden Sun applicants' fraud included, among other things, falsely overstating project costs (including by submitting fraudulent contracts in Golden Sun applications) and substituting cheaper, lower quality supplies after receiving Golden Sun subsidies.

12. Moreover, 80% of 2009 and 2010 projects were not completed by February 2012. Incensed, the Chinese government shuttered the Golden Sun program.

13. In fact, unbeknownst to investors, Yingli was complicit in all both fraud and delay. First, Yingli would typically overstate its costs in Golden Sun applications. Because Golden Sun applications required contracts, this necessarily involved submitting forged contracts to government authorities. Second, Yingli would substitute cheaper components than what was included in Golden Sun applications. Yingli would pass government inspections by first ensuring that certain specific physical project locations complied with subsidy requests, and then leaning on government inspection teams to inspect only the compliant locations. Moreover, Yingli would deliberately delay construction of solar projects to benefit from rapidly decreasing costs.

14. In March 2013, a series of articles published rumors that the Golden Sun program would be terminated. Yingli's investors were alarmed because so much of its

---

[2] As of December 31, 2012, the exchange rate between US dollars and Chinese Renminbi was about 6.07:1. Between 2008 and 2015, the exchange rate did not exceed 6.90 RMB:1 U.S. dollar, nor dip below 6.00 RMB:1 U.S. dollar.

success depended on Golden Sun. On March 18, 2013, Yingli's stock price fell from $2.47/ADS to $2.30/ADS, and from March 20-March 25, it fell from $2.52/ADS to $1.96/ADS, damaging investors.

15. But Golden Sun was not Yingli's only problem in the Chinese markets. Yingli's European customers had paid their bills in full and on time. Many of its Chinese customers, however, had shaky finances, and payment could not be assured. Fearing that revealing the poor condition of its receivables owed by Chinese customers would spook investors, Defendants resolutely refused to recognize allowances for doubtful accounts (i.e., bad debts) from Yingli's Chinese customers long after any hope of payment had dimmed.

16. Yingli's failure to recognize an allowance for doubtful account for its receivables owed by Shanghai Chaori Technology Co. Ltd. ("Chaori" and the "Chaori Receivables") in the 2013 20-Fis illustrative.

17. By the time the financial statements in the 2013 20-F were issued on April 11, 2014:

a. Chaori had publicly disclosed that it was in default on RMB 470 million in bank loans, its main bank accounts had been frozen, mortgaged, or pledged, and as 3 of its subsidiaries' production lines, as well as 4 of 6 of its production lines at its head office, had been indefinitely shut down for lack of funds;
b. Chaori had its bond issue downgraded to CCC, or extremely speculative, even though 97% of other RMB-denominated bonds of Chinese companies were rated BBB- or higher;
c. The eleven post-dated checks Chaori used to pay the Chaori Receivables had all bounced in April/May 2013, with the causes given as that there were insufficient funds in the bank accounts and/or that the funds had been frozen by court orders;

d. In September 2013, Yingli had sued Chaori for RMB 75.3 million. Chaori was not represented by outside counsel in the suit and did not defend itself;

e. Chaori had defaulted on an interest payment on its bonds, an international incident that one analyst compared to Bear Sterns' collapse in 2008; and

f. A creditor had sought to place Chaori into bankruptcy because it was "[unable] to pay the debts due and to stay solvent."

18. By the time the 2013 20-F was filed on April 11, 2014, Chaori's bankruptcy, occurring only three months later in July 2014, was inevitable. Yingli suffered an 80% loss on its receivable – and was only able to preserve the 20% because of the Chinese government's eleventh hour intervention in Chaori's bankruptcy.

19. Defendants plainly knew that the Chaori receivable was uncollectable. First, Yingli's accounting policy requires it to review credit information about its debtors like Chaori to assure that its receivables can be collected. Second, as legal representative of the Yingli subsidiary that sued Chaori, Defendant Miao would have to personally authorize any legal action. This includes authorizing the enforcement proceeding which led a Chinese court to issue a "Notice of Enforcement" on Yingli's behalf to Chaori on March 17, 2014. Third, Chaori's default was simply too prominent an event in Yingli's industry to escape Defendants' notice. And fourth, the Sarbanes-Oxley Act of 2002 ("SOX") vests personal responsibility on Yingli's CEO and CFO to design a system of disclosure controls to ensure that information like the impairment of the Chaori Receivables are identified and disclosed to investors. Accordingly, Defendants knew, or were deliberately reckless in not knowing, that the Chaori Receivables were impaired.

20. Mere weeks after Yingli filed financial statements included in its 2013 20-F that omitted to recognize an allowance for doubtful accounts in connection with the

Chaori Receivable, Yingli raised net proceeds of $83 million by selling its ADSs to unsuspecting investors.

21. After Chaori's bankruptcy plan was approved, Yingli was forced to increase its allowance for doubtful accounts on March 25, 2015, causing its stock price to fall from $2.34/ADS to $1.99/ADS, damaging investors.

22. Then, on May 18, 2015, Yingli wrote off about $33.2 million of its accounts receivable, a significant portion of which arose from the Chaori Receivables. In the next two trading days, Yingli's stock price fell from $1.70/ADS to $0.94/ADS, damaging investors.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

25. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

26. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

27. Founded in 1998, Yingli Green Energy, Holdings Co. Ltd. is a major Chinese vertically integrated solar company. It chiefly earns its revenues from

supplying solar panels and/or acting as a contractor for major solar panel projects, especially at the utility scale. Yingli's ADSs were actively traded on the New York Stock Exchange (the "NYSE") for the entire Class Period. Yingli is a Cayman Islands corporation with its principal executive offices located at No. 3399 Chaoyang North Street, Baoding 071051, People's Republic of China.

28. Defendant Liansheng Miao founded Yingli's precursor in 1998, and since then has served as its Chairman and CEO. As of December 31, 2014, Chairman Miao owned 28.75% of Yingli's stock. Miao received his bachelor's degree in business management from Beijing Economics Institute and his master's degree in business administration from Peking University in China.

29. Defendant Yiyu Wang joined Yingli in 2006, and served as its Chief Strategy Officer until 2013. Beginning May 2013, Wang served as Yingli's CFO and one of its directors. Wang has ten years' experience working as an auditor at PricewaterhouseCoopers, and holds a bachelor's degree in international finance from Shanghai University.

30. Defendant Zongwei "Bryan" Li joined Yingli as its CFO and one of its directors in 2006, and served in these positions until May 2013, when he became Yingli's Chief Strategy Officer, a position he held until December 2014.

31. Court-appointed Lead Plaintiffs Noe and Salvador Barocio, and Plaintiff Cindy Conybear, purchased Yingli ADSs at artificially inflated prices and were damaged thereby. Their PSLRA certifications were previously filed with the Court and are incorporated by reference.

## IV. WITNESSES

32. Plaintiffs' investigator spoke with former Yingli employees ("FE") who have personal knowledge of the facts alleged in this Complaint.

33. Former Employee 1 ("FE 1") was a general ledger accountant with a Yingli subsidiary, Tianjin Yingli New Energy Co. Ltd., from August 2013 to December 2015.

34. Former Employee 2 ("FE 2") was a head of project development at Yingli from December 2010 to May 2013. FE 2's principal responsibilities included Golden Sun project management, where he was mainly in charge of the project application process, including all interactions with government. FE 2's Golden Sun experience included Yingli Hunan Yueyang, a 20 MW project which received Golden Sun subsidies. FE 2 reported to Yingli's senior managers.

35. FE 3 was an Investment Manager at Hainan Yingli New Energy Co., Ltd., from March 2010 to October 2012. His responsibilities were to grow Yingli's market share in China, chiefly through the Golden Sun program, to develop and systematize Yingli's products, to collect industry resources and to manage construction projects. FE 3 was personally involved in several Golden Sun projects. At his previous employer, FE 3 also was involved in at least one Golden Sun project.

## V. BACKGROUND

### A. Yingli loses its European market.

36. Since as early as 2004, Yingli's focus was on European markets. Yingli drew more than 80% of its revenues from sales in Europe in every year between 2004 and 2010. Yingli made most of its European sales in Germany. Yingli's sales to Germany made up between 40% and 66% of its total worldwide sales for every year between 2004 and 2010 except 2007.

37. European markets were extraordinarily favorable to solar developers, as they were characterized by high prices and favorable payment terms. Further, as more fully set out below, European customers almost always timely paid Yingli the amounts the customers owed pursuant to the contracts the customers signed with Yingli. Yingli thus profited immensely from the European market.

38. To subsidize its production expansions, Yingli took out massive loans, becoming very leveraged, more than quadrupling its total debt between 2008 and 2014:

*Yingli bank debt, as of December 31 (in thousand U.S. dollars)*

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Total short-term borrowings and current portion of long-term debt | 299,626 | 512,903 | 887,557 | 1,306,833 | 1,208,009 | 1,109,384 | 1,629,767 |
| Total long-term borrowings | 97,172 | 110,287 | 378,255 | 548,451 | 654,316 | 678,640 | 460,651 |
| Total bank debt | 396,789 | 623,190 | 1,265,812 | 1,855,284 | 1,862,235 | 1,788,024 | 2,090,418 |

39. But between 2011 and 2013, events slashed Yingli's sales to Europe.

40. First, in 2011, European demand fell dramatically as a result of the European debt crisis. As Yingli stated on its Q1 2011 earnings conference call, Yingli experienced a sudden demand slowdown in Europe. Demand was also unexpectedly low in Q3 2011. Yingli's shipments to Europe fell.

41. Second, Yingli's European customers had relied on very high European feed-in tariffs, especially in Germany.[3] These tariffs had supported high demand for Yingli's solar panels in Europe, since developers were eager to develop costly solar programs because the developers anticipated that they would be able to sell the electricity generated by their developments into the electric system at high guaranteed rates for decades. Germany's feed-in tariffs were designed to fall greatly between 2010 and 2014. For example, Germany's feed-in tariff for rooftop-mounted projects up to 10 MW fell from €28.43/kWh[4] in January 2010 to €22.07/kWh in January 2011 to €13.50/kWh in April 2012. Tariff reduction came to a head when in Q2 2012, Germany dramatically cut its feed-in-tariff, causing Yingli's sales there to fall by 17% in Q3 2012.

42. And third, the European Union hit Yingli and other Chinese solar manufacturers with anti-dumping and anti-subsidy duties. In response to an industry

---

[3] Feed-in tariffs are guaranteed rates paid to companies that supply electrical power to the grid from renewable sources. The tariffs are designed to accelerate development of renewable energy. They typically have three features: (1) guaranteed grid access; (2) long-term contracts; and (3) cost-based purchase prices. Although tariffs paid for new projects decline, older projects continue to be paid the same tariff.

[4] Kilowatt hour.

complaint filed July 2012, in September and November 2012, the European Commission initiated anti-dumping and anti-subsidy investigations into certain photovoltaic products supplied by PRC manufacturers to European markets. According to a comment made by Yingli European head Darren Thompson on August 29, 2012, "[i]t goes without saying that the anti-dumping complaint filed at the EU Commission late in July cast a shadow over Europe's solar industry along the whole value chain." In June 2013, the European Union made a provisional finding providing for the imposition of anti-dumping duties. Then, in August 2013, the European Union accepted an undertaking from a group of Chinese PV manufacturers, including Yingli, voluntarily limiting their exports of solar panels and to set prices above a minimum price, in exchange for the EU agreeing to forgo imposing anti-dumping duties.

43. The result of these three developments was to sharply curtail Yingli's sales to Europe between 2010 and 2013.

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Sales to Europe (thousand $) | 951,178 | 1,561,585 | 1,440,964 | 1,102,042 | 666,880 | 395,830 |
| Sales to Europe (% of total) | 89.5% | 82.5% | 61.8% | 60.3% | 30.1% | 19% |
| Sales to China (thousand $) | 48,126 | 113,018 | 518,263 | 425,891 | 751,025 | 733,474 |
| Sales to China (% of total) | 4.5% | 6.0% | 22.2% | 23.3% | 33.9% | 35.2% |

B. The Chinese government creates the Golden Sun program to jump-start the domestic Chinese solar power industry.

44. In the 2000's, though Chinese solar companies were heavily involved in international solar projects, China's own domestic solar power development was

minimal. By December 31, 2010, China had developed less than 1 GW of solar power, against 2010 exports by Chinese companies of 10 GW of solar panels.[5]

45. Beginning in 2011, the Chinese government undertook to massively increase subsidies for domestic production of solar power. In 2011, China's National Energy Administration released a draft of its Twelfth Five-Year Plan for the Development of Renewable Energy, calling for the installation of 10 GW by 2015 and 50 GW by 2020. China later raised the 2015 goal to 21 GW in 2012 and 35 GW in 2013. In August 2011, China's National Development and Reform Commission issued its Notice on Perfecting Feed-in Tariff Policy of Solar PV Power Generation, setting an initial rate of $0.15 per kilowatt-hour – enough to allow solar electricity providers to break even in 7 years of an estimated 25+ year project lifespan.[6]

46. In 2011, China installed about 2.5 GW of solar power domestically. In 2012, it installed about 5.0 GW domestically.

47. A large part of the expansion of China's solar panel output was driven by a program named Golden Sun, an ambitious Chinese subsidy program designed to jump-start China's domestic production of solar power.

48. Domestic Chinese solar project developers received sizeable subsidies for projects approved under Golden Sun. The subsidies were meant to defray 50% of a project's actual costs, or 70% for rural projects. Moreover, the subsidies were paid before construction even began.

49. Golden Sun was established in 2009, and initially only applied to demonstration projects. Only 304 MW of projects were approved in 2009, and only 272 MW in 2010.

---

[5] Coco Liu, China Uses Feed-In Tariff to Build Domestic Solar Market, N.Y. Times Sept. 14, 2011, available at < http://www.nytimes.com/cwire/2011/09/14/14climatewire-china-uses-feed-in-tariff-to-build-domestic-25559.html>. All articles cited in this Complaint are incorporated by reference.

[6] *Id.*

50. But when China jump-started production in 2011, Golden Sun was expanded to include most of China's solar production.

51. The Golden Sun program provided massive subsidies. For projects announced between 2009 and 2011, the Golden Sun program provided subsidies of more than RMB 10 billion.[7] For projects announced in 2012, the Golden Sun program provided subsidies of about RMB 24 billion.[8] Golden Sun awards were made to projects totaling 6.147 GW in solar production.

52. Golden Sun applications were complicated and detailed. Applicants were required to state the total cost of the PV project. Per a notice titled Implementation of Golden Sun Program dated July 16, 2009, applicants were also required to follow a bid process to obtain PV parts from suppliers like Yingli. And the applications were required to include contracts with the PV parts suppliers, purchase agreements, and project pricing documents to prove the total claimed cost of the PV project.

53. Yingli was the largest single beneficiary of the Golden Sun program. According to a press release issued by Yingli on December 11, 2012, Yingli supplied one quarter of the photovoltaic panels used in all the Golden Sun projects, including 70% of a batch of Golden Sun projects announced in December 2010.[9]

54. Yingli benefited from the Golden Sun program in two ways. First, Yingli developed its own projects, for which it directly received Golden Sun subsidies. Second, with Golden Sun subsidies, many more projects were viable, and Yingli's customers turned to Yingli to supply solar panels.

---

[7] Jiali Wang *et al*, The Ministry of Finance to Liquidate PV Industry's Golden Sun Program. Where Did The Billons of RMB in Subsidies Go, May 20, 2013.

[8] You Wang, China Subsidized Golden Sun Program with Tens of Billions of RMB in 3 years. PV Enterprises Conned Subsidies in a Rampant Way. The Program May Come to an End, China Business News Daily, March 15, 2013 (reporting comments from Wentao Hou, PV Industry Analyst from Guotai Junan Securities).

[9] Source: 2010 20-F, at 73.

55. Yet even when projects were developed by Yingli's customers, rather than Yingli itself, the subsidies frequently were paid directly to Yingli. For example, on December 10, 2010, the Chinese government announced Golden Sun awards to projects amounting to 272 MW; Yingli was contracted to supply solar panels to projects amounting to 70%, or 190 MW, of the total awards. In fact, that very December, Yingli was paid $113.5 million from the subsidies, amounting to 35% of the total purchase price for Yingli's solar panels. 2010 20-F, at 73.

## VI. DEFENDANTS' MISCONDUCT

### A. Defendants misleadingly omitted to disclose that Yingli and other Golden Sun participants were systematically defrauding Golden Sun.

56. In a press release issued December 2, 2010, Yingli stated:

> "We are honored to become a major PV module supplier for the Golden Sun Program, which is a significant business milestone for our expansion in the Chinese solar market," Mr. Liansheng Miao, Chairman and Chief Executive Officer of Yingli Green Energy commented. "I am happy to witness that the Chinese government has demonstrated its strong commitment to boost renewable energy utilization in its recently announced Five-Year Plan. Meanwhile, the renewable energy industry, including solar energy, has been identified as one of China's strategic emerging industries by the central government of China. Earlier today, the Ministry of Finance, the Ministry of Science and Technology, the Ministry of Housing and Urban-Rural Development, and the National Energy Administration jointly hosted a meeting to further boost the utilization of renewable energy in China. In the meeting, the Chinese government declared its expectations to further expand its PV project portfolio in the next two years to reach a scale of at least 1,000 MW per year after 2012." "***As a solar pioneer based in China, Yingli Green Energy has demonstrated a firm commitment to the Golden Sun Program.***[10] The Company is responding to its mission and responsibility to meet the demand for affordable renewable energy in China by supplying high quality PV products from cutting-edge technologies. In addition, we expect this strategic move in emerging markets will further reduce the dependence on the German market, thus strengthening our long-term development dynamics," Mr. Miao concluded.

[10] Unless otherwise noted, all emphases are added.

57. Golden Sun projects were intended to be completed quickly. The Chinese government communicated the importance of quick completion by providing in the Golden Sun notices that failure to complete the projects within a year was a violation of the grant's terms and subjected award recipients to clawback of the entire subsidy amount.

58. For example, on June 26, 2011, the Chinese government published a notice providing that if a project was not connected to the grid by the due date, the Chinese government "shall" recover the subsidy from the developer. The Golden Sun awards specifically provided that projects receiving subsidies in 2009-2011 rounds, including those announced in Yingli's December 2, 2010 press release, had to be completed before February 15, 2012.

59. Golden Sun subsidies included an explicit condition that projects had to be completed quickly.

60. On the Q1 2011 Earnings Call,[11] Defendant Miao stated:

> ***In China, we have established a solid market position through continuous involvement in a series of solar initiatives, such as the Golden Sun Program***. We are growing more confident in the Chinese government signaling that it is considering raising cumulative PV installation targets to 10 gigawatts by 2015 and 50 gigawatts by 2020. We strongly believe that China will quickly evolve into one of the largest and most important solar markets in the world.

61. On the Q4 2011 Earnings Call, Defendant Miao stated:

> China market achieved significant growth in 2011 and has become one of the most promising emerging markets. ***The strong performance is attributable to the boom in the utilities segment driven by the feed-in tariffs and the steady growth in the rooftop segment under the Golden Sun Program***. Based on our commitment – committed strategic layout in broad sales networks, our sales to China increased to 22% of total revenues in 2011, compared to only 6% a year ago. We have reallocated our domestic sales force and implemented different strategic strategies to better address demands on the utility segment in Western China, and

[11] All capitalized terms are defined in the accompanying List of Defined Terms and Speakers, which is incorporated by reference into this Complaint.

> rooftop segment in Eastern China. We will continue to provide our customers with full service that covers project planning, technical support and talent training to improve our brand loyalty in establishing Yingli Solar as the brand of choice. Through enhanced cooperation with our customers, we are on track to further improve our leading position in China.

62. The Q4 2011 Earnings Call took place on February 29, 2012 – after the construction deadline imposed by the Chinese government to avoid a clawback.

63. On the Q1 2012 Earnings Call, Defendant Miao attributed part of Yingli's success to the Golden Sun Program:

> In recent two months, we have actively involved in the bidding for many ground mounted projects. We expect that China – we expect the demand in China market to surge in second and third quarter, as the constructions of utility scale will be gradually begin in Western China.
>
> ***Earlier this month, the China government announced a total of 1,709 megawatts Golden Sun program for 2012, while the number was only 689 megawatts in 2011.*** In addition, we expect promising demand from the public and family-use sector, especially independent off-grid systems in remote area may be also encouraged by the Chinese government. ***We will fully utilize our domestic sales and service networks to bid for the projects and target to provide more customers with Yingli modules. We expect approximately 30% of our revenue to come from Chinese customers this year by leveraging our solid customer relations and pioneer position in China.***

64. In the Q2 2012 Earnings Release, Defendant Miao was quoted as saying:

> ***In China, demand started to pick up as the installation of utility scale projects in northwestern China and the Golden Sun Program gradually accelerated***. We expect to see a significant increase of demand in China in the second half of this year, especially from September to November.

65. On the Q3 2012 Earnings Call, Defendant Li stated:

> ***And under the current situation based on our understanding, we expect the China government will be announced more and more incentive program. The Golden Sun volume for next year will be much larger than this year*** and the ground project of RMB1 feed-in tariff for this year will be – remain the same for next year. ***There will be no any cut.***

66. On the Q3 2012 Earnings Call, Defendant Miao also stated:

> In addition to our own application for the Golden Sun Program, we have actively helped our customers with the application procedures. We believe this practice will reinforce our customer relations and help expand our market shares in China.

67. On the Q3 2012 Earning Call, Defendant Miao stated:

> <Q - >Just a quick one on the receivables. What were the payment terms like in China right now? And also, given that the shipments to China will still continue accounting for significant portion, what would be Yingli's strategy to contain the receivables at comfortable levels? Thank you.
>
> **<Defendant Miao>** [Foreign Language]
>
> **<A – Arthur Chen**>:[12] We are now taking this very seriously. He [Miao] thinks this is a very important question to be addressed but however observing from the trend that we control and the situation has been improving from Q3 to present. And going forward and he thinks that there are many ways that it could further improve and one way is to like (inaudible) which could potentially be changed in the future and certainly we are going to tap into the downstream market and which make it more leverage and thirdly the Chinese government will implement stringent regulations in which will also benefit from this. ***And also the Golden Sun project in which we are offer a better, much better payment terms that will also benefit us from those payment terms and also for some of the receivables will rely further upon insurance to make sure that those receivables will be covered.***

68. Until 2014, Yingli's contracts provided that it would only be paid in full when the projects were complete. In fact, as set out below, as of the Q3 2012 Earnings Call, Yingli had been paid in full on, ***at most***, 4 of the 55 Golden Sun projects Yingli was supplying solar panels that were announced in 2009-2011, because at most 4 projects had been completed by Q3 2012. Yingli thus knew that 51 of 55 Golden Sun project to which it was supplying solar panels were in explicit violation of the award's terms. The awards given to the developers on the 51 of 55 projects were thus subject to rescission, and without the awards, the developers did not have enough cash to pay their obligations to Yingli – casting doubt on whether Yingli would be paid. Thus, the

[12] Arthur Chen was translating Defendant Miao's answer, which was provided in a foreign language.

emphasized statements were misleading because it omitted to disclose that Yingli's customers were violating the terms of the Golden Sun project. Such widespread violations were likely to cause the Chinese government to simply cancel the Golden Sun program.

69. In a press release issued December 11, 2012, to announce Yingli's second phase 2011 programs, Defendant Miao was quoted as saying:

> The acceleration of the Golden Sun Program and the announcements of other incentive policies have clearly demonstrated China's strong determination of promoting solar applications. With these policies in place, we believe that the China PV market will achieve a faster and healthier growth. We'll continue to enhance our business activities in China and power more families and businesses with our high quality products."

70. Yingli accompanied its Q4 2012 earnings call with a series of powerpoint slides. The slides provided that: "We secured 288 MW of modules under the Golden Sun Program to delivery in 2013."

71. Then, on the Q4 2012 Earnings Call, Defendant Miao stated that China would meet its quota of roughly 30 GW production by 2015 through Golden Sun projects.[13] And Defendant Miao added that "in the future, our profitability points are really coming from Golden Sun Program and the distributed generation program will leverage our brand name and network."

72. These statements were false and misleading because, for the reasons set out in ¶¶78-93, below: (a) they omitted to disclose that a large proportion of Golden Sun contracts were procured through outright fraud; (b) they omitted to disclose that in its own Golden Sun projects, Yingli committed fraud by overstating its actual costs,

---

[13] Specifically, Defendant Miao stated: "As you may all heard, so for year 2015 and the installation from now through 2014, the total installation would be up roughly 30 gigawatts Chinese market. So this year we are estimating we will be 10 gigawatts minimum length and there are three types of segments that will be highlighted probably during the next three or four years. [...] The second one is announce the Golden Sun Program."

purposefully delaying construction to benefit from rapidly decreasing costs, and substituting lower quality materials after an application is approved; (c) for these reasons, the Golden Sun program was in danger of being cancelled.

B. The Chinese government cancels Golden Sun because of fraud and abuse.

73. On March 18, 2013, Bloomberg published an article calling attention to a new Chinese government policy enacted on March 14, 2013.[14] The Bloomberg article cited Xiangan Meng, Vice Chairman of the China Renewable Energy Society in Beijing, as saying that the March 14 policy may abolish Golden Sun subsidies. Mr. Wang was quoted as saying that Golden Sun "have been increasingly accused of using public resources ***inefficiently*** by providing developers with an ***overgenerous*** capital expenditure-based subsidy before installation." The March 18 Bloomberg article, however, did not mention any fraud or abuse in the Golden Sun program.

74. As a result of this adverse news, on March 18, 2013, Yingli's stock price fell from $2.47/ADS to $2.30/ADS, or 6.9%, damaging investors.

75. On March 18, 2013, 80 solar industry professionals gathered at the PV Project Implementation Conference – China to discuss the future of the Chinese PV market. On March 20, 2013, PV Magazine, an industry journal, published an article citing rumors that Golden Sun would be scrapped, and quoted Minsheng Securities analyst Hai Sheng Wang as saying that "it is very likely that Golden Sun will be cancelled soon."[15] The March 20, 2013 PV Magazine article did not mention any fraud or abuse in the Golden Sun Program.

76. Also on March 20, 2013, Sicheng Wang of the Energy Research Institute, part of China's top economic planning authority, the National Development and Reform Commission, spoke about a shift from Golden Sun, which offers subsidies for

[14] China Seen Cutting Subsidy for Largest Solar Projects: Energy, Bloomberg News, March 18, 2013.

[15] Eckhart Gouras, China: Scaling back ambitions and overhauling PV subsidies, PV Magazine, March 20, 2013.

capacity construction, to a program that subsidized performance. And on March 21, NPD Solarbuzz analyst Han Qiming stated at a separate conference organized by econet china that Golden Sun would be scrapped in 2013. Wang and Qiming's comments were reported in a March 22, 2013 article in PV Magazine.[16] The March 22, 2013 PV Magazine article did not mention any fraud or abuse in the Golden Sun program.

77. These disclosures trickling in between March 20 and March 22, 2013, caused Yingli's stock price to fall from $2.52/ADS on March 20 to $2.32/ADS on March 21, a fall of 7.9%, then to $2.17/ADS on March 22, a fall of 6.5%, and finally to $1.96/ADS on March 25 (the next trading day after March 22), a fall of 9.7%. The total price collapse was 22.2%.

78. In April 2013, the Chinese Ministry of Finance issued its Notice on the Settlement of the Financial Subsidy Funds for the Golden Sun Demonstration Projects (No. 117) ("Notice 117"), ordering inter alia that projects that had received subsidies in 2009-2011 but had not been completed on schedule were cancelled and the subsidies would be recovered. Pursuant to Notice 117, sub-national Departments of Finance began to issue notices to developers that had been granted awards in 2009-2011: (a) finding that the developers had breached the terms of their awards by failing to develop solar power within one year as provided in the grant; and (b) demanding that the developers repay all or part of the subsidy.

79. On May 20, 2013, a Chinese-language article was published on Sina.com by a reporter from Caijing Magazine, a respected Chinese-language business daily.[17] The May 20, 2013 Caijing article reported that the Ministry of Finance had issued notices to 109 projects, accounting for 998 WM of the 1,295 MW for which subsidies

---

[16] Eckhart Gouras, Solarcon 2013: Restructuring in China, PV Magazine, March 22, 2013.

[17] Jiali Wang et al, The Ministry of Finance to Liquidate PV Industry's Golden Sun Program. Where Did The Billons of RMB in Subsidies Go, May 20, 2013.

had been issued, and demanded repayment of nearly RMB 10 billion. For example, the Chinese government demanded return of hundreds of millions of RMB from Datang Power Generation Co. Ltd., and approximately RMB 240 million from Guangxi Yuchai New Energy Co Ltd. project.[18]

80. The May 20, 2013 Caijing article quoted a Yingli sales head as saying that Yingli supplied solar panels to 55 Golden Sun projects awarded in 2010 and 2011, and that 51 of the projects had received notices demanding repayment for failure to meet conditions of the awards.[19] The sales head added that hundreds of millions of RMB of Yingli's accounts receivable were gravely imperiled.[20]

81. It was only later that it became clear that the Golden Sun program was being cancelled because of fraud and abuse. First, a June 8, 2013 China Economic Weekly article reported that the Ministry of Finance had issued demands for repayment of subsidies for an astounding 80% of the subsidies that had been awarded in 2009-2011.[21]

82. Then, on June 20, 2013, the Chinese National Audit Office issued a report on its audit of the Golden Sun Program. The National Audit Office Report estimated that by wattage, 29% of the projects awarded in 2009-2011 were procured through intentional fraud. The National Audit Office Report identified three types of fraud. First, subsidy recipients overstated the costs of materials and therefore of whole projects to obtain higher subsidies. Second, subsidy recipients agreed to build projects using high quality materials, but then used cheaper poor quality materials instead. Third, contractors submitted false applications using fraudulent paperwork, or misappropriated subsidies for other purposes. The National Audit Office Report

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Fengtao Li, "Liquidation" is not "Cancellation." PV Golden Sun will not sink, China Economic Weekly, June 8, 2013. The June 8, 2013 China Economic Weekly article was not reported in the English-language press.

reached its conclusion by auditing a sample of projects amounting to 239.37 MW;[22] in that sample alone, the National Audit Office determined that subsidies of RMB 207 million had been awarded based on intentional fraud.

83. The National Audit Office's June 20 report identified projects that were procured through intentional fraud:

| Project | Violation | Status of recovery effort |
|---|---|---|
| Hunan Junhong Real Estate Co Ltd PV Power Model Project | Misappropriated RMB 3 million to pay unrelated transfer fee, land use rights, and taxes | Subsidy returned |
| Guangdong Hanergy Co Ltd 10MW PV Power Project | Substantially overstated project size to obtain RMB 26.4 million, violating rules | Subsidy returned |
| Sha'anxi Yulin Yushen Energy Development and Construction Co Ltd - Yushen Industrial Zone Coal Museum PV Power Model Project | Fabricated documents and fraudulent obtained RMB 21.87 million in subsidies | Redressing the violation |
| Sha'anxi Yanan Shenzhen Light Industry Zone Co Ltd - Yanan Economy and Technology Development Zone Plants' Rooftops PV Power Consolidated Module Model Project | Applied on behalf of an unqualified project and obtained RMB 38.51 million | Redressing the violation |
| Shandong Dongying PV Solar Power Co Ltd - Donging PV On Grid Power Plant Construction Project | Supplied untruthful leasing agreement to obtain RMB 33.6 million in violation of rules | Redressing the violation |

[22] Fengtao Li, The Golden Sun Project: Fraud with Zero Risk. So Why Not Con? China Economic Weekly, July 1, 2013. The July 1, 2013 China Economic Weekly article was not reported in the English-language press.

| | | |
|---|---|---|
| Anhui Bengbu Glass Industry Design Institute - Ningguo Port Ecosystem Industry Zone PV Power Model Project | Submitted untruthful rooftop leasing agreement, and obtained 33.5989 million RMB subsidies in violation of rules | Redressing the violation |
| Anhui Maanshan South Transitional Industrial Transfer New Zone Economic and Technological Development Co Ltd - Transitional Industrial Transfer Model Park PV Power Model Project (Phase I) | Obtained 3.5 million RMB subsidies in violation of rules by submitting duplicate applications | Redressing the violation |
| Anhui Central Energy Investment and Management Co Ltd - Longzihu Industrial Park User Supplemental Grid Non-Silicone PV Power Project | Submitted fraudulent application and obtained 59.26 million RMB subsidies in violation of rules | Redressing the violation |

84. Sources quickly drew a connection between the fraud reported in the National Audit Office Report and Golden Sun's cancellation. On June 25, 2013, Solar PV Investor reported that "[t]he report is another signal that the Golden Sun subsidy program is nearing its end."[23] Fengtao Li of China Economic Weekly reported that Golden Sun would be cancelled, even though the same reporter had reported just before the National Audit Office Report that Golden Sun would not be cancelled.[24]

***Defendants were aware of widespread Golden Sun misconduct***

*Fraud*

---

[23] Ray Yu, Vast Subsidy Fraud Revealed in Chinese PV Industry, Solar PV Investor, June 25, 2013, available at <http://tinyurl.com/qzkgsjq>.

[24] *Compare* Fengtao Li, The Golden Sun Project: Fraud with Zero Risk. So Why Not Con? China Economic Weekly, July 1, 2013 *with* Fengtao Li, "Liquidation" is not "Cancellation." PV Golden Sun will not sink, China Economic Weekly, June 8, 2013

85. Yingli plainly knew of the widespread Golden Sun fraud and abuse because it partook in the fraud and abuse: Yingli's Golden Sun projects were extremely profitable because it benefited from at least three different kinds of fraud and abuse.

86. First, according to FE 2, Yingli made false statements about its costs in Golden Sun applications. Yingli's Golden Sun contracts provided solar panels at a typical rate of RMB 6 per watt. Yet in Golden Sun applications, Yingli reported a typical rate of about RMB 10 per watt. Yingli thus overstated the costs of solar panels on its projects by about RMB 4 per watt, resulting in a fraudulent over-subsidy to Yingli and its customers of about RMB 2 per watt.

87. Second, Yingli provided parts that fell below its representations in its subsidy applications. For example, when Yingli's contracts called for use of a 240 watt solar panel, Yingli would use a 235 watt solar panel instead. According to FE 2, such fraudulent substitutions were "widespread." Because Yingli substituted lower-quality, cheaper materials, but received subsidies on projects that assumed higher-quality, more expensive materials, Yingli and its customers earned fraudulent profits from Golden Sun subsidies.

88. According to FE 2, in late 2009 and 2010, the government discovered several instances of fraud in Golden Sun projects. In response, subsidies awarded from September 2010 onwards provided that an inspection of the project should be conducted upon completion. Indeed, the September 21, Notice of Strengthening Golden Sun Program provides that an inspection should be conducted upon completion of a Golden Sun project.

89. And third, according to FE 2, because of Yingli's many intentional substitutions of goods of lower quality than what its contracts stated were to be used, Yingli and its customers' projects did not comply with their subsidized projects' specifications, thus rendering Golden Sun subsidies subject to clawbacks. Yet according to FE 2, Yingli passed the inspections because its "good connections" with the Golden Sun auditors provided it a "certain influence" on the auditors' judgment.

According to FE 2, before a government audit, Yingli's staff would review a project and ensure that a few specific locations in the projects met the subsidy standards. When the government audit team arrived, Yingli staff would direct the audit team to these areas which Yingli had previously prepared for inspection. Because of Yingli's good connections, the audit teams accepted Yingli's directions. More generally, Yingli's good connections ensured that government scrutiny of Yingli's projects was limited.

*Deliberate project delays*

90. According to FE 2, Yingli deliberately delayed construction of Golden Sun projects. Because the subsidies were paid immediately, while costs were only paid when they were incurred during construction, Yingli and its customers thereby obtained interest free loans from the Golden Sun programs. But the benefits often were even more substantial because throughout 2009-2013, prices for solar panels and solar power accessories were falling steeply. Between Q4 2010 and Q4 2012, the cost of producing 1 watt of solar power fell by 54%.[25] FE 2 cites as an example a large and relatively expensive project for which Yingli received a subsidy in very early 2012/late 2011. At that time, Yingli could only complete the project for RMB 13 per watt, the amount reported in the subsidy application. Yet by deliberately delaying construction, Yingli was able to complete the project at a time when its costs had fallen to RMB 7-8 per watt. Yingli and its customers thus earned a fraudulent profit of RMB 5-6 per watt from Golden Sun subsidies awarded for the project.

91. According to FE 3, Yingli submitted applications as soon as they found a seemingly feasible project. Yingli then conducted a quick and dirty feasibility study.

92. According to FE 3, most companies (including both Yingli and its customers) would then deliberately slow down their project completion processes to benefit from quickly falling materials cost. The deliberate delay thus ensured that projects were more profitable. According to FE 3, this was a deliberate policy that

[25] See generally PV Technology and Cost Outlook, 2013-2017, Green Tech Media Research, available at <http://tinyurl.com/zxgeoed>.

Yingli employed generally. In fact, using this deliberate delay, companies were able to complete projects using the subsidy alone.

93. According to FE 3, the deliberate delays were implemented by other companies throughout the solar industry. According to FE 3, the deliberate delays were an open secret in the Chinese solar industry. FE 3 recalls discussing them with his peers at other solar companies.

C. Defendants misleadingly omit to take an allowance for doubtful accounts in connection with Chaori.

94. The 2013 20-F provided that:

> We establish an allowance for doubtful accounts for the estimated loss on receivables when collection may no longer be reasonably assured. We assess collectability of receivables based on a number of factors, including the customer's financial condition and creditworthiness.
>
> 2013 20-F, at 72-73.

95. The 2013 20-F also provided that "[o]ur consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or U.S. GAAP." 2013 20-F, at 3.

96. The Chaori Receivables are the RMB 75.3 million amount owed by Chaori to Hainan Yingli New Energy Co. Ltd. ("Hainan Yingli"), a Yingli subsidiary. These debts relate to work performed by Yingli in 2012.

97. GAAP contain two disclosure requirements triggered by the doubtful collectability of the Chaori Receivable. Accounting Standards Codification ("ASC") 310 provides that an entity which carries assets in the form of receivables, like Yingli did with respect to the Chaori Receivables, must assess such receivables for collectability at each reporting date. This includes the 2013 Form 20-F.

98. If, after performing this assessment, Yingli determined that it was ***probable*** that, as of the date of the financial statements, it would not be able to collect all principal and interest due as scheduled according to the Chaori Receivables' contractual terms, and the amount of loss (i.e., impairment) could have been

***reasonably estimated***, Yingli should have recognized this loss contingency by recognizing a charge to income (i.e., record an expense) with a corresponding establishment of an allowance for doubtful accounts as of the reporting date. ASC 450-20-25-2; ASC 310-10-35-10.

99. Under GAAP, "probable" means that "the future event or events are likely to occur." ASC 310-10-20. Furthermore, to clarify the conditions of recognition of a loss when a future event or events are determined to be probable, ASC 310 states they "are not intended to be so rigid that they require virtual certainty before a loss is recognized." ASC 310-10-35-19.

100. The condition that a loss be reasonably estimable is only intended "to prevent accrual [] of amounts so uncertain as to impair the integrity of th[e] financial statements." ASC 450-20-25-4. Thus, if Yingli determined that it was probable that it would suffer a loss with respect to the Chaori Receivables, and the loss was estimated to be within a range, under GAAP, Yingli should have, at a minimum, recognized a loss, and a corresponding allowance for doubtful accounts, for the lowest amount in the range ***and*** disclose the range. ASC 450-20-25-5.

101. If, however, as of the reporting date of its financial statements, Yingli determined that it was ***reasonably possible*** (as opposed to "probable") that it would not be able to collect the Chaori Receivables, or a portion thereof, and this resulting loss would have a material impact on Yingli's financial statements, Yingli should have, in accordance with GAAP, disclosed in its financial statements/footnotes: (a) that fact (i.e., the possibility of the impairment), and (b) an estimate of the possible loss or range of loss, if such an estimate is possible, or a statement to the fact that such estimate could not be made. ASC 275-10-50-8 & 9.

102. GAAP defines "reasonably possible" as the chance that a "future event or events occurring is more than remote but less than likely." ASC 275-10-20.

103. In determining whether to make such disclosure in accordance with GAAP, specifically ASC 275-10-50, Yingli should have considered all information ***available as of the date the financial statements were filed***. ASC 275-10-50-8.

104. The question to have been considered in determining whether to recognize a loss contingency in accordance with ASC 450-20-25-2 was whether the Chaori Receivables were impaired as of the date of the financial statements. In accordance with GAAP, Yingli should also have considered subsequent events through the date the financial statements were issued if information available to Yingli after the reporting date of its financial statements, but prior to the issuance of such financial statements, indicated that the Chaori Receivables were probably impaired as of the date of the financial statements. ASC 855-10-25-25-1A.

105. GAAP explicitly provides that the further deterioration of Chaori's financial condition between December 31, 2013 and the date the 2013 Form 20-F was issued, April 11, 2014, was such an event that should have been considered by Yingli when it determined whether and how much of an allowance for doubtful accounts it should have recognized relating to this receivable. The following is an example of a subsequent event that GAAP states should be evaluated by an entity through the date that financial statements are issued:

> Subsequent events affecting the realization of assets, such as receivables and inventories or the settlement of estimated liabilities, should be recognized in the financial statements when those events represent the culmination of conditions that existed over a relatively long period of time. For example, a loss on an uncollectible trade account receivable as a result of a customer's deteriorating financial condition leading to bankruptcy after the balance sheet date but before the financial statements are issued or are available to be issued ordinarily will be indicative of conditions existing at the balance sheet date. Thus, the effects of the customer's bankruptcy filing shall be considered in determining the amount of uncollectible trade accounts receivable recognized in the financial statements at balance sheet date.
>
> ASC 855-10-55-1.

106. Yingli filed its 2013 20-F on April 11, 2014. According to Plaintiffs' expert, Harris Devor, CPA, by the time Yingli filed its 2013 20-F, Yingli was aware of information showing that no reasonable accountant would have failed to either establish an allowance for doubtful account or disclose a reasonably possible loss with respect to the Chaori Receivable.

***March 18, 2013 letter***

107. On March 18, 2013, Chaori sent Yingli a letter acknowledging that Chaori owed Yingli payments in March 2013, but would not be able to pay what it owed until the end of 2013. Chaori requested an extension to pay until the end of 2013.

***Bounced checks***

108. Between October 27, 2012, and November 9, 2012, Chaori "paid" Yingli RMB 75.3 million in purported satisfaction of the Chaori Receivables via eleven Chinese financial instruments similar to post-dated checks, dated in April/May 2013. All eleven checks bounced when they were presented for payment upon coming due. The reasons the banks provided for the checks bouncing were that (a) there was no money in Chaori's accounts, and/or (b) the funds in those accounts had been frozen by a court order.

***Lawsuit and judgment***

109. In April 2013, Yingli sued Chaori in Chinese court for RMB 75.3 million owed to Yingli, and past due as of March 2013.

110. Chaori did not defend itself. It did not retain counsel. It did not submit a written response to Yingli's lawsuit. Nor did it object to the admissibility of any evidence Yingli offered. The one-day trial took place in July 2013.

111. On September 1, 2013, the Court entered judgment in Yingli's favor.

112. Satisfaction of the judgment was due within 10 days of the judgment. Chaori did not appeal.

113. Yingli had not collected on the judgment by April 11, 2014, the date the 2013 20-F was issued.

114. Defendant Miao was Hainan Yingli's legal representative. As such, only Defendant Miao could authorize legal action on Hainan Yingli's behalf, including the filing of the lawsuit against Chaori, and any steps to enforce the judgment.

115. The facts set out in Paragraphs 107 and 108, above, and 117, below, above, were proved at trial with evidence submitted by Yingli, and were set out in the judgment entered in Yingli's favor.

***Chaori's financial condition***

116. According to its accounts receivable impairment policy as described in its 2013 Form 20-F, Yingli "assess[es] collectability of receivables based on a number of factors, including the customer's financial condition and creditworthiness."

117. On January 31, 2013, a special notice was filed on CNInfo, a repository of Chinese issuers' regulatory filings similar to EDGAR. This special notice included a statement from Chaori that "[a]t present, Chaori Solar's liquidity difficulties have not been alleviated." The difficulties listed by Chaori included: (a) RMB 470 million in overdue bank loans that had not been renewed or extended and were in breach (b) approximately RMB 647 million in lawsuits, including RMB 350 million in lawsuits filed by banks over defaulted in bank loans, RMB 167 million in lawsuits from suppliers, and RMB 130 million in lawsuits from other creditors (c) that Chaori's main bank accounts and assets were all frozen, mortgaged, or pledged, and (d) that 4 of 6 of Chaori's production lines in its main facilities had been indefinitely discontinued.

118. In 2012, Chaori issued RMB 1 billion of RMB-denominated bonds that were publicly traded on the Shenzhen Exchange. The Chinese firm Pengyuan Ratings was employed to rate Chaori's bond issue. It downgraded Chaori's bonds 5 times between June 2012 and May 2013. The final downgrade, which was reported on Bloomberg, was to CCC, or extremely speculative.

119. Moreover, according to certain analysts, Chinese ratings agencies tend to provide unjustifiably high ratings, at least compared to U.S. firms. According to the Wall Street Journal, as of June 30, 2015, over 97% of RMB-denominated bonds were

rated investment-grade (BBB- or higher). Exhibit B to the Declaration of Harris Devor, CPA, Concerning Chaori Receivables (the "Devor Declaration").

120. On October 28, 2013, Chaori filed its 2013 third quarter financial statements. In these financial statements, Chaori reported current assets of RMB 2.8 billion, against current liabilities of RMB 4.2 billion, and cash and cash equivalents of only RMB 62 million.

121. As of August 2013, more than 50 banks and suppliers had sued Chaori over unpaid debts totaling approximately RMB 2.2 billion.

***Default and bankruptcy***

122. Before the 2013 20-F was issued, it was obvious that Chaori would shortly enter bankruptcy proceedings.

123. On March 5, 2014, Chaori publicly announced on CNInfo that it would be unable to pay an RMB 89.8 million interest payment due March 7, 2014 on its RMB-denominated RMB 1 billion bond issue. Instead, Chaori announced that it would only be able to pay RMB 4 million.

124. Chaori's default was widely reported, including in Bloomberg, the Wall Street Journal, Reuters, the BBC, and the South China Morning Post. These articles are attached as Exhibits C, D, E, and F to the Devor Declaration. Notably, a Bank of America analyst noted that the default could prove to be China's "Bear Sterns moment," because it represented the first default on RMB-denominated bonds. (Exhibit C). According to Reuters, Chaori's default had a noticeable impact on the overall Chinese economy, as it caused yields on AA- rated debt to immediately increase more than 0.5%. (Exhibit D).

125. On March 17, 2014, Chaori received a notice from the Chinese court administering Yingli's collection proceeding demanding that Chaori satisfy the September 1, 2013 judgment. The notice provided that no part of the judgment had been satisfied. The notice was issued in response to a collection proceeding filed by

Yingli. Only Defendant Miao, as Hainan Yingli's legal representative, could authorize filing of the collection proceeding.

126. On April 4, 2014, Chaori reported that a creditor had sought to place it into a bankruptcy restructuring proceeding in the Shanghai No. 1 Intermediate People's Court. According to Chaori's announcement, "the creditor filed the application because of Chaori['s] inability to pay the debts due and to stay solvent."

127. Chaori's announcement also provided:

> The Company has lost all credit. The implementation of the debt payment emergency guaranty plan cannot be guaranteed. Some of the guaranty measures cannot be implemented.

128. Chaori thus told creditors that they would not be paid at least some of what was owed to them.

129. Chaori ultimately entered bankruptcy in July 2014. Unsecured creditors like Yingli eventually recovered the first RMB 200,000 of their claim and 20% of the balance, and that only after Chaori was acquired by a Chinese state-owned enterprise that promised to make good on some of Chaori investors' losses.

130. According to Plaintiffs' accounting expert Harris Devor, CPA, no reasonable accountant would deny that, as of the date of the 2013 Form 20-F on April 11, 2014, Chaori was ***probably*** unable to pay the Chaori Receivables due Yingli, or at a minimum, that such inability to pay was a ***reasonable possibility***. In fact, any reasonable accountant would determine that the provisions of ASC 450-20 and Yingli's own stated accounting policy required Yingli to either recognize a loss contingency and related allowance for doubtful accounts with respect to the uncollectable portion of the Chaori Receivables of RMB 75.3 million, or at a minimum disclose that such a loss was reasonably possible.

131. First, a trade receivable held by a company that has or will soon file for bankruptcy is a textbook example of a situation showing that a loss is probable.

132. Second, at a minimum, it was reasonably possible that Chaori would not be able to pay the Chaori Receivable. Moreover, in light of the newness and importance of the Chinese market to Yingli, it was plain that the failure to collect the Chaori Receivables was material to Yingli's financial statements.

133. Third, it is plain that collectability of a large debt from a debtor on the verge of bankruptcy is not reasonably assured.

134. Yet, in 2013, Yingli did not record any allowance for doubtful account related to Chaori. Indeed, that year, Yingli recognized a total allowance for doubtful account of only RMB 20.0 million.

135. On April 30, 2014, 19 days after filing the 2013 20-F that did not recognize an allowance for doubtful accounts in connection with the Chaori Receivables, Yingli completed a public offering of 25 million ADSs, raising net proceeds of $83.0 million.

***The failure to include an allowance for loan losses in connection with the Chaori Receivables rendered the 2013 20-F materially false***

136. An allowance for doubtful accounts results in a charge against net income. Yingli's 2013 net loss was about RMB 2.1 billion. In 2013, Yingli earned approximately 30% of its revenues in the PRC. If sales in the PRC are as profitable, on average, as sales in the rest of the world, then Yingli's 2013 net loss attributable to its sales in China was approximately RMB 630 million. The Chaori Receivables accounts for, at a minimum, 3.5% of Yingli's total net loss, and 12.0% of its net loss attributable to Chinese operations.

137. Yingli's recognition of an allowance for doubtful account arising from the Chaori Receivables would have been material to investors. As further set out above, in 2013, Yingli was in the process of shifting its sales' center of gravity from Europe to China. Accordingly, information concerning Yingli's nascent Chinese market was especially relevant to investors. Moreover, that Yingli was severely exposed to an event

that an analyst theorized could be China's "Bear Sterns moment" made the disclosure even more salient.

***Defendants Miao and Wang were personally responsible for the failure to recognize an allowance for doubtful accounts in connection with the Chaori Receivables***

138. The SOX tasks a company's Principal Executive and Financial Officers (in Yingli's case, its CEO and CFO) with designing disclosure controls to ensure that material information is disclosed to investors. Disclosure controls are defined as:

> [T]he term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.
> 17 C.F.R. § 240.13a-15(e)

139. The SOX also mandates that the Principal Executive and Financial Officers evaluate and attest to these disclosure controls in certifications accompanying every 20-F, including the 2013 20-F. Defendants Miao and Wang accordingly filed public certifications accompanying the 2013 20-F providing in relevant part that they each:

> The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> []
> (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation[.]

140. Included in the 2013 20-F was the result of their evaluation:

> As of the end of the period covered by this annual report, an evaluation has been carried out under the supervision and with the participation of our management, including our chief executive officer and our chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rules 13a-15[(e)] and 15d-15(e) promulgated under the Exchange Act. Based on that evaluation, our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures are effective in ensuring that material information required to be disclosed in this annual report is recorded, processed, summarized and reported to them for assessment, and required disclosure is made within the time period specified in the rules and forms of the Commission.

141. SEC and NYSE rules and regulations require that public companies such as Yingli include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. §13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

142. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles ***will be presumed to be misleading or inaccurate***." [17 C.F.R. § 210.4-01(a)(1)] (emphasis added).

143. Therefore, ensuring that financial statements are presented in accordance with GAAP falls squarely within the requirements of disclosure controls.

144. According to FE 1, Yingli conducts formal reconciliations every month with the customer's accounting department. Notwithstanding these reconciliations, Yingli prefers not to recognize a provision for doubtful accounts because it affects the company's reported financial performance. According to FE 1, the accounting department records a provision for doubtful accounts solely as a last resort.

D. Loss causation

145. On March 25, 2015, Yingli announced its financial results for Q4 2014, disclosing that Yingli was recording a bad debt provision of RMB 90.5 million in Q4 2014, or about ($0.08) per share.

146. The allegations in this complaint establish the bad debt provision arose from private domestic (Chinese) customers, including Chaori. Yingli only recognized an allowance for doubtful accounts of RMB 20.1 million in 2013, or far less than the Chaori Receivable. After Chaori's bankruptcy plan was approved in October 2014, it was a certainty that Yingli would not recover more than 20% of the Chaori Receivable.

147. On March 25, 2015, Yingli's stock price fell from its previous close of $2.34/ADS to $1.99/ADS, or 15.0%, damaging investors.

148. On May 15, 2015, Yingli filed its 2014 20-F.

149. The 2014 20-F disclosed that Yingli was writing off RMB205.9 million of overdue accounts receivable, or $33.2 million. Approximately RMB 60 million of this write off arose from the Chaori Receivable.

150. On May 18, 2015, the next trading day, Yingli's stock price fell from its previous close of $1.70/ADS to $1.49/ADS, or 12.4%, and it continued to fall to $0.94/ADS, or by 37.0%, the following day, damaging investors.

## VII. PLAINTIFFS COMPLIED WITH THE STATUTE OF LIMITATIONS AS TO THE GOLDEN SUN ALLEGATIONS[26]

151. This Action was filed on May 28, 2015, and Plaintiffs' claims have a statute of limitations of 2 years.

152. Plaintiffs are individual investors and do not read Chinese or speak Mandarin. Plaintiffs did not review the May 20, 2013 Caijing article, or a March 15, 2013 Chinese-language article published in the China Business News Daily, which in any case did not discuss Yingli. The Caijing article was not reported on Bloomberg or anywhere in the English language press. Even had Plaintiffs reviewed the Caijing article, they would not have been able to confirm the reporter's account in the eight days between May 20, 2013 and May 28, 2013. While the Caijing article listed the name of the reporter, it did not list any contact information for the reporter. When Plaintiffs sought to arrange an interview with the reporter (after the filing of this lawsuit) through Caijing, leaving multiple voicemail messages over a period of days to multiple different departments of Caijing, Caijing did not return Plaintiffs' calls. Lead Plaintiffs are based in Illinois, while Named Plaintiff is based in Colorado, and are in time zones respectively 11 and 10 hours apart from China. Further, because Plaintiffs do not speak Mandarin, they would have had to retain a Chinese-speaking interpreter to assist them with the journalist.

153. Nor could Yingli have confirmed the reports of the sales head quoted in the Yingli article. As an issuer subject to the securities laws of the United States, Yingli is prohibited from selectively disclosing material non-public information. Regulation FD [17 C.F.R. § 243.100(a), (b)(iv)].

154. Nor is it unreasonable for Plaintiffs to invest in Yingli even though they do not speak Chinese. As an SEC-filing issuer, Yingli was required to provide annual

[26] There is no question that Plaintiffs complied with the statute of limitations as to the Chaori Receivables allegations.

financial statements and periodic updates in its SEC filings. All SEC filings must be in English.[27] Further, Yingli's conference calls were conducted in English, not Mandarin.

155. Yingli is closely followed by stock analysts who issue periodic reports updating investors on developments. During the period from March 14, 2013 to May 28, 2013, analysts from Deutsche Bank, UBS, Credit Suisse, Oppenheimer & Co., Roth Capital partners, Maxim Group, Macquarie Capital, Morningstar Research, and Trefis each issued at least one report on Yingli. Not one analyst report mentioned that there were allegations of widespread fraud in Golden Sun.

156. Further, the Caijing article did not provide definitive proof that Yingli knew or was reckless in not knowing that its own statements about Golden Sun were false. While the Caijing article showed that Yingli's projects were responsible for some of the fraud and abuse, it did not show that Yingli itself ***knew*** that its projects were non-compliant or that Yingli engaged in any intentional fraud itself.

## VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER AND MATERIALITY

157. During the Class Period, Yingli's financial condition became ever more precarious.

158. At the same time, during the Class Period, accounts receivable became Yingli's largest asset.

159. Yingli used accounts receivable to meet its immediate cash flow needs. For example, Yingli sold accounts receivable and used them as security for short-term loans.

160. Accordingly, any fact that cast doubt on Yingli's receivables' collectability would impair its ability to raise the funds it needed to pay its obligations as they came due.

---

[27] See SEC Release No. 33-8099 *et seq.*, Section II.C., available at <https://www.sec.gov/rules/final/33-8099.htm#treatment>.

| *In thousands U.S. dollars* | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Accounts receivable as of December 31: | 289,291 | 338,483 | 583,321 | 697,710 | 655,808 |
| Accounts receivable sold during the year ended December 31: | 255,297 | 54,635 | 35,838 | 111,964 | 30,319 |
| Accounts receivable used as security for loans as of December 31: | 0 | 2,062 | 0 | 53,290 | 72,009 |

161. The Chaori Receivables were, in fact, the start of substantial increases in Yingli's allowance for doubtful accounts due to Chinese clients. In 2015, Yingli recognized RMB 404.3 million in allowances for doubtful accounts, or 7.1% of its net loss of RMB 5.6 billion, and 4.0% of its revenues of RMB 10.0 billion.

162. In 2016, Yingli recognized allowances for doubtful accounts of RMB 261 million, or 13.1% of its net loss of RMB 2.0 billion.

## IX. CLASS ACTION ALLEGATIONS

163. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Yingli's securities between December 2, 2010 and May 15, 2015, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

164. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Yingli's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown

to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Yingli ADSs were traded publicly during the Class Period on the New York Stock Exchange. At the end of the Class Period, Yingli had 181,763,770 Ordinary Shares outstanding, including 128,592,337 ordinary shares represented by ADSs. Record owners and other members of the Class may be identified from records maintained by Yingli's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

165. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

166. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

167. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Yingli;

(c) whether the Individual Defendants caused Yingli to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Yingli ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) to what extent the members of the Class have sustained damages and the proper measure of damages.

168. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

169. The market for Yingli's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Yingli's securities traded at artificially inflated prices during the Class Period. On February 18, 2011, the Company's ADSs closed at a Class Period high of $13.34 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Yingli's securities and market information relating to Yingli, and have been damaged thereby.

170. During the Class Period, the artificial inflation of Yingli's ADSs was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Yingli's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Yingli and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all

relevant times, and when disclosed, negatively affected the value of the Company ADSs. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

171. At all relevant times, the market for Yingli's securities was an efficient market for the following reasons, among others:

(a) Yingli's ADSs met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) as a regulated issuer, Yingli filed periodic public reports with the SEC;

(c) Yingli regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Yingli was followed by at least 8 securities analysts employed by brokerage firms who wrote reports about the Company during the Class Period, including Credit Suisse Securities (USA) LLC, Deutsche Bank AG, RBC Capital Markets, and Arete Research, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e) On average, 17% of Yingli's outstanding ADSs were traded weekly, permitting a very strong presumption of that its shares traded on an efficient market;

(f) More than 270 market makers made a market in Yingli's ADS; and

(g) New company-specific information was rapidly reflected in Yingli's stock price.

172. As a result of the foregoing, the market for Yingli's securities promptly digested current information regarding Yingli from all publicly available sources and

reflected such information in Yingli's stock price. Under these circumstances, all purchasers of Yingli's securities during the Class Period suffered similar injury through their purchase of Yingli's securities at artificially inflated prices and a presumption of reliance applies.

173. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

174. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false

or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Yingli who knew that the statement was false when made.

## XII. FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

175. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Yingli's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

177. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Yingli's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

178. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Yingli's financial well-being and prospects, as specified herein.

179. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Yingli's value and performance and continued substantial growth, which included the

making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Yingli and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

180. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

181. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Yingli's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

182. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Yingli's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Yingli's securities during the Class Period at artificially high prices and were damaged thereby.

183. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Yingli was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Yingli securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

184. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

185. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XIII. SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

186. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

187. The Individual Defendants acted as controlling persons of Yingli within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

188. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

189. As set forth above, Yingli and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual

Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 24, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
By/s/ *Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
Jonathan Horne (pro hac vice)
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (310) 407-7502
Email: lrosen@rosenlegal.com
Email: jhorne@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on April 24, 2017, I filed the foregoing CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS through the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 24, 2017 /s/ Laurence M. Rosen.